file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS

2
    JAMES M. CYZE,                    )
3                    Plaintiff,    )
                                      )
4          -vs-                  ) No. 07-L-003638
                                      )
5    R.R. DONNELLEY & SONS COMPANY,  )
    a Delaware corporation and      )
6    successor in interest to BANTA  )
    CORPORATION, a Wisconsin        )
7    corporation, STEPHANIE A.       )
    STREETER, an individual, and    )
8    MICHAEL B. ALLEN, an individual, )
                    Defendants.   )
9    _____)


10


11              The deposition of MICHAEL BRENNAN

12    ALLEN, called by the plaintiff for examination,

13    pursuant to notice, and pursuant to the provisions of

14    the Rules of Civil Procedure for the District Courts of

15    the United States, taken before Judy A. Landauer, CSR,

16    a Certified Shorthand Reporter and Notary Public within

17    and for the County of Cook and State of Illinois, at

18    321 North Clark Street, Suite 2800, Chicago, Illinois,

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19     on January 8, 2009, at the hour of 10:00 o'clock A.M.

20

21

22

23

24

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

2

1    P R E S E N T :
     _ _ _ _ _ _ _

2        STEPHEN P. CARPONELLI, ESQ.
             (of the firm of Messrs. Carponelli & Krug,
3             230 West Monroe Street, Suite 250,
              Chicago, Illinois 60606)
4             appeared on behalf of the plaintiff;

5        MICHAEL A. BOWEN, ESQ.
             (of the firm of Messrs. Foley & Lardner,
6             LLP, 777 East Wisconsin Avenue, Milwaukee,
              Wisconsin 53202-5306)
7             appeared on behalf of the defendants.

8

9            I N D E X
             _ _ _ _ _

10   WITNESS
     _____

11   Michael Brennan Allen

12   Direct examination by Mr. Carponelli . . . . Page 3
     Cross-examination by Mr. Bowen . . . . . . . Page 182
13   Redirect examination by Mr. Carponelli . . . Page 194
     Recross-examination by Mr. Bowen . . . . . . Page 199
14   Redirect examination (Resumed)
                 by Mr. Carponelli . . . Page 202
15   EXHIBITS
     _____

16
     Deposition Exhibit No. 15. . . . . . . . . . Page 35

17    Deposition Exhibit No. 16. . . . . . . . . Page 75

      Deposition Exhibit No. 17. . . . . . . . . Page 95

18    Deposition Exhibit No. 18. . . . . . . . . Page 101

      Deposition Exhibit No. 19. . . . . . . . . Page 109

19    Deposition Exhibit No. 20. . . . . . . . . Page 166

      Deposition Exhibit No. 21. . . . . . . . . Page 169

20    Deposition Exhibit No. 22. . . . . . . . . Page 170

      Deposition Exhibit No. 23. . . . . . . . . Page 180

21    Cyze Deposition Exhibit No. 2. . . . . . . Page 48

      Jones Deposition Exhibit No. 1 . . . . . . . Page 80

22    Armbruster Deposition Exhibit No. 12 . . . . Page 90

      Jones Deposition Exhibit No. 3 . . . . . . . Page 105

23    Complaint Exhibit No. 6. . . . . . . . . . Page 112

      Complaint Exhibit No. 7. . . . . . . . . . Page 113

24    Complaint Exhibit No. 8. . . . . . . . . . Page 114

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

3

1          MR. CARPONELLI:  Let the record

2     reflect that this is the deposition of

3     Michael Allen taken pursuant to notice,

4     from time to time continued until this

5     date, time, and place, and let the record

6     further reflect that this deposition is

7     being taken in accordance with the

8     applicable provisions of the Federal Rules

9     of Civil Procedure.

10               MICHAEL BRENNAN ALLEN

11   having been first duly sworn, was examined and

12   testified as follows:

13               DIRECT EXAMINATION

14               BY MR. CARPONELLI

15     Q.   Would you state your name, please?

16     A.   Michael Brennan Allen.

17     Q.   Mr. Allen, would you give me your

18   current address, please?

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      A.    433 South Lincoln Street, Hinsdale,

20   Illinois 60521.

21      Q.    And how long have you lived at that

22   address?

23      A.    Approximately 19 years.

24      Q.    And with whom do you reside there?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

4

1      A.    With my wife and my two children.

2      Q.    Okay.  And are you currently

3    employed?

4      A.    I am currently C.E.O. of a company

5    called Leveler Protective Technology.

6      Q.    And where are they located?

7      A.    Downers Grove, Illinois.

8      Q.    And what do they do?

9      A.    It's a small technology startup.

10   They have some patents, and we're trying to get

11   product manufactured and developed into the

12   market.

13          It's a small six-person company.

14     Q.    Okay.  Are you an owner?

15     A.    No.

16     Q.    Is it owned by a private equity

17   group?

18     A.    Now, it's a -- it's a private LLC.

19      Q.   Okay.  Are any of the investors

20   affiliated with Madison Partners, Madison Dearborn

21   Partners?

22      A.   No.

23      Q.   Okay.  What is your current age?

24      A.   I'm 49.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1     Q.   And the date of your birth?

2     A.   November 18, 1959.

3     Q.   And your Social Security number?

4     A.   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.

5     Q.   Do you have any military service?

6     A.   No, I do not.

7     Q.   Okay.  And you have no criminal

8   record?

9     A.   I have no criminal record.

10     Q.   Could we go through your education

11   just briefly?

12     A.   I assume you mean just college

13   education?

14     Q.   Sure.

15     A.   I went to Lawrence University in

16   Appleton, Wisconsin and graduated in 1982 with a

17   B.A.

18       MR. CARPONELLI:  Off the record.

19                    (Whereupon a discussion

20                    ensued off the record.)

21          MR. CARPONELLI   Q.   Do you belong to any

22   professional associations?

23          THE WITNESS   A.   No.

24          Q.   Okay.  Have you received any awards

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

6

1    for competence or excellence as it relates to

2    business management or anything like that?

3         A.    Not outside of the companies that I

4    was employed by.

5         Q.    Okay.  What is your expertise in

6    terms of business generally, would you say?

7         A.    I'm not sure I understand.

8         Q.    Are you a marketing guy, a numbers

9    guy?

10        A.    I started my career with R.R.

11   Donnelley and I was in sales, and then after seven

12   years or so in sales I moved into management and

13   then moved through a number of general management

14   ranks, different business units that I ran.

15        Q.    So would you say that your expertise

16   is management?

17        A.    Yes, I would say the vast majority of

18   my business career has been in management, and

19    prior to that it was in sales.

20        Q.   Okay.  Could you basically run

21    through your employment history with me, beginning

22    with your current employer, Leveler, and tell me

23    how long and then just take it back for 15 or 20

24    years?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1  A. I joined Leveler in January of 2008.

2 Prior to that I worked for Banta Corporation as

3 the print sector president.

4   I joined Banta in January of 2004 and

5 was discharged from the company in January of

6 2007, I guess that was, when R.R. Donnelley

7 completed the acquisition of Banta.

8  Q. Okay.

9  A. Prior to Banta I spent -- I'd have to

10 go through the actual math, but about 21 years

11 with R.R. Donnelley.

12   And if you want me to go in reverse

13 order of what I did for R.R. Donnelley, the last

14 position was executive vice-president reporting to

15 the chairman with responsibility for sales and

16 marketing of Donnelley Print Solutions.

17  Q. Was the chairman at that time, the

18 last chairman, was that Mark Engelson?

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      A.   No.  R.R. Donnelley and Moore Wallace

20   came together, combined in 2004, after I had left.

21      Q.   And that's when Engelson took over?

22      A.   Yes.  So prior to being executive

23   V.P. of Donnelley Print Solutions -- that position

24   started in 2000 -- 2001, I believe it was.  It

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

8

1    might have been in 2002.

2            Prior to that I was executive

3    vice-president over what we called core commercial

4    print, which was a combination of the printing

5    businesses for magazines, catalogues, and retail

6    inserts.

7            Those three businesses and they --

8    and their respective presidents reported to me at

9    Donnelley.

10           I was in that position starting in

11   2000.  Prior to that I was president of R.R.

12   Donnelley's book printing business unit.

13           I took that position in late 1997.

14   Prior to that I was president for a very short

15   period of time for R.R. Donnelley's information

16   services group.

17           That was only a nine-month stint.  We

18   shut down that business.  Prior to that I was

19    president of R.R. Donnelley's retail printing

20    services group.

21        That started in -- I'd have to check

22    my resume, but 1995, I think it was.  Prior to

23    that I was senior vice-president of sales and

24    marketing for retail services, and that was from

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    1993 to 1995, if I recall.

2         You want me to keep going all the way

3    back?

4    Q.    No, that's good enough.

5    A.    There's only like two or three other

6    positions.

7    Q.    Yes.  That's good enough.  Thank you.

8    That was comprehensive.  I appreciate it.  Now,

9    I'm going to call your attention to the period of

10   time from January of '04 to January of '07.

11        If you could give me a breakdown in

12   January of '04 to January of '07, which is the

13   time you worked at Banta, let me know what your

14   positions were, and then I'll ask you about your

15   duties and responsibilities.

16   A.    I had only the one position that

17   I -- that I mentioned.  I was executive -- excuse

18   me.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19          I was print sector president.

20     Q.     Okay.  And who reported to you?

21     A.     When I joined the company in January

22 of '04 I had four business unit presidents

23 reporting to me.

24          In the middle of '04 we added a fifth

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

10

1    business unit as a result of a small little

2    restructuring that we had, so for the balance of

3    time I had five presidents reporting to me, until

4    the restructuring in July of 2006, when we

5    consolidated down to two direct reports.

6        Q.    Okay.

7        A.    I can give you the names, if you need

8    them.

9        Q.    In the -- and correct me if I'm

10   wrong.  One of the direct reports to you during

11   this entire period of time was Jim Cyze?

12       A.    Yes.

13       Q.    And how often did you interact with

14   him during this period of time, let's say, '04 to

15   '07?

16       A.    I would have interacted with Jim Cyze

17   several times a week.  We both worked in the same

18   physical office in Oak Brook, Illinois, but, you

19    know, travel schedules and things might be such

20    that I wouldn't see Jim every day.

21         Q.   Okay.  And did you report to

22    Stephanie Streeter?

23         A.   I did report to Stephanie Streeter.

24         Q.   Okay.  And correct me if I'm wrong.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   The five group presidents that reported to you did

2   not report to Stephanie Streeter?

3       A.   No, they reported to me throughout

4   the entire time that I was at Banta.

5       Q.   Okay.  How often did you interact

6   with Stephanie Streeter throughout the period of

7   January '04 through January '07?

8       A.   I would interact with Stephanie

9   multiple times a week, sometimes by phone,

10   sometimes face to face.

11      Q.   Where was her office?

12      A.   Her office was in Nina -- excuse me,

13   Menasha, Wisconsin, which is where the corporate

14   headquarters was.

15      Q.   Would you travel up there on

16   occasion?

17      A.   I would travel up there usually every

18   couple of weeks.  I usually would go up, spend a

19    night or two, and then drive back home.

20         Q.    Okay.  When she interacted with you

21    would on occasion she come down to the Oak Brook

22    office or would you always go to Menasha?

23         A.    No, on occasion she'd come to

24    Oak Brook.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

12

1      Q.   Okay.  How often?

2      A.   I would say Stephanie would be in the

3   Oak Brook office quarterly.  We also would

4   interact at various facilities.

5           We would get around to various

6   offices and manufacturing locations as a practice,

7   so that we could interact with people who were out

8   in the field.

9      Q.   Okay.  During this period of time

10   while you were at Banta did you interact with Mr.

11   Kneezel?

12      A.   I did interact with Ron Kneezel.

13   Ron Kneezel was our general counsel and secretary.

14      Q.   And how often?

15      A.   I would interact with Ron Kneezel

16   several times a month.  If we were involved in

17   a -- in a project I might interact with Ron

18   several times a week.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      Q.   And where was he located?

20      A.   Ron was also in the corporate

21   headquarters in Menasha, Wisconsin.

22      Q.   Okay.  Did you know Jim Cyze before

23   you went to work for Banta?

24      A.   Yes.  The first time I met Jim Cyze

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    was in the fall of 2003, when he interviewed me

2    for the position at Banta.

3        Q.    What position was that?

4        A.    The position I was ultimately hired

5    into, president of the print sector.

6        Q.    And how did it happen that he was

7    interviewing for the president of the print

8    sector?

9        A.    I don't know.  I would speculate that

10    he had been asked by Frank Rudolph, the head of

11    corporate HR, and by Stephanie Streeter to

12    participate.

13              I interviewed with all of the people

14    who would ultimately report to me.

15        Q.    Okay.  Did you know him at all when

16    you worked at Donnelley?

17        A.    No, I did not know Jim.

18        Q.    Okay.  Did you know he had worked at

19    Donnelley?

20        A.   I did after -- when we interviewed

21    together we shared experiences from Donnelley.  He

22    worked in the financial printing unit of R.R.

23    Donnelley.

24            And I don't expect you to remember

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

14

1    all of the units that I worked in at Donnelley,

2    but it was one of the units I had never worked in,

3    never had any responsibility for.

4        Q.   Okay.  Did you have an impression of

5    Cyze's competence when you met him for the first

6    time?

7        A.   I'm sure I had an opinion at the

8    time, but I don't remember what it would have been

9    in the fall of '03.

10       Q.   But you hadn't actually interacted

11   with him before the interview?

12       A.   No.  I met him -- we met at an

13   off-site location.  It was the Drake Hotel in

14   Oak Brook.

15           I met with him and I met with two

16   other people in separate meetings, as I recall.

17       Q.   Okay.  Did you voluntarily leave

18   Donnelley?

19      A.    Yes.

20      Q.    So have you ever been the subject of

21   a termination or a suspension of your work

22   activities?

23      A.    Well, I was terminated from Banta

24   after the acquisition by R.R. Donnelley.  I've had

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

15

1    my position eliminated when I was inside of

2    Donnelley as a result of restructurings, where

3    that came close to me having to leave the company,

4    but ultimately I found alternative positions

5    inside the company.

6        Q.   Okay.  Were you involved in the

7    decision to terminate Jim Cyze?

8        A.   Yes, I was involved in terminating

9    Jim Cyze and the decision to do so.

10       Q.   Okay.  Can you remember, when was the

11   first time that you discussed the termination of

12   Jim Cyze?

13       A.   The termination of Jim Cyze was

14   related to the print sector restructuring that was

15   publicly announced in July of 2006.  We began

16   planning that in February of 2006.

17           The first time I would have discussed

18   with Stephanie Streeter who I thought should go

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    into the remaining positions would have been in

20    the March/April time frame of 2006.

21        Q.    Okay.  Do you have notes or memos

22    that reflect your -- that concept that --

23        A.    I'm not in possession of any of the

24    notes.  When I was terminated from Donnelley I

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

16

1   left all of my --

2   Q.   Okay.

3   A.   -- work correspondence there.

4   Q.   And it's your recollection that you

5   did have some notes dating back to March or April

6   as it related to Cyze and his termination?

7   A.   There are -- there were -- there were

8   notes, there were -- we had -- a little

9   background.

10      The discussion around the print

11  sector restructuring was part of the strategic

12  planning process that we did annually at the

13  company, so we had -- we had work plans that were

14  laid out that I was involved in.

15      Sara Armbruster was involved in

16  driving that process, so there had been notes and

17  documents associated with that.

18      When the initial discussion about the

19   print sector restructuring was raised with

20   Stephanie she asked me to come back -- in the

21   initial meeting there were no documents that I

22   remember.

23          There may have been handwritten

24   notes.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

17

1       Q.     And when was that initial meeting?

2       A.     That would have been about February

3   of 2006.

4       Q.   Okay.

5       A.     That was with Sara Armbruster and

6   Stephanie Streeter in Stephanie's office, and it

7   was part of our discussions about the strat

8   planning process and the review process that we

9   were going to have for '06.

10      Q.     And you're saying strategic planning

11   process --

12      A.     Yes.

13      Q.     -- and review plan?

14      A.     Right.  Every year we would do -- we

15   would -- we would start every year with a

16   strategic planning process that culminated with a

17   two-day strategic review with our Board of

18   Directors at the July Board meeting.

19      Q.   Okay.

20      A.   And we started that in February,

21   because Sara -- we always started early, but I

22   remember starting it particularly early in '06,

23   because Sara was leaving on pregnancy leave.

24      Q.   Okay.  Correct me if I'm wrong.  Is

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

18

1  it true that the strategic planning review

2  sessions were somewhat freeform and did not become

3  firm until sometime before the Board meeting that

4  took place annually, if you know?

5      A.   In my experience at Banta, which is

6  '04 to '07, the strategic planning process was not

7  freeform.  It was structured.

8          It was very detailed.  We put a lot

9  of effort into it both at the corporate level and

10  at the individual business unit level.

11     Q.   But when you're talking about the

12  strategic plan, wasn't it originally formed in

13  '04?

14     A.   The strategic plan -- there may have

15  been strategic plans -- in fact, I know there were

16  strategic plans prior to '04.

17     Q.   Okay.  But the one -- the first one

18  that you were involved in --

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      A.    The first one I was involved in was

20    in 2004, because I wasn't employed.

21      Q.    And that's the one that has the four

22    cornerstones?

23      A.    Right.  We did some work -- we did a

24    very extensive amount of work in the strategic

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19

1    planning process.  We set out a long-term

2    strategy.

3            The way the process worked inside

4    Banta, and even when I was at Donnelley, was you

5    would start the year reviewing the long-term

6    strategy of business.

7            You would go into a structural review

8    to make sure that the structure that you had in

9    place was consistent with what you were trying to

10    do strategically.

11            In the summer you would do an HR

12    review to make sure you had the talent so that you

13    could execute the strategy, and then you would

14    culminate with an annual operating budget that was

15    created in the fall consistent with the long-term

16    strategy that you would then execute in the

17    following year, and then the process would begin

18    anew after the first of the year with a new

19    strategic planning review.

20         Hopefully you don't change your

21    strategy frequently, but you do it annually, so

22    that you can make adjustments, if necessary.

23         Q.   Okay.  So the original strategic plan

24    went into effect in '04.  You were involved in

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

20

1   that, and then there was an annual update on that,

2   is that correct?

3       A.   There were annual updates.  We did an

4   annual update in '05, and then we modified the

5   strategy in '06.

6       Q.   Okay.  And that would have started in

7   February, and when would it have been -- when

8   would it have been finalized on the '06

9   modification?

10      A.   We would have started it -- we would

11  have started it in January/February of 2006 as

12  part of the normal process.

13          It would have gone to the Board for

14  the two-day strategic plan review and discussion

15  that we held every year in July, so we had a

16  two-day Board meeting.

17      Q.   Okay.

18      A.   Normally our Board meetings were a

19    single day, but the July meeting was two days.

20         Q.   It was the 24th and 25th of 2006, is

21    that correct?

22         A.   I'd need a calendar, but that sounds

23    right.  It was usually the third Monday or so of

24    the -- of the month.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      Q.    Okay.  Is it fair to say that the '06

2   strategic plan was finalized in July?

3      A.    It was approved by the Board in the

4   July meeting, yes.

5      Q.    Okay.  So is it fair to say that, as

6   it relates to the corporate structure of Banta,

7   for the strategic plan to be modified it would

8   require Board approval?

9      A.    Yes.  Stephanie did not feel that

10   taking a structural change to the company, which I

11   had proposed, was something that she could do

12   unilaterally and that it would require Board

13   approval.

14      Q.    Okay.

15      A.    And I do know that she took it to the

16   Board prior to the Board meeting in July.

17      Q.    Okay.  At a meeting of the Board?

18      A.    She took it -- as I understand it

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    from our conversations, she took it to the

20    Executive Committee of the Board, which was a

21    subset of the Board that she would interact with

22    on a frequent basis.

23              I know that she did that, because we

24    had finalized the restructuring plans prior to the

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

22

1    Fourth of July weekend, and at that time she told

2    me that we were not going to go ahead with the

3    restructuring until after the Board meeting at the

4    end of July, that she wanted to discuss it with

5    the Board.

6        Q.    Okay.  So if I understand

7    correctly -- I'm a little bit confused now.  You

8    just said that you finalized the restructuring

9    before the Fourth of July weekend?

10       A.    Our internal planning was finalized.

11       Q.    The senior management team?

12       A.    Exactly.  Internally we had done --

13   we had done all the work.  We started the work in

14   January/February.

15           We had done lots of work prior to

16   that.  We made our final presentation and

17   proposals to Stephanie in -- it would have been in

18   June of 2006.

Case: 1:07-cv-02357 Document #: 65-3 Filed: 04/30/09 Page 44 of 416 PageID #:798

19          I think, you know, I may have said

20   2004, but it would have been in June of 2006.  And

21   Stephanie told me that we were not going to go

22   ahead with that plan.

23          Now, my recommendation was that we

24   put the plan into place as soon as possible.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

23

1    Q.   And she said, "We got to -- we have

2  to go to the Board for this"?

3    A.   Right, at the end of July, and

4  discuss it with the Board.

5    Q.  Okay.

6    A.   And I remember this because it was --

7  it was prior to the Fourth of July weekend.

8    Q.  Okay.

9    A.   After the Fourth of July weekend

10  Stephanie and I spoke on the phone, and we had

11  both reconsidered our positions over the Fourth of

12  July weekend, and we had coincidentally both come

13  to the conclusion that delaying it by a month or

14  more did not make sense, and she told me she was

15  going to take it to the Executive Committee and

16  that she tasked me with developing the

17  communications plan and the implementation plan,

18  so that we could announce the restructuring at the

19    July Board meeting.

20          Q.    And have the Board vote on it?

21          A.    We would take it to the Board, the

22    Board would approve it.  I actually believed she

23    was going to have the Executive Committee approve

24    the plan prior to the July Board meeting, so that

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   when we announced earnings coming out of the July

2   Board meeting we could announce the plan and start

3   to execute right away.

4       Q.   Okay.

5       A.   And I remember it because we both had

6   that conversation right after the Fourth of July

7   weekend.

8       Q.   Okay.  On the July 2006 Board meeting

9   what quarterly earnings were you going to take to

10   the Board?

11      A.   That would have been the second

12   quarter's earnings for 2006.

13      Q.   Okay.  Which would have ended June

14   30th?

15      A.   It would have, yes.

16      Q.   Okay.  And was that the -- was this

17   the quarter when you missed your numbers?

18      A.   We barely missed our numbers in that

19    quarter if you go back and look at the numbers,

20    but we knew in print four of my five businesses

21    were underperforming and the fifth business unit

22    was keeping us close, kind of in the game, so

23    on an aggregate basis the numbers weren't real

24    bad, but we had bad performance of four out of

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

25

1   five business units, and we knew that the trend

2   in the second half of the year was going to be

3   down.

4       Q.   When was it that the -- so in your

5   mind do you believe that the plan was finalized

6   when Stephanie met with the Executive Committee

7   in July of 2006 on the revision of the 2004 plan?

8       A.   Yes.  Prior to Fourth of July's

9   weekend Stephanie told me that I did not have

10   approval to go forward and that she wanted to

11   discuss it at the meeting.

12      Q.   Okay.

13      A.   Subsequent to that Fourth of July

14   weekend she told me that she was going to go to

15   the Executive Committee, seek their approval, and

16   that she was giving me approval to put in place

17   communication plans and detailed implementation

18   plans, and she tasked me to develop those detailed

19      plans.

20              That would mean I would have to

21      extend and broaden the number of people who we had

22      been talking to.

23          Q.   Okay.  So I'm -- just so that I have

24      this correctly, Stephanie told you after the --

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

26

1    she told you before the Fourth of July, "Don't do

2    anything 'til we go to the Board meeting," then

3    she said -- reconsidered that and said, "I'm going

4    to go to the Executive Committee, start to put

5    this plan in place," but did you understand that

6    it was not finalized 'til the Executive Committee

7    approved it?

8        A.   Yes.  I know that Stephanie -- I

9    don't believe that Stephanie ever said those words

10    to me.

11        My understanding of having worked

12    with Stephanie is that Stephanie would not take

13    that type of action until she had approval of the

14    Board.

15        Q.   Okay.

16        A.   If it was a change to a strategic

17    plan or a strategic direction Stephanie would want

18    to at least discuss it with the Board.

19        I don't know if she would have asked

20   them for approval.  She may have told them she was

21   going to do it and gotten their counsel.

22      Q.   Got a read?

23      A.   Gotten the counsel, right.

24      Q.   So did she meet with the Executive

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    Committee?

2        A.   I don't know if she met with the

3    Executive Committee.

4        Q.   Okay.  All right.  Now, this plan

5    that ultimately went to the Board in July of '06

6    was approved, is that correct, this modification

7    of the strategic plan?

8        A.   Stephanie gave me approval.  Whether

9    she got approval from the Board of Directors or

10    not I don't know, and we did move forward and

11    implement the plan.

12        Q.   Okay.  And you received approval

13    after the Fourth of July weekend?

14        A.   Yes.

15        Q.   Okay.  Was this plan called NBI?

16        A.   Yes.

17        Q.   Okay.  And who named the NBI?

18        A.   I did.

19     Q.   Okay.  And is that New Business

20  Initiative?

21     A.   No.

22     Q.   What does it stand for?

23     A.   It took me a while to remember, and

24  what it stood for is Nothing But Initials.




CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

28

1    Q.    What initials?

2    A.    NBI.

3          MR. BOWEN:  N, Nothing, B, But, I,

4    Initials.

5          THE WITNESS:  I'll explain, if you

6    want.

7          MR. CAPONELLI:  Yes, please.

8          THE WITNESS:  We have -- we had

9    always used project names to keep

10    confidential anything that we were working

11    on, acquisitions, and I was involved in

12    multiple acquisition opportunities in the

13    three years I was at Banta, and I always

14    thought that the -- that the naming process

15    was kind of a cutsie little process.

16          And because I had initiated the

17    restructuring I got to name it, and I

18    called it NBI.

19          And what would happen is people

20     would do what you just did and they would

21     say what does NBI stand for, and I would

22     say Nothing But Initials.

23          MR. CAPONELLI:  Nothing But Initials.

24     Okay.


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

29

1          THE WITNESS:  It was my little

2      joke --

3          MR. CAPONELLI:  Okay.

4          THE WITNESS:  -- with people

5      internally.

6          MR. CARPONELLI    Q.    Okay.  So much like

7   the sound of a tree falling in the forest, does it

8   stand for Nothing But Initials or does it stand

9   for nothing?

10          Don't answer that.  That's

11   rhetorical.  Okay.  And you worked on this plan

12   with Sara Armbruster, Stephanie Streeter.

13          Anyone else?

14      THE WITNESS    A.    Lots of people,

15   depending upon when we're talking about.

16      Q.    Okay.  Tell me who else was involved

17   in the --

18      A.    Okay.  The plan -- what initiated my

19    thinking about a restructure was a telephone call

20    I received, I think it was, in January -- it might

21    have been early February -- from Mark Deterding,

22    who was the president of the catalogue group, and

23    he reported to me, and Mark called me and told me

24    that he had lost some business and that he was

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   worried about the outlook for the year and that in

2   the strategic planning process for 2006 we should

3   dust off and reconsider the restructuring plans

4   that we had talked about in previous iteration

5   cycles.

6       Q.   Okay.  Which had not come to

7   fruition?

8       A.   Well, in '04 you could say that we

9   had a modest restructuring when we created the

10   literature management group.

11      Q.   Okay.

12      A.   We pulled people and equipment out

13   of the book group and we formed a new business

14   unit.

15      Q.   Let me ask you a question.  The '04

16   strategic plan, did that increase the expenses

17   from the 12/31/03 year or did it decrease

18   expenses, the '04 strategic plan, the original

19    one?

20        A.   I don't understand the question.  Are

21    you saying did we spend money on the creation of

22    the plan?

23        Q.   No, whether or not the adding of the

24    literature, was that an additional expense on your

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

31

1    income statement?

2        A.   Yes, creating the literature

3    management group would have been an added expense,

4    because we would have added resources to an

5    independent group.

6            We would have created a separate, you

7    know, financial function, for example.  However,

8    there were other parts of the '04 plan that had

9    more than offsetting expense reductions.

10       Q.   Okay.  So if I understand correctly,

11   the '04 plan, which created the literature

12   management group, that was something that was

13   done to increase profits based upon good profits

14   and --

15       A.   The literature management --

16           MR. BOWEN:  Let him finish his

17   question.

18   MR. CARPONELLI    Q.   And the expectation

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    of further profits going forward?

20        THE WITNESS   A.   Yes.

21        Q.   Okay.  Now, my question is, with

22    regard to the '06 modification, is this something

23    that was implemented in an effort to reduce

24    expenses?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1        A.   The '06 restructuring had three basic

2    points of logic that supported it, from my

3    perspective.

4              One, I thought we could reduce

5    expenses by consolidating business units and,

6    candidly, eliminating my position.

7              Secondly, we could improve our

8    performance and accelerate our performance

9    relative to some of the strategic initiatives that

10    we had put in place in 2004.

11              It's easier to execute in two

12    business units with two leadership groups rather

13    than five.

14        Q.   Let me stop you right there.  I don't

15    mean to interrupt, but you said strategic

16    initiatives?

17        A.   Yes.

18        Q.   What do you mean by that?

19      A.    Implementation of lean manufacturing

20    techniques, consolidating our procurement

21    practices so that we could buy common commodities

22    at a cheaper cost by leveraging our scale,

23    implementing and centralizing some of our IT

24    processes, those types of things.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      Q.    Any change in control considered in

2    this --

3      A.    No.

4      Q.    -- strategic initiatives?

5      A.    No.

6      Q.    Okay.  Finish your answer.

7      A.    So I think there were three.  So the

8    third was improving our go-to-market and top line

9    revenue for the direct marketing and literature

10   management groups.

11          So it was reducing costs by

12   restructuring the organization, improving

13   execution of several strategic initiatives that we

14   had launched in '04, and improving our

15   go-to-market or the way we sold and represented

16   ourselves to the direct marketing and literature

17   management group customers, which in many cases

18   were common customers.

19      Q.   Okay.  Were you aware in June of '06

20   of a consolidation in the print industry that was

21   occurring?

22      A.   No.

23      Q.   You had -- you were aware that

24   Wallace Moore and Donnelley had merged?


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      A.   Yes, but that merger was in 2004.

2   You asked me about 2006.

3      Q.   Well, just generally during that time

4   period.

5      A.   In my 25 years of experience in the

6   printing industry companies merged periodically.

7   I wouldn't say that 2006 was -- actually, I would

8   say that 2006 represented a slower period of

9   consolidation than what we had seen in the 1990s

10   and early 2000s.

11      Q.   If you -- if you do not isolate 2006

12   and talk about the period, let's say, from when

13   you worked at Banta, from 2004 until January of

14   '07, would you say that there had been a

15   consolidation of interests in the print sector?

16      A.   No more so than I had seen in prior

17   years.

18      Q.   Okay.  Do you think Goldman Sachs

19    would agree with you?

20        A.   I don't know.  I don't think I know

21    anybody at Goldman Sachs.

22            MR. CARPONELLI:  Okay.  Did you --

23        let me show you what I have marked as --

24        what I'm going to have marked as our first

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

35

1    exhibit.

2              (Whereupon said document was

3              marked as Deposition Exhibit

4              No. 15 as of 1/89/09.)

5    MR. CARPONELLI    Q.    Now, Mr. Allen,

6    you were employed at Banta during July of 2004?

7    THE WITNESS    A.    Yes, I was employed in

8    July of 2004 --

9    Q.    Okay.

10    A.    -- by Banta.

11    Q.    Have you ever seen this document

12    before or anything similar to it, a final revised

13    or a prior draft?

14    A.    No, I don't believe I've ever seen

15    this document.

16    Q.    Okay.  Did you make reports to the

17    Board of Directors in '04?

18    A.    Yes.  I was -- I attended every Board

19    meeting, I believe, every Board meeting all three

20    years.

21         Q.   Okay.  Do you remember Goldman Sachs

22    being engaged by Banta Corporation in 2004 to make

23    a presentation to the Board of Directors?

24         A.   No.  It could have happened in

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

36

1    executive session.  A typical Board meeting was

2    management presentations by myself and other

3    leaders inside of Banta.

4           We would request any capital

5    appropriations, things of that nature.  Then the

6    senior executives other than, I think, Ron and

7    Stephanie would be excused and the Board meeting

8    would continue.

9       Q.   Okay.  So you're -- as you sit here

10    you're unaware that Goldman Sachs was retained as

11    Banta's anti-raid adviser in 2004?

12       A.   I did not know Goldman Sachs.  I

13    don't recall Goldman Sachs working for Banta.

14       Q.   Okay.  Can you look at Page 1?

15       A.   Discussion Topics and Objectives?

16       Q.   Yes.  Do you see that as part of

17    their engagement, quote, "We have reviewed Banta's

18    strategic alternatives on an ongoing basis"?

19    A.    Yes, the second bullet.

20    Q.    Okay.  Do they use the phrase

21   strategic alternatives in the same way that you

22   use strategic initiatives, if you know?

23        MR. BOWEN:  Objection, lack of

24     foundation.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

37

1          MR. CARPONELLI:  If you know.

2          THE WITNESS:  I don't know.

3       MR. CARPONELLI   Q.   Okay.  It says here

4    in this document in point three sale and merger of

5    the company.

6          Had you ever heard of the concept in

7    2004 that Banta would be interested in the sale or

8    the merger of its company?

9       THE WITNESS   A.   No.

10      Q.   Okay.  You'll agree with me that this

11    document reflects that?

12      A.   Well, I haven't read the entire

13    document, so I --

14      Q.   Why don't you just look at that

15    section and see if it says that.

16          MR. BOWEN:  I will object while he

17          looks at the document that the document

18          speaks for itself.

19          It says whatever it says.  The

20     witness hasn't seen the document, and his

21     characterization of it is irrelevant.

22          THE WITNESS:  Having just scanned

23     it, it would appear to me that this is

24     a general sales pitch by Goldman Sachs.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      MR. CARPONELLI   Q.    Would you look at

2  Page 4?

3      THE WITNESS    A.    I'm on Page 4.

4      Q.    The last square?

5      A.    The last, yes.

6      Q.    Would you agree or disagree with the

7  statement by Goldman Sachs that, quote,

8  "Consolidation continues to be anticipated to

9  counter the overcapacity, pricing pressure, and

10  capital expenditure requirements," end of phrase,

11  close quotes, dot dot dot?

12         Would you disagree with that?

13         MR. BOWEN:  Would he disagree that

14     Goldman Sachs anticipated that?

15         MR. CARPONELLI:  No, with that

16     statement.  Is that a true statement?

17         MR. BOWEN:  Was that his anticipation

18     in July of '04?

19          MR. CARPONELLI:  I'm asking him if he

20     agrees with that statement which Goldman

21     made in this document.

22          MR. CARPONELLI    Q.    Do you agree with

23   it or disagree with it?

24          THE WITNESS    A.    I did not -- I would

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

39

1    not have agreed with that in 2004.

2        Q.    Okay.  Would you agree with that in

3    2006?

4        A.    In 2006, I would not have agreed with

5    it in 2006.

6        Q.    Okay.  Now, correct me if I'm wrong.

7    Goldman sets out here several notable recent deals

8    within the printing sector that Goldman Sachs

9    advised on.

10           Are you aware that Deluxe/NEBS did a

11    deal, or were you aware at the time?

12        A.    I was not.  They weren't really in

13    our competitive space.  They were printers, but

14    they did business forms.

15        Q.    Did you know R.R. Donnelley and Moore

16    Wallace did a deal?

17        A.    I did.

18        Q.    Did you know that Fed Ex and Kinko's

19   did a deal?

20        A.   I did, but they are also not somebody

21   I would consider in our competitive space.

22        Q.   Okay.  Did Stephanie Streeter ever

23   discuss this agreement with you?  This document,

24   I'm sorry, or Goldman Sachs' engagement?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    A.   I don't remember Goldman Sachs ever

2    being engaged, and I don't remember ever

3    discussing this with Stephanie.

4    Q.   Okay.  Are you aware that Goldman

5    Sachs acted in the ultimate plan of merger and

6    sale to R.R. Donnelley of Banta?

7    A.   No, I didn't -- I don't recall that.

8    It's possible that I have read it in like the

9    merger agreement, but I haven't read the merger

10    agreement in two years.

11    Q.   Okay.  Let me show you -- now, I

12    didn't have this made, but I have it highlighted,

13    so let the record reflect that I'm reading from

14    the Banta Corporation special meeting of

15    shareholders notice dated December 4, 2006 and the

16    notice of special meeting of shareholders to be

17    held on January 9, 2007, okay, and I'm just going

18    to show this to your counsel and to you.

19          The subheading there called The

20    Merger, were you involved in drafting that?

21        A.    No.

22        Q.    Do you know who was?

23        A.    I can speculate, but I don't know.

24        Q.    Don't speculate, but if you can --

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

41

1    what I don't want is conjecture, speculation, or

2    guess, but if you have a reasonable belief without

3    an absolute certainty who would have been involved

4    in that I would ask you to answer.

5         MR. BOWEN:  So he's saying not

6         guesswork, but if you've got some basis for

7         it.

8         THE WITNESS:  A reasonable -- a

9    reasonable -- I don't -- I'm trying to

10    think of it.

11              You said guess, and I'm not --

12    trying not to use the word, but a

13    reasonable judgment would be that Ron

14    Kneezel, our general counsel, and Foley &

15    Lardner, who had been our counsel, would

16    have been the ones to draft that document.

17    MR. CARPONELLI    Q.    What about

18    Stephanie?  Would she have been involved in it?

19    THE WITNESS    A.    Stephanie would have

20  been involved in it, and I believe that there may

21  have been -- I would -- I would assume that a

22  committee of the Board would have also reviewed

23  it.

24    MR. CARPONELLI:  Okay.  So now back

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    to Goldman Sachs.  I want to ask you a

2    question, and I'm going to go to a

3    different highlight here.  This is in the

4    merger section, which is a discussion

5    portion.

6         I'll show you right there in

7    this paragraph that begins with, "On

8    October 13, 2006 Miss Streeter," and refer

9    to there, and refer to on the bottom of the

10    page, if you want to read that.

11         (Pause.)

12    MR. CARPONELLI   Q.   Did you see there

13    that Goldman is involved in the -- in consulting

14    on the merger plan?

15         MR. BOWEN:  Can you specify

16    consulting with whom?  Because I think

17    this --

18         MR. CARPONELLI:  Well, we need to

19      find that out, because it's not clear.

20          THE WITNESS:  What is -- what I read

21      from this document is that UBS and Goldman

22      Sachs participated in a meeting between

23      senior Banta executives and senior

24      Donnelley executives.


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

43

1      MR. CARPONELLI   Q.   Okay.  And who did

2   Goldman represent, if you know?

3      THE WITNESS    A.   I don't know.

4      Q.   Okay.  And did you read both sections

5   where it -- where it talked about Goldman?

6      A.   I skimmed it.

7      Q.   The one down on the bottom?

8      A.   I skimmed it pretty quickly.

9      Q.   Okay.  So you -- so you don't know --

10   you don't know in what capacity Goldman

11   participated in that meeting?

12      A.   I do not know.

13      Q.   Okay.  And you were unaware of this

14   document dated July 27th of 2004 --

15      A.   That's correct.

16      Q.   -- marked as Exhibit 15?

17      A.   And it's really unclear to me,

18   because in that document that you -- this document

19    that you showed me it said that Goldman

20    represented Donnelley, so it could be that

21    Donnelley brought Goldman to this meeting.

22            I don't know.

23        Q.    Okay.  Where does it say it

24    represents -- it says here presentation to Banta

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    Corp. Board of Directors.

2        A.    You directed me to Page 4.

3        Q.    Yes.

4        A.    And you said several notable recent

5    deals with print sector that Goldman Sachs

6    advised, and you pointed out R.R. Donnelley and

7    Moore Wallace.

8        Q.    They had done those deals.

9        A.    Right.  So they obviously had

10   represented R.R. Donnelley and Moore Wallace, and

11   Mr. Engelson was at R.R. Donnelley after that

12   deal.

13        Q.    So is it your -- I also directed your

14   attention to Page 1.  And I don't mean to argue

15   with you.

16            It says Goldman Sachs has been

17   retained as Banta's anti-raid adviser.

18        A.    I hadn't -- I didn't read that first

19    bullet.

20        Q.    Okay.

21        A.    You pointed me to the second one.

22            MR. BOWEN:  Can we go off the record

23    just one minute?

24            MR. CARPONELLI:  Sure.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

45

1               (Whereupon a discussion

2               ensued off the record.)

3       MR. CARPONELLI   Q.   Back on the record.

4   In this same document, the very initial -- I'm

5   talking now about the December 4, 2006 important

6   special meeting of shareholders.

7           It says here by Stephanie Streeter

8   that our Board of Directors unanimously determined

9   that the merger is fair to and in the best

10   interests of our company, shareholders, and other

11   constituencies.

12           Okay.  You want to take a look at

13   that language?  It's highlighted.

14       THE WITNESS   A.   Okay.

15       Q.   "And other constituencies" is a

16   phrase, I will represent to you, is utilized on

17   several occasions as it relates to the

18   considerations on the ultimate plan of merger that

19    happened between Banta and R.R. Donnelley.

20         And my question to you is when the

21    phrase "other constituencies" is used, does it

22    include employees?

23         MR. BOWEN:  Objection, lack of

24    foundation.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

46

1    MR. CARPONELLI:  If you know.

2    THE WITNESS:  I don't know.  I can

3    speculate again, but I don't know.

4    MR. CARPONELLI    Q.    You don't know.

5    Okay.  Now, were you aware in July of 2006 that

6    Jim Cyze was party to a key executive employment

7    and severance agreement?

8    THE WITNESS    A.    Yes.  I refer to it as

9    a change of control agreement.

10    Q.    Okay.  Or KEESA agreement?

11    A.    Yes.

12    Q.    Okay.  And you were party to that as

13    well?

14    A.    Yes.

15    Q.    And there were seven or eight key

16    executives that were party to that, agreements

17    similar to that?

18    A.    I don't know what the number was, but

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    it was -- I would hazard a guess that it was

20    between five and twenty.

21        Q.   Okay.  Were you involved in the

22    drafting of that agreement at all?

23        A.   No.

24        Q.   Okay.  Did you have a clear

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   understanding of how it operated?

2       A.   At what time?

3       Q.   At any time; when you signed it, when

4   it went into effect, or at any time during the

5   interim.

6       A.   I read it.  I read it when I signed

7   it in January of 2004 when I joined the company,

8   and I read it again in August of 2006.

9           I went home and I read the document.

10      Q.   And did you understand it?

11      A.   I think I understood it in August of

12  2006.

13      Q.   Okay.

14      A.   Actually, it turns out that I didn't

15  fully understand it.  I had to have some things

16  explained to me.

17      Q.   Okay.  Then that was after the fact?

18      A.   Yes.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      Q.    Have you ever done any analysis of

20   the agreement as it relates to Mr. Cyze, whether

21   or not Mr. Cyze is entitled to his KEESA benefits?

22      A.    No, I never did that analysis.

23           MR. CARPONELLI:  Okay.  In your

24   review of your agreement, which I will

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

48

1    assume is similar to -- let's show it to

2    you and we'll see if it is.

3        Let's mark this.  This has

4    previously been marked at Cyze, so you

5    don't have to mark it, Madam Court

6    Reporter.

7        It's No. 2.  And, counsel, I

8    have one for you.

9     MR. BOWEN:  Thank you.

10     MR. CARPONELLI:  And I'll ask you

11   to review that and tell me if your

12   agreement is the same or similar, if you

13   know.

14     THE WITNESS:  This could take a while

15   then.

16     MR. BOWEN:  Take all the time you

17   want to review it and answer the question,

18   if you can.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19          THE WITNESS:  I haven't read the

20     entire thing.  I've kind of scanned the

21     paragraphs.

22          It appears that this is the

23     same agreement --

24          MR. CARPONELLI:  Okay.



CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

49

1          THE WITNESS:  -- that I had.

2          MR. CARPONELLI:  Okay.

3          THE WITNESS:  I'd have to do a --

4          MR. CARPONELLI:  Okay.

5          THE WITNESS:  I would suspect that it

6      is the same agreement.

7      MR. CARPONELLI   Q.   Okay.  I'm going to

8      call your attention on that document to -- it's

9      A-3.

10          It's five pages from the back.

11      THE WITNESS   A.   Five pages from the

12      back?

13      Q.   Yes.  It's an exhibit attached to it.

14      A.   A-3.

15      Q.   A-3, exactly.

16      A.   All of it?

17      Q.   Just Paragraph H.

18      A.   I've read it.

19      Q.   Do you understand how that effective

20   date operates?

21      A.   I think so.

22      Q.   Okay.  Here's my question to you

23   as it relates to Jim Cyze.  Were you -- strike

24   that.


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

50

1          Were you involved in the decision

2     regarding whether Jim Cyze would participate in

3     the KEESA agreement?

4          A.   No.  I believe Jim Cyze had this

5     agreement in place prior to my joining the

6     company.

7          Q.   Let me -- let me rephrase the

8     question.  I was not clear.  Thank you for that

9     clarification.

10          As it relates to this exhibit before

11     you, Cyze was terminated in July of '06, is that

12     correct?

13          A.   I talked -- I spoke to Jim Cyze and

14     told him that his position was being terminated on

15     July 20th.

16          The effective date was, I believe,

17     the end of August at the -- at the time of the

18     initial discussion.

19    Q.    Right.

20    A.    And I don't know when the actual

21    termination date was, because there were some --

22    Q.    We'll go through that.  I have

23    three --

24    A.    There were some other -- there were

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

51

1    some other things.

2        Q.    There were some other issues which

3    I'm going to ask you about.  But were you involved

4    in the decision as to whether or not his

5    termination would entitle him to benefits under

6    his KEESA agreement?

7            You received benefits under your

8    KEESA agreement?

9        A.    I did.

10       Q.    Okay.  So the question is were you

11   involved in the decision as it related to whether

12   or not Jim Cyze would receive his KEESA benefits?

13       A.    I don't recall any conversations in

14   which a decision like that occurred.  I know we

15   would -- there was no discussion about the KEESA

16   change of control agreement at all prior to August

17   10th or 11th of 2006.

18       Q.    Okay.  I'm going to ask you a

19    question now.  You weren't involved in the

20    decision whether he got his benefits or not, but

21    I'm going to direct your attention to that section

22    of Effective Date, H on A-3, and it's double I,

23    going down to the fourth line.

24        A.   Yes, I see it.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

52

1      Q.   It says "or otherwise arose in

2   connection with or in anticipation of a change in

3   control of the company."

4          Do you understand what "otherwise

5   arose in connection with" refers to?

6      A.   I'm not a lawyer, so my laymen's

7   reading of this would tell me that if Jim was

8   terminated as a result of a change of control or

9   in anticipation of a change of control then the

10   agreement would be effective.

11      Q.   Okay.  Let me ask you a question.

12   What does "otherwise arose in connection with"

13   mean to you?

14      A.   That somebody had approached us about

15   a change of control, either hostile or friendly,

16   and that as a result of those discussions, in

17   connection with those discussions, we chose to

18   terminate Jim.

19        Q.    Okay.  So you're reading in there --

20    where in the phrase it says "otherwise arose in

21    connection with," you're reading into that that

22    there's a resulting antecedent to a change in

23    control.

24            Could you read that language just as

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

53

1   otherwise arising in connection with what

2   ultimately becomes a change in control?

3       A.   I don't understand your question.

4           MR. BOWEN:  Objection.  I don't

5       think -- I didn't understand it.

6           MR. CARPONELLI    Q.   Okay.  The phrase

7   "otherwise arose in connection with" does not

8   have to be as a result of, would you agree with

9   me?

10          MR. BOWEN:  Object.  That's calling

11      for a legal conclusion.

12          THE WITNESS:  Again, I'm not sure I

13      understand your question.

14          MR. CARPONELLI:  Just English, just

15      English.

16          THE WITNESS:  To me -- to me it says

17      that if there were -- if there was ongoing

18      discussions regarding a change of control

19      and in connection with those discussions

20      Jim was terminated.

21              That's how I read that, and

22      maybe you're trying to get me to read it

23      differently.

24              I don't.  I don't understand

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1        that.

2            MR. CARPONELLI   Q.   Well, what I'm

3    asking you is the phrase "otherwise arose in

4    connection with," and I don't read that to mean as

5    a result of.

6            I think otherwise arose in connection

7    with is -- doesn't require a proximate causation.

8    That's my personal reading of it, and I'm

9    wondering if you agree with that interpretation.

10           And I'm assuming you don't.

11           MR. BOWEN:  Objection, asked and

12       answered.

13           THE WITNESS:  I don't.

14           MR. CARPONELLI    Q.   Okay.  As part of

15    your responsibilities from '04 through January of

16    '07 did you do performance evaluations of Jim

17    Cyze?

18           THE WITNESS    A.   Yes.

Case: 1:07-cv-02357 Document #: 65-3 Filed: 04/30/09 Page 108 of 416 PageID #:862

19      Q.   Okay.  And do you remember what they

20   were in '04, '05, and '06?

21      A.   Not specifically and not for each of

22   the years.

23      Q.   How about generally?

24      A.   Generally I viewed Jim's performance

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

55

1    as being good.  Jim's business unit performed, I

2    would say, very well in 2005.

3          I don't remember how the business

4    unit performed in 2004.  I thought Jim was very

5    good at the point of execution, at disciplined

6    follow-up, follow-through.

7          However, I also thought that Jim on

8    an improvement side of things was not as strategic

9    as I thought somebody in his position could be,

10    and I didn't think Jim was as good with customers

11    as he could be.

12          That wasn't Jim's forte.  He didn't

13    necessarily -- he wasn't a strategy and a

14    customer-oriented guy.

15          I'm not saying he was not interested

16    in customers, but that wasn't where his strengths

17    were.

18          His strength was really in, I would

19    say, driving execution.

20        Q.    When you say he was not as strategic,

21    what do you mean by that?

22        A.    He wasn't as comprehensive a thinker,

23    didn't think through how to create new value for

24    customers or even how to think -- how to create

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   new value for our owners, more of a -- it's more

2   of a broader conceptual thinker is what I mean by

3   that.

4        Q.   Did his unit outperform all other

5   units in '05?

6        A.   What metric?

7        Q.   The five unit profits.

8        A.   Absolute profits?  No.

9        Q.   What's an absolute profit versus a --

10  just a profit?

11       A.   Well, are you -- are you talking

12  about year-over-year change in profit?  He

13  improved significantly year over year, but the

14  direct marketing group was at the very least the

15  third least profitable of the five.

16       Q.   Okay.  But in terms of growth and

17  profitability for his unit he had the lowest

18  overhead, didn't he, for his unit, business unit?

19    A.   I don't recall that.  That wouldn't

20   be my impression, but I don't recall that.

21    Q.   Okay.  So what you're saying is he

22   was -- his group was not the No. 1 performer?

23    A.   His group performed -- it depends on

24   the metric you want to use.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1     Q.   Okay.  What metric would you agree

2   with me that his group was the No. 1 performer?

3     A.   I don't recall any one metric.  What

4   I would say, I will tell you -- let me give you

5   kind of a characterization of how I saw his

6   group's performance.

7          When I came into the company they

8   had, as I recollect, suffered through several

9   years of very poor earnings slide, I mean,

10   earnings erosion.

11          They were making a couple of million

12   dollars.

13     Q.   Profit?

14     A.   Profit.  We had other businesses

15   making 20 or 30 million dollars, so they were --

16   that was in 2004.

17          Jim's year-over-year improvement in

18   that profit was good.  I believe in 2006 he was in

19    the twelve million dollar range of profit.

20            So he went from, you know, let's say

21    three million to twelve million, but again there

22    were other business units that made more money

23    than the direct marketing group.

24            That 12 million was still

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

58

1    substantially lower than some of the others, and

2    there were other groups that during the three

3    years that I was there had a very good rate of

4    change improvement, and that's why I can't say

5    that Jim's -- I can't even say that Jim's rate of

6    change was the highest of the five.

7         Q.    Okay.  So, however, would you agree

8    with me that in the NBI that eliminated his

9    position his performance numbers for his group

10   during the period of time that you were there was

11   not the reason for eliminating him?

12        A.    That's right.  I did not eliminate

13   Jim for financial performance reasons.

14        Q.    Okay.  What about Jim's salary as it

15   related to the business group and bonus and

16   compensation?

17        A.    By that do you mean all of the other

18   presidents?

19      Q.   All the other group presidents.

20      A.   Okay.  Jim was, I believe, in the --

21  he was either the top or the second-highest-paid

22  business unit president that reported to me.

23      Q.   Okay.  Was that a factor in your

24  determination to consolidate him in the strategic

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

59

1    plan of '06 out of the company?

2        A.   No.

3        Q.   That was not?

4        A.   No.

5        Q.   Did you realize that by eliminating

6    him the net income would be improved?

7        A.   Absolutely I realized that, but

8    your -- I thought your question was was his income

9    relative to the other business unit presidents a

10   consideration, and my answer to that is no.

11           Did I know that eliminating a

12   president was going to improve bottom line

13   operating earnings?

14           The answer is yes.

15       Q.   Okay.  And is that one of the reasons

16   why you eliminated him?

17       A.   I think I said earlier that the

18   purpose of structuring was to --

19    Q.    Keep going.

20    A.    Okay.  The purpose -- the purpose of

21  the restructuring was to reduce costs by

22  consolidating multiple business unit functions and

23  going from five units down to two, to improve our

24  strategic implementation of key strategies that

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   came out of the 2004 strat plan, and to improve

2   the way we went to market in the direct marketing

3   literature management group.

4         So yes, eliminating a -- you know, we

5   were -- we were eliminating -- in the first phase

6   of the project we eliminated between ten and

7   fifteen people, and that was part of --

8   Q.   When was the first phase?

9   A.   July, the July announcement.  There

10  was really about three phases to the overall

11  project.

12   Q.   Okay.  What were they?

13   A.   The first phase was the announcement

14  of consolidating five business units into two.

15   Q.   When?

16   A.   And that was in July.  And then

17  immediately following that would be the second

18  phase, where the -- where the new leaders of these

19    combined organizations would then have to design

20    the organizations below them.

21          I wasn't going to tell them how many

22    accountants they needed in these combined

23    entities.

24          So that was the second phase.  And as

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    I remember, we were targeting 15 to 20 million

2    dollars worth of cost reduction.

3         And then the third phase of the

4    restructuring, which would also occur between July

5    and the end of the year, would be planning for the

6    consolidation of subscale printing plants.

7    Q.   Okay.  Now --

8    A.   In total we were targeting 25 to 30

9    million dollars worth of operating earnings

10   improvement.

11   Q.   Now, was this restructuring triggered

12   at all by the first quarter earnings?

13        MR. BOWEN:  The first quarter?

14        MR. CARPONELLI:  First quarter.

15        MR. BOWEN:  Okay.

16        THE WITNESS:  The restructuring was

17        triggered by the strategic plan review that

18        we did.  It started in January and

19      February.

20          And Mark Deterding called me,

21      suggesting that I consolidated his business

22      unit with the publication group or with the

23      direct marketing group, so that we could

24      reduce cost.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1       MR. CARPONELLI   Q.   So that the

2   missing -- what about the second quarter earnings?

3       THE WITNESS    A.   Second quarter

4   earnings, we knew -- second quarter earnings, as I

5   recollect, were not real bad.  They were bad.

6          They were not on plan, but we knew

7   going into the second quarter that we saw softness

8   in multiple business units and that the second

9   half of the year was going to be challenging, so

10   the restructuring was partially motivated to get

11   ahead of that strategic change.

12          We saw things happening in our

13   business that was causing us to have deep concern

14   about our performance in that year, and so as part

15   of the strategic review we decided to move forward

16   with the strategic restructuring.

17     Q.   Okay.  Are you aware that on July

18   25th of 2006 Banta issued a press release

19    reflecting second quarter results of operations

20    and revised the 2006 earnings guidance downward?

21        A.    Yes.  It was the guidance that, as I

22    recollect -- as I recall, the earnings through Q1

23    and Q2 were not far off of our budget, but we knew

24    that the second half of the year was not looking

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

63

1    good.

2        Q.    Okay.  Were you aware that following

3    your earnings announcement in July that the stock

4    traded down over 22 percent?

5            Were you aware of that?

6        A.    Yes.

7        Q.    Okay.  So that there was -- there was

8    a detrimental effect on the value of the stock as

9    a consequence of the downward revision on guidance

10    as it related to earnings in the first quarter and

11    the second quarter, is that correct?

12            MR. BOWEN:  Objection.  Perhaps I

13            didn't understand the question.

14            MR. CARPONELLI:  I'll rephrase it.

15            MR. BOWEN:  Well, let me explain.

16        Unless you have a problem with it, let me

17        explain my confusion.

18                Guidance, as I understand it,

19      is forward looking.

20          MR. CARPONELLI:  Right.

21          MR. BOWEN:  By the end of July 2006

22      the earnings in the first and second

23      quarters were historical facts --

24          MR. CARPONELLI:  Correct.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

64

1        MR. BOWEN:  -- being what they were.

2        MR. CARPONELLI:  Okay.  Let me make

3    it clear.  I think that's a good point.

4    Okay.

5        MR. CARPONELLI    Q.    When I'm talking

6    about the revision of guidance downward I'm

7    talking about the balance of the year, just like

8    you were talking about the balance of the year, is

9    that correct?

10        THE WITNESS    A.    You'll have to

11    rephrase your original question.

12        Q.    Well, correct me if I'm wrong.  In

13    July of '06 --

14        A.    Yes.

15        Q.    -- there was a revision of the -- for

16    the third quarter and the fourth quarter of

17    guidance downward?

18        A.    From what you -- yes, I believe so.

19      Q.    Okay.

20      A.    And I believe that's what you just

21   read.

22      Q.    Okay.  And correct me if I'm wrong.

23   The first quarter and the second quarter

24   historical numbers were off of original guidance

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

65

1   and were down, and so that you needed more

2   urgently to implement the NBI for cost savings

3   purposes, is that correct?

4        A.   I don't know as I sit here.  I would

5   have to review the financial earnings report.  As

6   I remember it, our first quarter results were on

7   or very close to plan, our second quarter results

8   were also very close to plan, but that in my

9   business unit, the print -- the print group, we

10   had four -- three or four of the five business

11   units that were down, and the literature

12   management group, which Dan Thornton led, was up

13   significantly, and so if you -- if you peeled

14   apart the aggregate -- the aggregate number, I

15   think, was relatively close to our plan, but if

16   you peeled it apart you saw --

17        Q.   A downward trend?

18        A.   -- a downward trend.

19      Q.    Okay.  And so that made the NBI

20   restructuring more urgent, is that fair?

21      A.    Yes, yes.

22      Q.    Okay.  Now, my question to you is are

23   you aware whether or not by having the first and

24   second quarter, which was reflective of a change

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

66

1    in your guidance for the balance of the year,

2    whether that made you more likely to be a

3    candidate for a hostile takeover or a change in

4    control?

5        A.   I don't remember thinking about it or

6    being concerned about it prior to August 10th or

7    11th.

8        Q.   Okay.  Was that not your

9    responsibility as the print sector president?  Was

10   that Stephanie Streeter's?

11       A.   My responsibility would be to serve

12   customers and make as much money as humanly

13   possible for our owners.

14       Q.   Okay.  And it was not to be concerned

15   about whether or not strategically the company

16   would remain independently owned as opposed to a

17   party to a plan of merger or a hostile takeover?

18       A.   They were -- that was not part of my

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    job description.  It would have been, I presume,

20    clearly Stephanie's as chairman of the Board and

21    the Board of Directors' responsibility --

22        Q.   Okay.

23        A.   -- to think about the ownership

24    structure of the company.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    Q.   And in your -- in your belief do you

2   believe that's also one of the reasons why you

3   were not party to the Goldman Sachs presentation

4   to Banta Corporation, because that wasn't part of

5   your responsibility?

6    A.   That would be my belief.  There were

7   many discussions after August 10th or 11th that

8   occurred, I'm sure, about the ownership structure

9   and the strategic direction of our company, and I

10   was not privy to any of them.

11    Q.   Okay.  Would you agree with me that

12   the basic cornerstones for the 2004 strategic

13   plan, which was modified in 2006, would you agree

14   with me that they are; one, to improve the base

15   business to sustain competitiveness and growth?

16    A.   Yes.

17    Q.   Two, position the company to pursue

18   key market segments?

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19     A.   Yes.

20     Q.   Three, effect acquisitions to enhance

21   competitive advantage?

22     A.   Yes.

23     Q.   And four, take steps to ensure that

24   we have the talent needed to operate our business

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   successfully?

2        A.   Yes.

3        Q.   Okay.  You were involved in

4   acquisitions, is that right?

5        A.   Yes.

6        Q.   Did you work on the Cadmus potential

7   transaction?

8        A.   Yes.

9        Q.   That never came to fruition?

10       A.   It did not.

11       Q.   What was the reason for that?

12       A.   As I recall, we made an offering, a

13  price offering, to Cadmus, and then Cadmus decided

14  that they were going to run an auction, and so

15  they didn't accept our offer and they ultimately

16  ran an auction.

17       Q.   Okay.  And they were ultimately sold?

18       A.   They were ultimately sold.

19    Q.    But you didn't -- you were not the

20    buyer?

21    A.    No, we were not buyers.

22    Q.    Was Cadmus a publicly-traded company?

23    A.    Yes.

24    Q.    Did you work with Foley on that or

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

69

1    did you do that with --

2        A.   I don't know, but I believe so.

3        Q.   Okay.

4        A.   I don't remember working with another

5    law firm.

6        Q.   I'm referring now to the merger

7    discussion in the document that's not been marked

8    as an exhibit, which the cover page is dated

9    December 4th to the shareholders by Stephanie

10   Streeter, and in this document it says -- and it's

11   referring now to the ultimate transaction of Banta

12   to Donnelley.

13       A.   Okay.

14       Q.   And it says "Our reasons for the

15   merger recommendations of our Board of Directors,"

16   and it says, "On October 31st on your Board of

17   Directors unanimously adopted resolutions," bullet

18   point one, "determining that the merger agreement

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19   is fair to and in the best interests of Banta, our

20   shareholders, and other constituencies."

21       Do you know what that phrase "other

22   constituencies" refers to?

23       MR. BOWEN: Objection, asked and

24     answered. We went over this about ten

CENTRAL REPORTERS ASSOCIATED, LTD. (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

70

1    minutes ago.

2          MR. CARPONELLI:  This is different

3    language.

4          MR. BOWEN:  Okay.  Fine.

5          MR. CARPONELLI:  It's the same

6    phrase, but it's found in a different

7    location.

8          MR. BOWEN:  Okay.

9          THE WITNESS:  I don't know.

10        MR. CARPONELLI   Q.   Okay.  On Page 15

11   it goes on to say that "Our Board of Directors

12   believes that the merger agreement is fair to our

13   shareholders and other constituencies."  I won't

14   ask you about that, I promise.

15         "In reaching these conclusions our

16   Board of Directors consulted with our senior

17   management and our legal and financial advisers

18   and considered the short-term and long-term

19    interests and prospects of Banta and our

20    shareholders and other constituencies.

21          "In reaching the foregoing

22    determination the Board of Directors considered

23    the following material factors that it believed

24    supported its determinations."

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1        And this is the determination to do

2    the plan of merger with R.R. Donnelley.  And I'm

3    going to ask if you agree that this is accurate.

4        Our current and historical financial

5    condition?

6        MR. CARPONELLI:  I'm sorry?

7    MR. BOWEN    Q.   Do you agree that that

8    was a consideration?

9        MR. BOWEN:  Object.

10        MR. CARPONELLI:  As a member of the

11    senior management?

12        MR. BOWEN:  Objection, lack of

13    foundation.

14        MR. CARPONELLI:  Okay.  Are you --

15        MR. BOWEN:  I'm not -- I mean, I'm

16    not telling him not to answer.

17        MR. CARPONELLI:  No, I understand.

18    But I want to get it clear, because you

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      know what, Mike?

20              You don't make objections

21      unless they're legitimate.  I have a great

22      deal of respect for you as a lawyer.

23              So what I want to do is get a

24      good question on the record.  And unlike a

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    lot of lawyers, I don't take offense to

2    your objections.

3          I think that they're probably

4    offered in a sense of professionalism,

5    trying to get a good record, so I'm going

6    to rephrase.

7    MR. CARPONELLI    Q.    Would you agree

8    with me that you were a part of the senior

9    management team?

10    THE WITNESS    A.    Yes, I was part of the

11    senior management team.  However, I never

12    participated in meetings with our Board of

13    Directors when they looked at the -- discussed the

14    reasons or the validity behind any merger.

15    Q.    Okay.  That would have been Kneezel,

16    Stephanie?  Do you know anybody else?

17    A.    I don't know.  I can speculate that

18    it would have been Ron Kneezel, Geoff Hibner,

19    Stephanie Streeter would have been the three key

20    players.

21          Q.   Okay.  Did you read this document

22    that went to the shareholders?  You were a

23    shareholder.

24          You received it obviously.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      A.   I'm sure I have read most of that

2   document.

3      Q.   Okay.  And you find it to be

4   accurate, is that correct?

5      A.   I don't -- I don't recall.  I

6   wouldn't have known.  When I read that document,

7   if that's the document that I think it is, it's

8   where I began to learn what occurred prior --

9   from, you know, August through October 31st, which

10   is the day that I received a telephone call from

11   Stephanie Streeter telling me that my former

12   employer was buying my current employer.

13      Q.   August 31st?

14      A.   Excuse me.  October 31st.

15      Q.   October 31st?

16      A.   It was Halloween.

17      Q.   And do I take it that you were not

18   involved with Mr. Burton of Cenveo?

19    A.    Never have met the man.

20    Q.    Or Scott Eulin, his investment

21  banker?

22    A.    Never met him, never spoken to him.

23    Q.    Okay.  But generally correct me if

24  I'm wrong.  This document which went to the

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

74

1   shareholders, which you received and read, you

2   have no quarrel with anything that's in here?

3       A.   It's been -- it's been a couple of

4   years since I've read that document.  I don't

5   recall seeing anything that looked wrong or false.

6       Q.   Okay.  Do you have a belief as to

7   whether or not the downward revision -- I may have

8   asked this, and I'll withdraw it if I did.

9            Do you have a belief as to whether or

10   not the NBI restructuring, which saved costs,

11   militated against or was in anticipation of a

12   hostile takeover?

13       A.   It was not in anticipation of a

14   takeover or a change of control.

15       Q.   Do you believe that the reduction in

16   overhead expenses would have had the effect of

17   diminishing the likelihood of a hostile takeover?

18       A.   I'm not a stock expert.  It would be

19    my position that implementing a restructuring that

20    is going to improve earnings would increase the

21    value of the company and that if the value of the

22    company is increasing that would be counter to

23    somebody wanting to buy the company.

24             MR. CARPONELLI:  Okay.  Let's mark

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

75

1      this next.

2              (Whereupon said document was

3              marked Deposition Exhibit No.

4              16 as of 1/8/09.)

5      MR. CARPONELLI    Q.    Showing you what

6  has been marked as your Deposition Exhibit No. 16,

7  do you recognize this document?

8      THE WITNESS    A.    I don't.  I don't

9  remember ever seeing this document.  I understand

10   what it is, I think.

11      Q.    Okay.  It bears a date of 4/18/06.

12   Is that your handwriting?

13      A.    I don't think that's my handwriting.

14      Q.    Okay.  You're not sure?

15      A.    It doesn't -- it doesn't look like my

16   handwriting.

17      Q.    Was this document reviewed by you on

18   or about the date it bears as part of the due

19    diligence that you were performing on modifying

20    the strategic plan in '06?

21        A.    I don't remember ever seeing this

22    document, and so I think the answer would be no.

23        Q.    Okay.  Let's just look as it relates

24    to Allen, M.  Are the numbers reflected here as it

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

76

1    relates to you accurate, if you know?

2        A.   Some of them are familiar to me,

3    others I know are wrong, and others I can't tell

4    you, so I can walk through those, if you want.

5        Q.   Okay.  And you have no idea who

6    prepared this?

7        A.   No.

8        Q.   And you have no idea what the purpose

9    is?

10       A.   No.  I would assume it was standard

11   governance with the Board or something of that

12   nature.

13       Q.   Okay.  Would you look at footnote

14   one?

15       A.   Okay.

16       Q.   The second sentence, "This is not

17   meant as any indication of expected future value

18   surrounding a possible Banta sale premium," do you

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    know what that means?

20         A.    My reading of that is that whoever

21    prepared this document is not making any judgment

22    about the future value of the company, but in

23    preparing the document some valuation of our stock

24    had to be assumed, and they are just simply saying

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   that.

2       Q.   And were they considering a possible

3   Banta sale premium?

4       A.   Yes.  They say that they have

5   included a 20 percent stock price premium figure

6   for illustrative purposes only.

7       Q.   Okay.  And so in April, presumably in

8   April of '06, they were -- for purposes of doing

9   this KEESA summary they were calculating the

10   current stock price at a 20 percent premium in the

11   event there had been a Banta sale, is that -- is

12   that your understanding of what this document

13   represents, and have you ever worked the numbers

14   to see if it is?

15          MR. BOWEN:  Okay.  Objection;

16          compound, lack of foundation, and it

17          mischaracterizes the document.

18          THE WITNESS:  I'm not sure I remember

19      everything you just asked.

20           MR. CARPONELLI:  Okay.

21           THE WITNESS:  Can I get that read

22      back to me, so I can answer it?

23           MR. BOWEN:  Sure, you can have the

24      question read, sure.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

78

1     MR. CARPONELLI   Q.   Yes.  Did you

2    ever -- correct me if I'm wrong.  You're saying

3    you never saw this document before and you don't

4    know who prepared it?

5     THE WITNESS   A.   I don't remember ever

6    seeing this document, and I do not know who

7    prepared it.

8     Q.   Okay.  And so you didn't see it in

9    April of '06, even though it bears that date?

10     A.   I don't remember ever seeing this in

11    April of '06, and I don't know why I would have

12    seen it in '06.

13     Q.   Okay.  Would this have been prepared

14    internally by your Accounting Department, if you

15    know?

16     A.   It could have been prepared by our

17    Accounting Department.  It could also have been

18    prepared by an outside firm or our either HR

19    Department, our Accounting Department, or a

20    committee of the Board.

21        Q.   Okay.  And you don't know which of

22    those it is?

23        A.   I don't, and I don't know when it was

24    prepared.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      Q.   Okay.

2      A.   It would -- presumably it was

3   prepared after 12/31/05, because they say they

4   used the closing price of that date.

5      Q.   Right.  And it bears a date of

6   4/18/06, and it contemplates a premium for shares

7   in the event the company is sold, assuming it's

8   one of your documents at Banta --

9      A.   Yes.

10     Q.    -- is that correct?

11        MR. BOWEN:  I'm going to object.  It

12        says it's not taking that into account, so

13        you're mischaracterizing the document.

14            This is not meant as any

15        indication of expected future value.

16        MR. CARPONELLI:  Well, okay.  So let

17        me rephrase.  That's a good point.

18        MR. CARPONELLI    Q.    Certainly the

19    possibility of Banta being sold for a premium was

20    part of the consideration of this document, would

21    you agree with me?

22         THE WITNESS    A.    I would agree.

23            MR. BOWEN:  Objection, lack of

24    foundation.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

80

1        MR. CARPONELLI:  If you know.

2        THE WITNESS:  What I read here is the

3     author of this document was wanting to

4     calculate what the potential change of

5     control payment would be under the KEESA,

6     and to do that you needed to assume a stock

7     price.

8     MR. CARPONELLI     Q.    Okay.  And do you

9   know who, if anybody, authorized a change of

10   control summary under the KEESA agreement to be

11   run?

12      THE WITNESS     A.    No.

13        MR. CARPONELLI:  Okay.  All right.

14     Fair enough.  Let's mark this.  This has

15     previously been marked as Jones Exhibit 1,

16     and I have a copy for you, Mike.

17        MR. BOWEN:  Great.  Thank you.

18     MR. CARPONELLI     Q.    Did you create

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt (159 of 416) [4/30/2009 5:17:32 PM]

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    this document?

20        THE WITNESS    A.   I was involved in the

21    creation of this document.

22        Q.   Who typed it?

23        A.   I don't know.  If I were to hazard a

24    guess, I would say Laurie Case in corporate

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

81

1   communications.

2       Q.   Okay.  And who did she report to?

3       A.   The head of corporate communications,

4   who worked up in Menasha, and I don't recall his

5   name.

6       Q.   Okay.  Do you know what the purpose

7   of this document was?

8       A.   Yes.

9       Q.   Okay.  Do you know when it was

10  created?

11      A.   Yes.

12      Q.   When was it created?

13      A.   It would have been created between

14  July 4th and July 20, 2006.

15      Q.   And what was the purpose?

16      A.   As I said earlier, after the Fourth

17  of July weekend Stephanie Streeter and I had a

18  conversation, and she asked me to prepare a

19    communication plan and an implementation plan for

20    the restructuring project that we had been

21    discussing throughout the early part of the year.

22            Based on that, I broadened the group

23    of people who knew about this restructuring plan

24    and to include corporate communications, which, as

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

82

1    I remember, it was Laurie Case was the primary

2    contact, and her boss.

3            Mark Fleming was her boss, and Frank

4    Rudolph would have been involved.  And this is one

5    document out of a series of documents that we

6    would have created.

7            We would have had perhaps, you know,

8    a letter to customers, we would have had a letter

9    to our employees, we would have had a script for a

10   conference call that we would have had, and these

11   documents were used so as to, you know, kind of

12   have a consistent communication method.

13           This specific document would have

14   been sent out to sales managers and plant managers

15   across Banta, so that they could field questions

16   from field sales reps, secretaries, factory floor

17   workers.

18       Q.   Okay.  Would you -- would you agree

19    with me that this was a script for those plant

20    managers and field superintendents to be able to

21    deal with questions regarding the restructuring?

22        A.    It's not meant to be like a verbatim

23    script as I think of the word script, but it is

24    suggested responses, because these people would

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

83

1    have just learned in a conference call of the

2    restructuring plan.

3        Q.   Okay.

4        A.   And we would have then sent this out

5    to them either via e-mail or hard copy or both, so

6    that as they get hit with questions they have some

7    idea of how they should respond.

8        Q.   Okay.  And did you create some of

9    these questions?

10       A.   I probably created some of these

11   questions.  Originally it was Frank Rudolph,

12   Laurie Case, Mark Fleming, myself.  After I

13   brought Mark Deterding -- excuse me, not Mark

14   Deterding.

15           After I brought Bob Kreider and Bob

16   Thornton into the planning, which would have been

17   around July 11th or 12th, they would have also

18   participated in looking at this, and everybody

19   was, you know, offering up what kinds of questions

20   are we likely to get from people in the field.

21          Q.   Okay.  Do you know what the mailing

22   date on this was?

23          A.   I talked to Jim Cyze and Kim Williams

24   on July 20th.  This document would have been

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   originally intended to go out on July 25th or

2   26th, right after the Board meeting, but I believe

3   it went out on Friday, July 21st, because we had

4   to accelerate our announcement.

5        Q.   Okay.  And why did you have to

6   accelerate your announcement?

7        A.   Competitors had been notified of the

8   plans and the details and started calling in to

9   our sales force and our plants on the night of

10   July 20th, and it was -- the news had been -- had

11   been broken, and we started receiving concerned

12   phone calls the night of the 20th.

13        Q.   Okay.  All right.  We'll get into

14   that.  I know you want to go there, and I

15   promise --

16        A.   I don't --

17        Q.   I promise I'll ask you about it.

18        A.   I don't need to go there.

19    Q.    And so it was mailed on the 21st?

20    A.    I believe it was mailed on the 21st,

21  after we had our conference call to announce the

22  restructuring.

23    Q.    Who finally approved -- is this the

24  actual document that was mailed, and was there a

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    cover letter that went with it?

2        A.   I don't know if this is the actual

3    document or if this is one of the drafts.  Based

4    on just the way I see how it ends on Page 2 and it

5    goes to Page 3 and there's kind of a break, and it

6    looks like there's some different fonts in here, I

7    would say that this is probably a draft.

8            There would have been a cover e-mail

9    or a cover letter, I'm sure, explaining this.

10       Q.   Okay.  And did you write the cover

11   letter?

12       A.   I would have participated in the

13   editing of it.

14       Q.   And who would have sent it?

15       A.   As I recall, corporate

16   communications -- during the planning in July

17   corporate communications collected an e-mail

18   distribution list and a hard copy distribution

19    list, so they would have then sent out this

20    information.

21         Q.   Okay.  When it went out did it have

22    question 30?

23         A.   I don't know.  I don't know.

24         Q.   Would there -- is it the same answer

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

86

1   for questions one through twenty-nine?

2      A.   Yes.  I mean, I would assume that --

3   since I don't know if this is the final document,

4   and I actually think it's a draft, it's possible

5   that anything on here could have changed from the

6   final draft that was distributed.

7        MR. CARPONELLI:  Okay.  Can you -- I

8      couldn't find anything other than this in

9      the documents, and that production number

10     shows that it came from your documents.

11        Mike, could you get me the

12     final, if there is a final other than this,

13     and the cover letter?  It wasn't produced.

14        I shouldn't say that.  I cannot

15     say -- and I've been through those boxes,

16     eight boxes of documents.

17        I cannot say that I found a

18     cover letter and another version of this.

19          MR. BOWEN:  Right.  Well, I mean,

20      everything we were able to retrieve from

21      the limited files that were retained after

22      the acquisition have either been produced

23      to you or put in a privilege log.

24          MR. CARPONELLI:  Okay.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

87

1          MR. BOWNEN:  So, you know, I'll make

2     an inquiry.

3          MR. CARPONELLI:  Okay.

4          MR. BOWEN:  But I can guarantee you

5     that if someone comes up with something we

6     haven't produced to you I'm going to be a

7     little bit upset, because there was a --

8     there was a determined effort to get every

9     scrap of paper we could find.

10        MR. CARPONELLI   Q.   Okay.  So I'm just

11    trying to get genuineness and authenticity.  You

12    have no reason to believe that 30 was deleted

13    from --

14        THE WITNESS   A.   I don't know.  I don't

15    know.  In the process from July 4thth to July 20th

16    or so, when we were iterating through all of the

17    communication plans, I don't know what version of

18    this this is.

19      Q.   Okay.

20      A.   It could have been included.  It

21  could have been that our general counsel, Ron

22  Kneezel, would have struck something like that.

23      Q.   Okay.

24      A.   Ron and Stephanie would have seen all

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

88

1    communications.

2        Q.   Is it fair to say that in the period

3    of time from July 4th through July 20th, before it

4    was mailed, that people raised the concept that

5    are we at risk of a takeover in terms of it

6    finding its way into a draft of the NBI Q&A?

7        A.   Yes, one of the people who created

8    the initial list of questions that then answers

9    were created during this process would have raised

10   that question, saying, okay -- the process we used

11   was what types of questions are our managers in

12   the field likely to receive.

13           I mean, there are things in here,

14   just looking at it briefly, are you going to cut

15   benefits, how am I going to get my performance

16   review next year, so we were trying to understand

17   what people or anticipate what people in the field

18   might ask and then provide some Q&A for people.

19      Q.    And so this question was asked and

20   this topic was considered in the NBI.  And, in

21   fact, correct me if I'm wrong, ultimately in the

22   beginning of August Cenveo made a hostile takeover

23   attempt, is that correct?

24      A.    This question was anticipated as a

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    possible question from the field.

2        Q.   Yes.

3        A.   Yes.  And yes, this was -- this

4    document was created prior to Cenveo's overture to

5    the company.

6        Q.    And so it was -- it was wise to

7    include it, because ultimately there was a

8    publication in August that Cenveo was attempting a

9    hostile takeover?

10        A.    That presumes that this was included

11    in the final draft, but if it was I guess it was

12    convenient.

13             I have no idea if this is in there.

14    Ron Kneezel may have told me not to, you know,

15    have something like this in there.

16        Q.    Okay.  Do you have a recollection one

17    way or the other?  I mean --

18        A.   I don't -- I don't recall.

19    Q.    Okay.

20    A.    I recall -- I recall a Q&A being

21    prepared for the purposes I've described.

22    Q.    And you'll agree with me that this is

23    a Banta document?

24    A.    Yes.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

90

1      Q.    Let's just get this out of the way.

2   I'm going to show you what has been marked as --

3      A.    Is there any chance I could have a

4   bathroom break?

5          MR. CARPONELLI:  Sure.  Absolutely,

6      absolutely.

7              (Whereupon a short

8              recess was taken.)

9      MR. CARPONELLI    Q.    Can you -- well,

10   actually, you don't have to do any marking.  This

11   has already been marked.

12          Mr. Allen, I'm going to show you

13   what's been marked as Armbruster No. 12.  I have a

14   copy for Mike.

15          Do you recognize this document?

16      THE WITNESS    A.    From the title page I

17   think I know what it is, yes.

18      Q.    Is this the document -- were you

19    involved in creating this document?

20        A.    Yes.

21        Q.    Did I give you the one with the

22    yellow highlights on it?

23        A.    Yes.

24        Q.    Can I switch with you?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

91

1    A.   Sure.

2    Q.   Thank you.  As far as you know, is

3    this a document that was presented in July of 2006

4    to the Executive Committee or to the Board or

5    both?

6         MR. BOWEN:  It's a compound question.

7         THE WITNESS:  This is either a draft

8    of or the final document that was presented

9    to the Board, and I was in the room for the

10    presentation.

11        MR. CARPONELLI:  Okay.  I have just a

12    couple questions.

13        THE WITNESS:  This actually looks --

14    that's right.  Okay.

15        MR. CARPONELLI:  Is it --

16        THE WITNESS:  Yes.

17    MR. CARPONELLI    Is this a document that

18    you were there when it was presented?

19        THE WITNESS    A.    Yes.

20        Q.    Okay.  And Today's Objectives on

21    Page 3 --

22        A.    My Page 3 says Executive Summary.

23    Page 2 says Today's Objectives.  Page 3 in the

24    document, slide No. 2.


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

92

1      Q.    Yes.  Okay.  Yes.  This is a power

2    point, right?

3      A.    Yes, yes.

4      Q.    Okay.  So Page 2 of the document --

5    Page 3 of the exhibit and Page 2 of the document,

6    it says "share progress against strategic

7    aspirations to date."

8          Can you tell me what that means?

9      A.    As I recall -- I'd have to go through

10    the document, but as I recall, what we did is we

11    laid out a strategic plan in 2004 with the Board

12    which the Board approved.

13          We gave them an update in 2005, and

14    this is the update in 2006, so we are sharing

15    progress against the objectives that we had been

16    working against.

17      Q.    Okay.  So that's not referring to

18    shares of stock?  It's just you're sharing with

19    them progress against the strategic aspirations to

20    date?

21        A.   Yes.

22        Q.   Okay.  And the second point is

23    discuss the business environment and strategic

24    issues.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

93

1          Do I take that to mean that you're

2   talking about the four cornerstones of your

3   strategic plan?

4       A.   I'd have to flip through the entire

5   document.  It would be -- it would be what's going

6   on in our markets, what's happening from a

7   competitive perspective, and what impact do those

8   have, both positive and negative, on our strategic

9   aspirations.

10      Q.   Okay.  Could you look at the next

11   page?

12      A.   Yes.  Executive Summary?

13      Q.   Yes.  And it -- and it says there on

14   the executive summary in the third paragraph, "The

15   four strategic cornerstones don't change, but the

16   business must be restructured and executional

17   intensity increased in order to take out costs,

18   focus on driving customer loyalty, and make it

19    easier to do business with Banta."

20        A.    Yes.

21        Q.    And you agree with that statement?

22        A.    Yes.

23        Q.    Okay.  And is it a correct statement

24    that the restructuring wherein Mr. Cyze lost his

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

94

1    job resulted in an annual cost reduction of 2.6

2    million?

3        A.   The immediate print restructuring

4    cost reduction was 2.6 million dollars.  As I

5    stated in some of our earlier discussions, there

6    were other phases contemplated that would increase

7    the ongoing cost reduction.

8        Q.   Okay.  But you would agree with me

9    that the termination of Cyze and the elimination

10    of his salary would be the immediate print

11    restructuring --

12       A.   He would be part of that.

13       Q.   Yes.

14       A.   There were -- there were several

15    people who would have been included in the savings

16    here.

17       Q.   Yes.  There was one other group of

18    Kim Williams?

19      A.    Kim Williams was another president.

20      Q.    Right.

21      A.    We demoted Mark Deterding, and as a

22   result we didn't have to hire some people, and

23   there were other people who ultimately lost their

24   jobs as well in the initial wave.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      Q.    Okay.  And there's no date on this.

2   Do you recall what date this was?  It's just

3   dated -- well, it's dated July, but it doesn't

4   have a date.

5      A.    It would have been July 23rd to 25th,

6   somewhere in there.

7      Q.    Okay.

8      A.    I'd have to look at a calendar for

9   2006 --

10     Q.    Okay.

11     A.    -- to figure it out.

12        MR. CAPONELLI:  All right.  Okay.

13     Will you mark this next, please?

14           (Whereupon said document was

15            marked Deposition Exhibit No.

16            17 as of 1/8/09.)

17     MR. CARPONELLI    Q.    This is an e-mail

18   from Sara Armbruster to Stephanie Streeter.  It

19    does not show you receiving a copy of it.

20              Are you familiar with this e-mail?

21         THE WITNESS    A.    I don't remember this

22    e-mail, but I can also read it and see if it

23    triggers anything.

24         Q.    Okay.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

96

1                    (Pause.)

2        A.   I don't recall ever seeing this.

3        Q.   Okay.  Do you remember a meeting on

4    May 12th, a Friday?

5        A.   I don't.

6             MR. CARPONELLI:  Okay.

7             MR. BOWEN:  The 12th or 10th?  This

8    says --

9             MR. CARPONELLI:  Well, this is --

10       the e-mail is the 10th, but it refers to

11       a meeting on Friday, which would be the

12       12th.

13            THE WITNESS:  Right.

14       MR. CARPONELLI   Q.   And you don't

15    recall attending?

16       THE WITNESS   A.   I don't.  I don't know

17    what -- it looks like it's CMC, which was -- I

18    don't remember what the acronym stood for, but it

19    was the -- it was the senior management team of

20    the company, so it would have been basically all

21    of Stephanie's direct reports.

22        Q.   Okay.

23        A.   And it may have been -- we met

24    periodically throughout the year, and she may have

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   been wanting to discuss the strat plan process.

2       Q.   Okay.  I'm going down to Peer

3   Comparisons.  Do you know what is referred to?  It

4   says, "Peer Comparisons: I've pulled data on our

5   peer group in the areas you requested."

6           Do you know what that is referring

7   to?

8       A.   As I recall, we were looking at how

9   were our sales, general, and administrative

10   expenses as a percentage of sales compared to

11   other competitor peers, so it's trying to get a

12   sense are we -- are we running a tight ship or was

13   there too much cost in our organization relative

14   to the competitive peer set.

15       Q.   In the second sentence it says, "I've

16   excluded restructuring and special charges, and in

17   cases where restatements created a lot of noise I

18   did not take the time to sort through that, so a

19    couple of companies have one year less of data

20    than the others."

21          What does -- what does the phrase "a

22    lot of noise" mean to you?

23          A.   I can remember one of the problems

24    that we had inside of Banta is as we would go from

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

98

1    year to year certain types of costs might get

2    allocated to different parts of the profit and

3    loss statement.

4         Q.   Yes.

5         A.   And as a result if you were looking

6    at comparisons you had some noise.  In other

7    words, you were comparing an apple to an orange.

8         Q.   I got you.  So noise meant they

9    weren't true comparisons?

10        A.   Right.  And so --

11        Q.   You needed to modify something?

12        A.   Exactly.  And when doing peer

13   comparisons inside the printing industry, for

14   example, marketing expense, sometimes that's

15   broken out as marketing expense, sometimes it's

16   included under sales, and some marketing expenses

17   might be included in manufacturing, so it's

18   difficult to get an apples to apples comparison.

19      Q.   Okay.  Now, on the very first

20   sentence it says, "Hi, Steph.  I've attached a

21   file that has all of the data you requested for

22   Friday except for the comparison of 2004 and 2006

23   strategic plan numbers."

24          As far as you know, is that talking

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1   about the financial numbers for sales revenue,

2   cost, expenses, SC&A, through the first quarter of

3   '06?

4        A.   As far as I know.  The standard

5   process during the strategic plan reviewing cycle

6   was to take a look at our current year performance

7   and projections and compare that back to what we

8   said in 2004.

9        Q.   Okay.

10       A.   And then to identify variances and to

11   explain what the variances were.

12       Q.   All right.  Now, you discussed

13   Deterding giving you a call in January?

14       A.   Deterding.

15       Q.   Deterding?

16       A.   D-I-N-G.

17       Q.   Deterding?

18       A.   Yes.

19    Q.    How does that -- how did that

20    information get to Stephanie?

21         A.    I told Stephanie about it in a

22    meeting that occurred in Stephanie's office where

23    Sara Armbruster, myself, and Stephanie -- it would

24    have been January/February of 2006.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

100

1          We were sitting down in Steph's

2     office to begin planning the work plan, what

3     needed to be accomplished during the strategic

4     planning review cycle that would happen between

5     January/February of '06 and the July Board

6     meeting.

7          Q.   Okay.

8          A.   And so Sara would have created a --

9     she would have created a detailed, you know, work

10     plan, and in that meeting I said we should be

11     looking at the restructuring and told her about

12     Mark Deterding's phone call.

13          Q.   And that's because you relied on that

14     phone call, which said things were going to be

15     dead for the second half?

16          A.   Yes.  Mark was -- there were a couple

17     things, as I recall, in Mark's conversation.  One,

18     Mark had lost some business, and so he was worried

19    about business, but that's more of a short-term

20    tactical issue.

21            Mark was concerned because his

22    performance, his business unit's performance, the

23    catalogue group, had been very good in 2005, but

24    he was running out of capacity, and so his ability

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

101

1    to grow earnings by growing his business was

2    coming to an end.

3            Therefore, we either needed to invest

4    back into his business to grow it or do something

5    else with it.

6            We even talked about should we sell

7    it, so that was one of the options on the table.

8    Q.   Okay.  And he ultimately was let go?

9    A.   No, he was ultimately demoted.

10           MR. CARPONELLI:  Demoted.  Okay.

11      That's right.  You're right.  You're

12      exactly right.

13              Would you mark this next,

14      please?

15              (Whereupon said document was

16              marked Deposition Exhibit No.

17              18 as of 1/8/09.)

18    MR. CARPONELLI    Q.   I just have a

19    couple.  Have you ever seen this document before?

20         THE WITNESS    A.    No.

21         Q.    Okay.  You were not involved in its

22    preparation?

23         A.    Not the preparation of the document.

24    I could have perhaps contributed content

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

102

1   unknowingly.

2       Q.   Okay.  To Stephanie, who was

3   obviously the author of it?

4       A.   I could have given it to Stephanie, I

5   could have given it to somebody during the

6   strategic planning progress, I could have given it

7   to Ginger Jones, who was our corporate, I could

8   have given it to Ron Kneezel or Geoff Hibner, any

9   number of people who could have collected

10   information and used it to prepare this document.

11       Q.   I'm just going to ask you, is it your

12   understanding that Stephanie, Frank Rudolph, Geoff

13   Hibner, Ron Kneezel, David Engel --

14       A.   Engelkemeyer

15       Q.   Engelkemeyer, Dennis Meyer, yourself,

16   Edward Padraic Allen, Robert Kreider, Dan

17   Thornton, Mark Deterding, Preston Walklet, Richard

18   Johnson, Alison Heiser, Jim Cyze, and Kim Williams

19    had KEESA agreements?

20        A.   Can you tell me what page that is?

21        Q.   I'm referring to Paragraph 19 on

22    D3747.  Is that consistent with your

23    understanding?

24        A.   Paragraph 19, D3747?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

103

1     Q.  Yes.

2     A.  Okay.

3     Q.  Paragraph 19.

4     A.  That looks -- that looks like about

5  right.  I'm surprised by two names there, but

6  other than that I'm not surprised by it.

7     Q.  Okay.  And do you see Paragraph 20 --

8     A.  I do.

9     Q.  -- where it talks about Cyze and

10  Williams were covered by KEESA prior to their

11  termination, and then it says, the last sentence,

12  "These individuals were informed of their

13  terminations prior to the hostile overture made by

14  Cenveo."

15     A.  Yes, I see that.

16     Q.  Okay.  In the sentence above that it

17  says, "The KEESA's definition of 'Effective Date'

18  includes a retroactive impact in the event that a

19    covered executive is terminated during the period

20    of 180 days prior to the date on which the change

21    in control occurs and it is reasonably

22    demonstrated by the executive that such

23    termination of employment," quotes, "'arose in

24    connection with or in anticipation of a change in

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

104

1    control.'"

2         Do you agree with that?

3         A.   Per my reading of the KEESA that you

4    gave me earlier, that looks like it's the same

5    wording.

6         Q.   Okay.  The next sentence refers to

7    the Cenveo hostile takeover only.  Correct me if

8    I'm wrong.

9         Wouldn't the effective date kick in

10   if the -- if anybody was anticipating a change of

11   control with anybody other than Cenveo at the time

12   of the termination?

13        It's not limited to Cenveo, is it?

14        MR. BOWEN:  Objection.

15        MR. CARPONELLI:  In your

16        understanding.

17        MR. BOWEN:  Objection.  The question

18        calls for a legal conclusion from the

19    witness, and I discern no foundation for

20    the -- for the question.

21        MR. CARPONELLI    Q.   Well, let me

22    rephrase.  You received your KEESA benefits,

23    correct?

24        THE WITNESS    A.   Yes, I did.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

105

1      Q.    And Cenveo never had a transaction?

2      A.    That's correct.

3      Q.    And you received your KEESA benefits

4   because the transaction with R.R. Donnelley closed

5   on January 9th of 2007, is that correct?

6          MR. BOWEN:  I think it was January

7      10th.

8          MR. CARPONELLI:  January 10, 2007.

9          THE WITNESS:  Yes, that's correct.

10     MR. CARPONELLI   Q.   Okay.  And the

11   change in control under the KEESA agreement is not

12   limited to any particular company?

13         It's any company where there is an

14   anticipation or there otherwise arises an

15   anticipation?

16         THE WITNESS   A.   That would be my

17   understanding.

18         MR. BOWEN:  I'm going to object.  The

19      contract in question is a written document.

20      It speaks for itself.

21          It says what it says.

22          MR. CARPONELLI:  Okay.  I'm going to

23      show you what has been marked as Jones

24      Exhibit 3, a copy for you, Mike.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

106

1        MR. BOWEN:  All right.

2        MR. CARPONELLI    Q.    Do you recognize

3    Stephanie's Streeter's handwriting?

4        THE WITNESS    A.    No.  I mean, I don't

5    remember Stephanie's handwriting.  So if you

6    handed this to me and told me to guess who it was,

7    I wouldn't have -- I wouldn't have known.

8        Q.    If I tell you that I -- that I

9    believe this is Stephanie Streeter's handwriting,

10    would that refresh your recollection so that you

11    could comment that it appears to be her

12    handwriting?

13        A.    (No response.)

14        Q.    Or are you not familiar enough?

15        A.    I don't -- I'm not familiar enough

16    with Stephanie's handwriting.  It's been a couple

17    of years since she and I have even corresponded,

18    and I don't know, so I don't think I can vouch for

19    this being Stephanie's handwriting.

20        Q.   Okay.  Fair enough.  Do you know if

21    Stephanie had a meeting with John Canning on June

22    29th of 2006?

23        A.   I have never heard the name John

24    Canning before.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1       Q.    Okay.  Did Stephanie ever tell you

2    about a meeting with John Canning on June 29th of

3    2006?

4       A.    I have never heard of John Canning

5    before.

6       Q.    Okay.  If I told you that John

7    Canning -- there is a John Canning, Jr. who's the

8    chairman and a managing director of Madison

9    Dearborn Partners, would that refresh your

10    recollection?

11       A.    I don't remember any conversations

12    that Steph ever had with me about talking to

13    Madison Dearborn Partners.

14       Q.    Okay.  Did you ever discuss with

15    Stephanie a leveraged buyout?

16       A.    No.

17       Q.    Never?

18       A.    Never.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    Q.    Okay.  Do you know if Madison

20    Dearborn Partners was involved in Jefferson

21    Smurfit?

22        A.    I don't know.

23    Q.    Boise Cascade?

24        A.    I don't know.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

108

1      Q.    Packaging Corp. of America?

2      A.    I don't know.

3      Q.    Okay.  Do you know what a fairness

4   opinion is?

5      A.    I think it's when an outside

6   company -- it might be an accounting firm or an

7   investment banking firm -- makes an opinion as to

8   whether or not an offer to buy a company is fair

9   and reasonable.

10      Q.    Okay.  And in the transaction with

11   Banta to R.R. Donnelley UBS did a fairness

12   opinion, is that right?

13      A.    I don't know.

14      Q.    Okay.

15      A.    I'm sure someone did.

16      Q.    Okay.  You were never asked to be

17   part of an investment by the management team to

18   invest in a potential LBO?

19     A.   Of Banta Corporation?

20     Q.   Yes.

21     A.   No.

22     Q.   Okay.  Stephanie never advised you

23   that she met with John Canning?

24     A.   No.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

109

1          MR. CARPONELLI:  Okay.  Would you

2      mark this next?

3               (Whereupon said document was

4                    marked Deposition Exhibit No.

5                    19 as of 1/89/09.)

6          MR. CARPONELLI    Q.    I'm showing you

7      what has been marked as an exhibit, and the

8      document is entitled Minutes, CMC Meeting, May 12,

9      2006, Butte des Morts Country Club.

10              Did you attend this meeting?

11          THE WITNESS    A.    Yes.

12          Q.    And what does CMC stand for?

13          A.    I think it stood for Corporate

14      Management Council.

15          Q.    Okay.  Was this a senior management

16      team meeting?

17          A.    Yes.

18          Q.    Okay.  I'm going to call your

19    attention to bullet point two on the first page.

20         A.    Yes.

21         Q.    Do I take it correctly that on May

22    12th of 2006 you discussed two separate structural

23    changes; A, put literature management and direct

24    marketing together and put publication, catalogue,

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

110

1    and book together, manage the first for growth and

2    the second for cost; and B, put all the businesses

3    into a single print sector at a minimum for all

4    operations and administrative functions?

5        A.   Yes, we had both of those

6    discussions.

7        Q.   Okay.  And so in May it had not been

8    determined to do A, is that correct?

9        A.   It had not been determined.  I didn't

10   make a final recommendation to Stephanie until

11   June.  Stephanie wanted me to update the

12   executive -- the CMC as to what our thinking was.

13           I walked through where we were --

14   where I was in my thinking, which would have been

15   A, and structural change option B, which is one

16   large print sector, was offered as an alternative,

17   as we discussed.

18           You know, why go down to two, why not

19    go all the way down to one was kind of the

20    discussion.

21         Q.   Okay.  And the final decision took

22    place sometime, as I understand it, in July?

23         A.   Yes.

24         Q.   Okay.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

111

1      A.   The decision -- the approval.  I

2   mean, what decision are you referring to?

3      Q.   Well, you hadn't made up your mind in

4   May, on May 12th, whether you were going to do A

5   or B, is that correct?

6      A.   Me personally?

7      Q.   Yes.

8      A.   I had a strong preference for A, and

9   that was what my recommendation had been since

10   January or February.

11      Q.   Okay.  But the CMC had to approve it?

12      A.   No, Stephanie and the Board of

13   Directors had to approve it.  The CMC was

14   providing input into my plan.

15      Q.   Okay.  The CMC didn't vote on it?

16      A.   No.

17      Q.   Okay.  So the CMC just discussed it?

18      A.   Yes.

19    Q.    They discussed A and B?

20    A.    Right.

21    Q.    And eventually Stephanie presented it

22    and A was approved, but that was sometime in July?

23    A.    Right.  And B was never even

24    presented to the Board.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

112

1       Q.   Okay.

2       A.   Never presented by me.  I mean, I

3    have no idea if Steph talked about it.

4       Q.   Do you know why this is marked

5    Exhibit 6, Mike?  Did we mark this previously in

6    Cyze's dep?  This is the exhibit to my complaint.

7           Okay.  So let's just go with -- let's

8    just go with what has previously been marked as

9    Exhibit 6 to my complaint and ask you to review

10   that document.

11      A.   I've scanned it.

12      Q.   Okay.  And do you know what the date

13   of this document is?

14      A.   No.

15      Q.   Okay.  Was it in effect when you came

16   on in '04, January of '04?

17      A.   I would say the date of this document

18   is likely to be after I came on board, because

19    Stephanie was not chairman when I came on Board.

20        Q.    Okay.  Now, this is Stephanie's

21    personal statement of her ethics.  Did you

22    subscribe to these same ethics?

23        A.    Yes.

24        Q.    Okay.  Was everybody expected to

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

113

1    subscribe to these same or similar ethics?

2        A.   At least similar ethics.  It may --

3    it may have been exactly this verbatim.  There was

4    a book -- we called it the Blue Book -- that our

5    general counsel distributed throughout the

6    corporation that had our ethics policy.

7        Q.   Okay.  Showing you what has been

8    marked as Exhibit 7 to my complaint, now this is a

9    separation and noncompetition agreement and

10    release of all claims, and it's between Jim Cyze

11    and Banta.

12             Correct me if I'm wrong.  It's signed

13    by you on July 20th?

14        A.   Yes, it is.

15        Q.   Okay.  And it was never signed by Jim

16    Cyze, as far as you know?

17        A.   As I believe, this version of an

18    agreement was not signed by Jim Cyze.  There

19    were -- there was a subsequent version, as I

20    recall, that Jim Cyze signed and then revoked.

21        Q.   That's No. 8.

22        A.   Okay.

23        Q.   Okay.  Correct me if I'm wrong.  Was

24    the first notice that you gave of Jim Cyze's

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

114

1    termination on July 20th, which is written up

2    here, date given to employee, July 20th?

3        A.   Yes.

4        Q.   Okay.  And that document was signed

5    by you before you gave it to him?

6        A.   Yes.

7        Q.   And the understanding was he was

8    going to be terminated effective in August at some

9    time but that under the terms of this agreement he

10   had certain time to review it with his attorney,

11   and you dated the date upon which it was given to

12   him, and if everything was copacetic during the

13   interim his effective date of termination would

14   have been August --

15       A.   Thirty-first.

16       Q.   August 31st, is that correct?

17       A.   Yes.

18       Q.   All right.  And this never came back

19    to you signed by him?

20         A.    This version did not come back to me

21    signed.

22         Q.    Okay.  Showing you now what has been

23    marked as my complaint Exhibit No. 8, this is a

24    letter by Mr. Kneezel.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

115

1      Were you involved in the preparation

2  of this letter?

3      A.   I had discussions with Mr. Kneezel

4  and Stephanie Streeter and Frank Rudolph and

5  perhaps Robin Shrader, who worked for Ron Kneezel,

6  about this document.

7      Q.   Okay.  And correct me if I'm wrong.

8  Was this document created at your urging and

9  request, if you know?

10     A.   No, that's not how I would

11   characterize --

12     Q.   Okay.

13     A.   -- how this document came about.

14     Q.   All right.  This document is dated

15   July 26th, and it comes from Kneezel?

16     A.   Yes.

17     Q.   After July 20th did certain events

18   occur that caused this agreement to be prepared by

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    Mr. Kneezel?

20         A.    Yes.

21         Q.    Okay.  Can you tell me, please, when

22    and what those events were?

23         A.    It started on July 20, 2006.  It was

24    the day that I was planning on telling Kimberly

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

116

1    Williams, president of the publication group, and

2    Jim Cyze, the president of the direct marketing

3    group, that their positions were being terminated,

4    and I presented with them the document that we

5    reviewed a moment ago.

6            And it was late in the afternoon,

7    about 4:30, 5:00 o'clock in the afternoon.  It was

8    a Thursday, I recall.

9            And we chose to tell Kim and Jim on

10   Thursday, the 20th, about five days or so prior to

11   receiving the final Board approval, about the

12   restructuring plan, because we wanted Kim and Jim

13   to have the opportunity to travel to Wisconsin to

14   meet with Stephanie Streeter face to face on that

15   Friday, the 21st.

16           I told Jim --

17   Q.   Where did Jim work, by the way?

18   A.   Jim worked in Oak Brook, Illinois, in

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    the same office that I worked in.

20         Q.   Okay.

21         A.   I went to Jim's office, and I closed

22    the door and I told Jim that the company was going

23    forward with a restructuring and we were going to

24    be presenting it to the Board, and that as a

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    result of that restructuring he was not going to

2    have a position going forward.

3        Q.    Now, did you tell him that before or

4    after you told Kim Williams?

5        A.    You know, I don't really remember.

6    It was -- both conversations were short.  I don't

7    remember which one I told first.

8        Q.    Okay.  All right.  Go ahead.  What

9    did he say in response?

10       A.    He was -- as I recall it, he was

11   cool.  I mean, I don't mean cold.  He took it in

12   stride, wanted to understand how the business was

13   going to be restructured.

14            I told him that he had the

15   opportunity to speak to Stephanie and she would

16   meet with him face to face if he wanted to have a

17   conversation with her.

18            I asked him to keep it --

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      Q.    That was the next day?

20      A.    He could.  He could talk to her that

21   night if he wanted to.

22      Q.    Yes.

23      A.    Or he could travel up to Wisconsin

24   the next day to meet her.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

118

1      Q.    She was available?

2      A.    She was available.  That's why we did

3   it Thursday.  And that this was not going to

4   become public until after the Board meeting and

5   that I wanted to tell him in advance so that he

6   could, you know, know when this was coming, so

7   that he could organize himself, and so that

8   because we were asking him to stay on as an

9   employee until the end of August we wanted him to

10   participate in any transition that might occur and

11   wanted him to be able to collect his thoughts and

12   his emotions, because we recognized that it could

13   be a difficult emotional experience the following

14   week, when this was announced to the organization.

15      Q.    Okay.

16      A.    I got up and I left Jim's office, and

17   I was walking down the hall to mine, which was at

18   the far end of the building.

19    Q.   Now, did you give him any

20    instructions with regard to what he was to do with

21    the information that he was terminated?

22    A.   I told him that -- I asked him that,

23    you know, he keep this in confidence and not

24    reveal it to anybody else.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

119

1      Q.    His termination?

2      A.    The restructuring and his

3  termination.

4      Q.    What did he know about the

5  restructuring?  What documents did you give him on

6  the restructuring?

7      A.    I didn't give him any documents on

8  the restructuring, but I explained in a broad

9  sense that we were taking the five business units

10  and we were consolidating them down to two, that I

11  had selected Bob Kreider and Dan Thornton to run

12  those two units, that Mark Deterding was being

13  demoted and that Kim Williams and he were being

14  terminated, and that there were likely to be other

15  terminations as a result of the consolidation.

16     Q.    Okay.

17     A.    And that it would be announced the

18  following week.  I gave him the separation and

19    noncompetition agreement, and I believe I gave him

20    a -- I don't know if I gave it to him.  I know I

21    had a power point slide that had kind of a summary

22    of what he could expect.

23            I didn't expect him to try and read

24    through one of these long legal documents, so it

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

120

1   was kind of a summary document that said you're

2   going to receive so many weeks of separation, so

3   much outplacement services, you know, this is

4   what's going to happen to your bonus, that type of

5   a thing, so that when he went home to his wife he

6   had answers to questions that he might have there.

7       Q.   Let me ask you a question.  Before

8   you met with Mr. Cyze did you know whether or not

9   he had an employment agreement?

10      A.   I don't remember that he had an

11  employment agreement.

12      Q.   Okay.

13      A.   I would have -- I think I would have

14  been told that by the corporate HR and legal.

15      Q.   So your understanding was he did not

16  have an employment agreement?  He was an at-will

17  employee?

18      A.   Yes, that's my understanding.

19    Q.   Did he have a covenant not to

20    compete?

21    A.   He did not.

22    Q.   Did he have a nonsolicitation

23    agreement?

24    A.   He may have.  As I remember, our

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

121

1    confidentiality agreement may have had a

2    nonsolicitation clause in it.

3        Q.    Do you have a specific recollection?

4        A.    I do not have a specific

5    recollection.

6        Q.    Okay.  And do you know how long that

7    lasted?

8        A.    I do not know.

9        Q.    Okay.  Did the agreement that you

10   gave Mr. Cyze have a noncompetition agreement in

11   it?

12       A.    As I -- as I recollect, the original

13   document that I gave to Jim Cyze on July 20th had

14   a severance component to it and a noncompetition

15   component to it.

16       Q.    Okay.  So that was something

17   different than what he had before?

18       A.    Yes.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19     Q.   Okay.  And did the document say

20   anything about confidentiality?

21     A.   Do you want me to go back to the

22   original document?

23     Q.   If you can recall.  As you sit here,

24   do you recall whether it did?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

122

1    A.   I don't.  I don't recall.

2    Q.   Okay.  Do you recall whether your

3  request to him about confidentiality was separate

4  from the agreement or in the power point

5  presentation or something that is contained in the

6  agreement?

7    A.   I believe I reminded him that he was

8  an employee of the company and that I wanted him

9  to keep the information I was communicating to him

10  confidential.

11    Q.   Okay.  Now, would you look at the

12  agreement and see if you can find that provision

13  in the original Exhibit 7?

14    A.   So you want me to go back to seven?

15    Q.   Yes, and see if you can find it in

16  there.

17                (Pause.)

18    A.   This document that I'm reading, which

19   is Exhibit 7, references on Page 4 a general

20   release and waiver, and I'd have to read that,

21   because that's being incorporated into this

22   agreement, to see if there's anything in that.

23       Q.   Yes.  Well, let me represent to you

24   it has nothing about not disclosing the

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    restructuring.

2          You can look at Page -- Paragraph E

3    on Page 6, however.

4          MR. BOWEN:  That would be a hint.

5          THE WITNESS:  That would help.

6          MR. CARPONELLI:  And probably D, too.

7          THE WITNESS:  Well, as I read it,

8      this is pretty clear that he is being

9      instructed to keep things confidential that

10       are nonpublic and that he acknowledges and

11       reaffirms his agreement with the

12       confidential information, intellectual

13       property, and nonsolicitation of employees

14       agreement that he signed on September 1,

15       1999.

16          MR. CARPONELLI   Q.   Okay.  It says --

17     but it doesn't mention specifically the

18     restructuring, is that correct?

19      THE WITNESS   A.   No, it talks about

20   nonpublic and otherwise confidential information

21   regarding the company and its operations.

22      Q.   Okay.  And when it says "employee

23   will not disclose," who is it referring to?

24      A.   I would have to have an attorney's

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

124

1    opinion on what that means.

2        Q.   Okay.  All right.  Go ahead.  What

3    happened next?

4        A.   I left Jim Cyze's office and I

5    started to walk to the far end of the building,

6    which was where my office was, and about halfway

7    there I remembered that I was going to also talk

8    to Rick Arozco, who was V.P. of HR for the print

9    sector, and tell him what was going on, since he

10    had been left in the dark during all of this

11    planning.

12        I turned around and started going

13    back to Jim -- Rick Arozco's office and passed by

14    the lobby of our building, and I saw Jim Cyze and

15    John Singer, his V.P. of sales, enter the

16    stairwell next to the elevators.  We were on the

17    third floor.

18        I went and spoke to Rick Arozco,

19    explained to Rick Arozco what was going on, and

20    left Rick's office and wandered over to John

21    Singer's office, and John Singer was there, and I

22    asked John Singer what the conversation was he had

23    with Jim Cyze in the stairwell by the elevator,

24    and John Singer told me that Jim Cyze had just

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

125

1    communicated to him that he had fired him.

2        Q.    Okay.  Anything else?

3        A.    That happened all that day?

4        Q.    No.  Did Singer tell you anything

5    other than that?

6        A.    Yes, he may have.  He may have.  I

7    don't recall.  He may have gone into more details

8    about the restructuring.

9            I don't recall.

10       Q.    Okay.  So correct me if I'm wrong.

11    Your testimony is that Cyze told his direct report

12    that he had been terminated?

13       A.    Yes.

14       Q.    Okay.  And you take that to be a

15    breach of the confidentiality provision in

16    Paragraph 6?

17       A.    I do.

18       Q.    Okay.  Did Singer tell you anything

19    about the restructuring?

20         A.   I don't recall if he knew the detail

21    of the restructuring.  I seem to recall that he

22    knew enough details that he knew that Dan Thornton

23    was going to be taking over the combined units and

24    that John Singer was then, "Well, what's going to

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    happen to me?"

2        Q.    Okay.  Correct me if I'm wrong.

3    Confidential information within the company would

4    not include Cyze talking to his direct report

5    about anything that was going on at Banta, is that

6    correct?

7        A.    No.  Jim was considered a senior

8    officer in the company and was -- had privileged

9    access to information, nonpublic information, and

10    him revealing that to people on a

11    not-need-for-know basis was inappropriate.

12        Q.    Well --

13        A.    If Jim knew --

14        Q.    -- I guess you and I -- I guess you

15    and I will have a disagreement about that, but the

16    point here is the only thing you've testified to

17    so far -- and I don't mean be argumentative -- is

18    that Cyze told his direct report that he was

19    terminated.

20         A.   Right.  That's my testimony.

21              MR. CARPONELLI:  Okay.

22              MR. BOWEN:  So far.

23         MR. CARPONELLI    Q.    And it was, in

24    fact, the case that he was terminated?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    THE WITNESS    A.    Yes.

2        Q.    Okay.  Is there anything else that

3   you can think of that occurred as it related to

4   Cyze and a breach of his confidentiality?

5        A.    Yes.

6        Q.    What else?

7        A.    That evening Frank Rudolph had driven

8   down from the Menasha headquarters.  He was the

9   V.P. of HR for the --

10        Q.    Now, excuse me.  Before you -- before

11   you answer that, at this point you've told Arozco

12   of the restructuring, you've told Singer of the

13   restructuring, you've told Kim Williams of the

14   restructuring, and you've told Cyze of the

15   restructuring, so we have at least four people who

16   are aware of the restructuring, not to mention

17   Stephanie Streeter and all the members of the CMC

18   Committee.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      A.   Yes.

20      Q.   Okay.  Anybody else know about the

21   restructuring?  Kneezel?

22      A.   Well, Kneezel would have been part of

23   CMC.  Corporate communications had helped me

24   prepare the documents we reviewed earlier, Ginger

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

128

1   Jones.

2           I can't remember if she was part of

3   CMC, but Ginger Jones helped me with the -- with

4   pulling together kind of the financial analysis.

5           Robin Shrader, I believe, knew,

6   because I believe Robin was actually the person

7   who probably created the legal documents that you

8   and I are looking at.

9           She reported to Ron Kneezel.  Our

10   Board of Directors, at least the Executive

11   Committee of our Board of Directors, I believe,

12   knew.

13      Q.    So we've got 20 to 40 people who were

14   familiar with the restructuring?

15      A.    Twenty is probably about the right

16   number.

17      Q.    Okay.  All right.  Go ahead.  I

18   interrupted you.

19      A.   So that evening Frank Rudolph, V.P.

20   of HR for the corporation, had traveled from

21   Menasha down to Illinois, and he and Rick Arozco

22   and I went to dinner.

23          Rick was -- reported jointly to both

24   Frank and I in his role as the head of HR for the

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

129

1   print sector.

2           That night at dinner I received a

3   telephone call from Kimberly Williams, who I had

4   terminated, or at least talked to her about the

5   restructuring and told her she was going to be

6   terminated the end of August, and she told me that

7   she had received a phone call at home from Andy

8   Johnson, who was the plant manager for our plant

9   in Kansas City, Missouri, and that Andy was asking

10   questions about her being fired and the

11   restructuring, because Andy had received a call

12   from Peter Hanson, who was a senior executive at

13   Cadmus Communications, one of our competitors, and

14   was a former Banta executive.

15           A few -- she talked to him and tried

16   to disarm things.  And then she received a phone

17   call from Ritt Schiano, who was a sales manager

18   working in the publication group, Kim Williams'

19    group, because he had received a telephone call,

20    as I recall, from a gentleman by the name of Todd

21    Baridelli, who also worked for Cadmus

22    Communications, and Todd Baridelli was saying, "I

23    know you guys are going to have a restructuring,

24    we're going to go after your business," you know,

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

130

1    that type of thing.

2           And so the publication -- the

3    publication group that Kim Williams led was now

4    running with information, and they were being told

5    by former executives of Banta, who were now

6    executives at our competitors, that they were

7    going to be contacting customers the next day and

8    trying to tell them about all of this and what was

9    going on in the company.

10          I was furious.  I called Ron Kneezel,

11   general counsel, to advise him of what had

12   happened.

13          I can't remember if it was Ritt

14   Schiano or Andy Johnson, but one of them told Kim

15   Williams that Peter Hanson got this information

16   from Jim Cyze.

17      Q.   So we're talking thirdhand?

18      A.   Absolutely, thirdhand.  So I called

19    Ron Kneezel, explained what was going on.

20         MR. BOWEN:  Don't tell what you

21    told -- the details of what you told Mr.

22    Kneezel.

23             He's counsel.  That's

24    privileged.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

131

1          THE WITNESS:  Okay.  So I called Ron

2     Kneezel.  We had a -- we had a discussion,

3     and I placed a call to Jim Cyze on his cell

4     phone, which was unanswered.

5               I called him at home and spoke

6     to his daughter, who said that he was not

7     home, and so I called him back on his cell

8     phone and I left him a message saying that

9     he should get in touch with me immediately,

10      that we had a situation that had developed

11      and I wanted to talk to him about it, and

12      explained that Peter Hanson had information

13      on the restructuring and that it would

14      appear that he was the source.

15               I received a phone call in ten

16      or fifteen minutes from Jim Cyze, and Jim

17      denied having spoken to anybody.

18                And that night I then spoke

19      with Stephanie Streeter and we made the

20      decision that we couldn't wait to go to the

21      Board of Directors at the Board meeting

22      four or five days later, and we decided

23      that we were going to make the formal

24      announcement public about the print sector

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

132

1    restructuring the following day.

2    MR. CARPONELLI    Q.    The 21st?

3    THE WITNESS    A.    The 21st, that Friday.

4    And so we went public with the announcement and

5    followed up on all of the communication planning

6    that we had put in place and escalated it to that

7    day.

8        Q.    So just so that I am clear, Cyze

9    denied having spread the rumor?

10       A.    Yes.

11       Q.    Okay.  But you elected not to believe

12    him?

13       A.    I did not believe him.

14       Q.    Okay.

15       A.    Well, I don't -- yes, I did not

16    believe him.

17       Q.    Okay.

18       A.    So we get to Exhibit 8.

19      Q.   Yes.

20      A.   Because I think your original

21   question at the beginning of this --

22      Q.   Yes.

23      A.   -- is how did this come about.

24      Q.   Yes.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

133

1        A.   I don't recall the timing, but

2    between July 20th and the date on this document,

3    July 26th, Stephanie Streeter, Ron Kneezel, and I

4    had a series of conversations, as you can expect.

5             I was a proponent of not replacing

6    this document, the original document that we gave

7    Jim Cyze.

8             I felt that it was important that we

9    continue to go forward with that, and if Jim had

10    been the source of the leak it pointed to me that

11    it was all that much more important that we have a

12    noncompete, and so I really felt that, you know,

13    going forward with this document as it was

14    originally given to Jim on July 20th was the way

15    to go.

16             Between July 21st and July 26th the

17    decision was made to change the original offer,

18    continue with the offer.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19          There had been some discussion about

20     pulling everything off the table, including all of

21     his severance, and to basically let him go

22     effective immediately.

23          We ultimately created a document that

24     was signed by Ron Kneezel and dated July 26th.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

134

1     Q.   Well, the letter is signed by Ron

2    Kneezel.  I don't have a copy of the agreement

3    signed by you.

4        Did you sign a copy of Exhibit 8, the

5    second one?

6     A.   I believe I didn't sign it before we

7    gave it to him.  I remember specifically being

8    chastised by our -- by our counsel I should not

9    have signed this one, the first one that I gave to

10    Jim on the -- on the 20th.

11        They said, "No, no, you should have

12    him sign it first and then you can sign it," so I

13    wouldn't have signed the second document that we

14    gave to Jim until after he signed it.

15     Q.   Okay.  And Cyze never signed it?

16     A.   It's my recollection that Jim

17    actually did sign this document, and then he came

18    back to my office in August or in September and

19    revoked it.

20            I'd have to read it, but I believe he

21    had 30 or 45 days or 60 days to revoke.

22        Q.   Under the release provisions?

23        A.   Yes.  I'd have to go through it, but

24    I think there's a --


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

135

1       Q.   How long did he work at Banta after

2    the 20th?

3           MR. BOWEN:  How long did Cyze work at

4    Banta?

5           MR. CARPONELLI:  After the 20th of

6    July.

7           MR. BOWEN:  You mean actually work?

8           MR. CARPONELLI:  Actually appear

9    there at the offices.

10          THE WITNESS:  I'm not sure I saw Jim

11      again as an employee.  Jim showed up in our

12      offices in August or September, came to my

13      office.

14              I was on the phone.  My door

15      was closed.  He knocked on the door, I

16      opened it up, and he handed me the revoked

17      version of this.

18    MR. CARPONELLI    Q.   Okay.  Well, when

19    did -- when did you have his personal belongings

20    removed from the Oak Brook office?

21        THE WITNESS    A.    I don't recall.  As

22    I -- as I -- as I recall, he came in, and Rick

23    Arozco, the V.P. of HR, who was also officed in

24    our Oak Brook complex, helped him remove his

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

136

1   belongings, but I don't recall when that occurred.

2       Q.   Okay.  Is it your understanding that

3   between July 20th and July 28th that Mr. Cyze

4   continued to work for Banta at the offices in

5   Oak Brook?

6       A.   Well, I know that Jim didn't show up

7   to work on July 21st.  On that following Monday,

8   which would have been about the 24th or the 25th,

9   I was at the Board meeting, so I don't know if he

10   came into the office.

11          That may be when he removed his

12   belongings.

13      Q.   Okay.  This letter is addressed to --

14   is addressed to him in Orland Park.  Is that --

15   was this -- the Exhibit 8, is that your

16   understanding of his home address?

17      A.   Yes.

18      Q.   Okay.  So is it your understanding

19    that he stopped attending work sometime between

20    the 20th and the 26th?

21        A.   Yes.  I would guess that he did not

22    show up for work again.  He didn't show up for

23    work on the 21st.

24        Q.   Okay.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      A.    And I was in the office on the 21st.

2      Q.    What was your understanding of his

3    status during the revocation period on the -- on

4    Exhibit 8?

5      A.    During the revocation period?  Well,

6    my understanding is he was no longer an employee.

7      Q.    As of July 28th?

8      A.    As of July 28th, and that there was a

9    period under which he could revoke this, but he

10   wasn't an employee during that period.

11      Q.    Okay.  So the fact that he revoked it

12   doesn't change your understanding of the fact that

13   he was terminated on July 28th?

14      A.    No.

15      Q.    That was his last day?

16      A.    Yes.

17      Q.    Or was his last day the 20th?

18      A.    Well, this would say that the

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    effective date of the termination was on July

20    28th, so I believe this would be the proper

21    documented separation date.

22         Q.   Although this was never executed by

23    him or you?

24         A.   It was signed by him.  I believe I

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

138

1    would have signed it.

2        Q.   You think you signed it?

3        A.   I believe so.  And then he revoked

4    it.

5        Q.   During the revocation period?

6        A.   Yes.

7        Q.   Which means that there was no

8    release, no noncompetition, and no written

9    agreement as it relates to his termination, is

10   that correct?

11       A.   There was no release that I know of,

12   there was no noncompetition, and I don't know if

13   there was anything executed between -- most of the

14   communication that occurred with Jim after the

15   20th occurred between our Legal Department, and he

16   had some conversation with Rick Arozco --

17       Q.   Okay.

18       A.   -- about getting his belongings.

19      Q.    All right.  Did you ever learn of any

20   other breach of a code of ethics by Cyze other

21   than what you've testified to here?

22      A.    Well, in addition to calling -- well,

23   in addition to what I've now learned from his

24   deposition, that he did call Peter Hanson, I know

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

139

1    that he also called Joe Wofolk and he called Larry

2    Panazzo.

3         Those were -- Joe Wofolk was an

4    employee, Larry Panazzo was not.  I don't believe

5    I can attest to anything else that would say he

6    violated any ethics.

7         Q.   Okay.  Now, were there any

8    consequences to Banta by going public on the 21st

9    as opposed to going public after the Board

10    meeting?

11        A.   I would say that we had -- we had

12    significant market communication and competitive

13    problems for a week or two.

14        Q.   Can you identify with a reasonable

15    degree of certainty any lost sales --

16        A.   No.

17        Q.   -- as a consequence?

18        A.   No.

19        Q.    Okay.  Can you identify with a

20    reasonable degree of certainty any lost profits?

21        A.    Only expenses that would have been

22    incurred by us to manage the communication problem

23    that had been created.

24        Q.    And what are those?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

140

1    A.   It would have been time, it would

2  have been travel, you know, going out to see

3  customers, getting in front of customers, holding

4  conference calls, things of that nature.

5    Q.   What specific conference calls,

6  visits to customers, and the like --

7    A.   I don't --

8    Q.   -- can you recall?

9    A.   I don't recall.

10    Q.   Okay.  So you have no specific

11  recollection of any specific expenditures as a

12  consequence of going public on the 21st as opposed

13  to the --

14    A.   I don't recall any specific

15  expenditures.

16    Q.   Okay.  And under Exhibit 6 can you

17  identify, at least as it relates to Stephanie's

18  personal statement of ethics and values, where a

19    specific provision would have been violated by

20    Cyze, had he been subject to the same statement of

21    ethics and values?

22        A.    By my reading I would say there are

23    two of the bullets that you could say his actions

24    the evening of the 20th would have at least

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

141

1    violated the spirit of, and that is that we live

2    by the highest standards of ethics and integrity

3    and we honor our commitments.

4        Q.   Okay.  And is it your impression that

5    Cyze told you after you advised him of his

6    termination that he was not going to reveal to his

7    direct reports that he was terminated?

8        A.   Yes.

9        Q.   He told you that?

10       A.   You asked me if it was my impression,

11   I thought.

12       Q.   Did he say that to you?

13       A.   I don't recall.

14       Q.   Okay.  That was your impression of

15   what his responsibility was?

16       A.   I don't -- yes, that's my impression

17   of what -- of how that meeting transpired.

18       Q.   Okay.  But he never told you what he

19     would and wouldn't do as it relates to the

20     circumstances, is that correct?

21          A.    No.  He told me that night that he

22     had not talked to anybody.

23          Q.    I guess the question is if someone is

24     terminated and they inform a direct report that

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

142

1   they've been terminated without advising them of

2   the restructuring whether or not it's legitimate

3   to presume that he's violated some kind of code of

4   confidentiality, and obviously in your mind you

5   felt it was so?

6       A.   Well, remember, we went to Jim on

7   July 20th so that Jim could talk to Stephanie.  We

8   went to Jim and told him on July 20th prior to the

9   Board so that he could prepare himself for what

10   would be obviously lots of questions the following

11   week, when it became public.

12       We went to Jim on July 20th and told

13   him that the termination wasn't effective

14   immediately but it was effective August 31st and

15   that we were asking him to participate in any

16   transition and implementation that would occur in

17   that ensuing period, and so based on the spirit of

18   why we were going to him and how we were having

19    this conversation I expected him to honor his

20    commitments and the code and the policy and live

21    up to the way he normally conducted himself.

22        Q.   But you will agree with me there is

23    nothing specific that said don't tell someone that

24    you're terminated?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

143

1           Not to be argumentative, but there

2    was no written document and no written statement,

3    no expressed verbal statement that said don't tell

4    anybody you've been terminated?

5       A.   No, I remember telling him to keep

6    this information confidential.

7       Q.   Did that include telling -- not

8    telling his wife?

9       A.   No, he could tell his wife.

10       Q.   And that was actually part of it.  So

11    it was understood on your part that when someone

12    gets terminated they're going to tell certain

13    people that they have been terminated.

14           The key here was keeping the

15    restructuring confidential, don't you agree with

16    me?

17       A.   Yes, the key would have been not

18    revealing that we were restructuring the

19    organization and what was going to transpire the

20    following week.

21        Q.    Okay.  All right.  And you're under

22    the impression in his deposition, in reading his

23    deposition, which you did before your deposition,

24    that he said that he revealed the restructuring?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

144

1        Is that your reading of his dep?

2        A.    That's my recollection.  I'd have

3    to -- it's been six months or so.  I don't know

4    how long ago I read that.

5        Q.    What else did you do in preparation

6    for your deposition besides read Mr. Cyze's dep?

7        A.    I spoke with Mr. Bowen.

8        Q.    Anything other than that?  Did you

9    look at any documents?

10       A.    Yes, we looked at documents.

11       Q.    What documents did you look at?

12       A.    We looked at -- I saw this NBI Q&A

13    document.

14       Q.    Did you see Stephanie Streeter's

15    memo?

16       A.    Which memo?

17       Q.    The handwritten one.

18       A.    No.

19          MR. BOWEN:  We have the documents the

20   witness reviewed, if you'd like to look at

21   them specifically.

22          MR. CARPONELLI:  Please.  Thank you,

23   Mike.

24              (Documents tendered.)


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

145

1      MR. CARPONELLI    Q.    Mr. Allen, do you

2   remember an incident where there was fake vomit

3   placed in front of Jim Cyze?

4      THE WITNESS    A.    It never happened

5   while I was with the company.

6      Q.    Okay.  You didn't -- you don't know

7   about that?  You never heard about it?

8      A.    I've read about it in your complaint.

9      Q.    But you never -- you didn't -- you

10   didn't participate in that?

11      A.    It never occurred when I was with the

12   company.

13      Q.    Well, you never saw it happen?

14      A.    It occurred in a budget meeting, if I

15   remember the complaint, and I went to all of the

16   budget meetings, so --

17      Q.    So you dispute that it occurred?

18      A.    While I was with the company.

19      Q.   Okay.  So you think it happened

20   before you were with the company?

21      A.   I don't know.

22      Q.   Did it happen while Stephanie

23   Streeter was with the company?

24      A.   I don't know if it happened.  I don't

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

146

1    know.

2        Q.    Okay.  What about a gold chain placed

3    around his neck --

4        A.    It never --

5        Q.    -- with a dollar sign?

6        A.    It never happened in a meeting that I

7    was in while I was with the company.

8        Q.    Did you ever make disparaging remarks

9    about his division in a budget meeting or any

10    other meetings?

11        A.    I suppose that would be defined by

12    the recipient of any remarks.  If I was

13    challenging the budget, he had a business unit

14    that had at least one plant, maybe two, that was

15    struggling to even turn a profit, so there was a

16    lot of, you know, pushback on the financial

17    numbers of certain parts of his business unit.

18        Q.    So would you ever be rude about it?

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    A.   I don't think so.

20    Q.   Okay.  Would you ever be loud about

21  it?

22    A.   No.

23    Q.   Would you ever be cynical about it?

24    A.   No.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

147

1     Q.   So as far as you can recall, you've

2  never criticized Cyze or his unit in any way that

3  would cause him to be offended?

4     A.   No.

5     Q.   And he never expressed to you that he

6  was offended by certain of the things that you

7  said or did to him?

8     A.   Never.

9     Q.   You said you became furious when you

10  heard about the situation with the disclosure of

11  his termination?

12     A.   On July 20th, yes.

13     Q.   Yes.  And when you became furious did

14  you raise your voice to anybody?

15     A.   No, I don't think so.  I remember I

16  used my cell phone to call Ron Kneezel and talking

17  to Ron, and then I had a conversation, as I said,

18  with Jim finally on the phone and spoke with

19     Stephanie.

20         I don't --

21     Q.   When you talked to Jim were you rude

22  or abusive to him at all?

23     A.   No.

24     Q.   Were you screaming at him?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

148

1      A.   No.

2      Q.   Were you raising your voice?

3      A.   No.

4      Q.   Okay.  And he denied it and you

5   didn't accept that?

6      A.   He denied it.  I passed that

7   information on to Stephanie and to Ron Kneezel,

8   and we made the decision that the information had

9   leaked somehow and that we needed to accelerate

10   our announcement of the restructuring, so that we

11   could do it the next day.

12      Q.   And how did it happen that the

13   original termination agreement was revoked?  Whose

14   decision was that?

15      A.   Ultimately it would have been

16   Stephanie's decision, I believe.  I don't think

17   Ron Kneezel would have made that decision

18   unilaterally.

19          And Stephanie may have consulted the

20   HR Committee of the Board or the Executive

21   Committee of the Board, but I'm speculating now.

22          Q.   Now, I guess I'd call it his exit

23   interview on July 20th when you met with him.  Did

24   you take any security precautions, you know, like

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

149

1    turning off his computer or limiting access on his

2    phone?

3        A.   No.

4        Q.   Okay.  Did you restrict any access to

5    clients or customers?

6        A.   No.

7        Q.   Did you restrict any access to other

8    employees, specifically mention that?

9        A.   No.

10       Q.   Did you give Cyze any instructions

11   whatsoever specifically on what he was to do after

12   you left him on the 20th?

13       A.   Other than keeping the information

14   confidential and reviewing the document and

15   then -- the documents I had given him and letting

16   me know whether or not he wanted to speak to

17   Stephanie, I gave him no specific instructions.

18       Q.   Were you monitoring his activities

19     when you discovered he was in the hallway with

20     Singer?

21          A.   No.

22          Q.   Okay.  Did you reveal to any clients

23     that Cyze was leaving?

24          A.   After the announcement, yes.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

150

1      Q.    And who was that?

2      A.    Well, I spoke with -- I don't know if

3    I spoke with any customers of the direct marketing

4    group.

5           I spoke with, I believe, a customer

6    from Watt Publications, which was a publishing

7    customer, and I would have at that time discussed

8    the fact that we restructured, that Jim had been

9    removed, Kim Williams had been removed, things of

10    that nature.

11     Q.    And when did that take place?

12     A.    That would have occurred between July

13   21st and, you know, a week or two after that.

14     Q.    Okay.  Did you talk to anybody else

15   and tell anybody else after the 21st that Cyze had

16   been terminated?

17     A.    I don't recall.

18     Q.    Did Jim Cyze talk to you prior to the

19    weekend of July 4th and ask you about rumors

20    whether the company was going private?

21         A.   No.

22         Q.   Did you have a conversation with him

23    before the weekend of July 4th?

24         A.   Yes.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

151

1      Q.    Tell me about the conversation you

2   had with Mr. Cyze prior to the long Fourth of July

3   weekend.

4      A.    I don't know how far in advance of

5   July 4th it was.  It was sometime in mid to late

6   June.

7           I remember it because I was startled

8   and surprised by the conversation.  Jim and I

9   worked in the same office complex.  He was at the

10  far end of the hall I was.

11          And so I oftentimes would, you know,

12  wander the halls, stick my head in and say hello

13  to people, and I got to Jim and I walked in and

14  probably had some niceties, and then Jim asked me

15  if there was a restructuring of the print sector

16  that was going to occur.

17     Q.    And what did you say to him?

18     A.    I said that as part of the strategic

19    plan and review process we always look at

20    different options, that there was no plan to

21    restructure the print sector at that time.

22            This was -- this was at the point

23    where Stephanie had not -- had not made the

24    decision and had said that we would discuss it

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

152

1    with the Board, but there was no action to be

2    taken.

3        Q.   Okay.  Would you agree with me then

4    at this conversation in mid to late June Cyze told

5    you that he had heard from some third person that

6    there was a restructuring plan afoot and he asked

7    if you there was any truth to it?

8        A.   He asked me about the restructuring

9    plan, whether or not it was afoot.  I don't know

10    if he said that he heard it from someplace else or

11    if he just was asking.

12         I've learned subsequently -- I called

13    Frank Rudolph the same day and I said, "Frank,

14    someone in corporate" -- because there was no one

15    else really who knew at that time, "Someone in

16    corporate has leaked, because Jim came to me about

17    this."

18         I learned within a couple of days --

19    it might have been a week, it might have been

20    two -- that the source of the leak was our V.P.

21    and corporate comptroller, a woman by the name of

22    Ginger Jones.

23          Ginger, I guess, who had been working

24    with us on it, innocently had asked Joe Wofolk,

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

153

1   who was the vice-president of finance for the

2   direct marketing group and a subordinate of Jim

3   Cyze, whether or not he had been involved in the

4   preparation of the restructuring information, the

5   review of the financial information, and Joe said

6   no, and Joe then went to Jim Cyze, and Jim Cyze

7   hit me with it unexpectedly.

8       Q.   Okay.  So is it a fair statement then

9   that when Cyze talked to you you were under the

10   impression that the restructuring was completely

11   and totally confidential and it came as a shock

12   that he knew about it?

13       A.   Yes, I was surprised that he knew

14   that something was being planned.  He didn't have

15   any of the details, but I was surprised that he

16   knew that something was being planned or was

17   being -- I should say being considered, because I

18   would argue at that time there was no

19    restructuring effort that had been approved.

20        Q.    Well, there had been a discussion in

21    May with the CMC team involving --

22        A.    Absolutely.

23        Q.    -- subject A and B.

24        A.    We had had --

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

154

1      Q.    And you said coming out of that you

2    had decided it was going to be A?

3      A.    We had had discussions going back to

4    January/February.  I had, you know, discussions as

5    part of the strategic planning process, so there

6    had been multiple conversations about

7    restructuring.

8           I had been doing work on

9    restructuring.  It's just, you know, that plan

10   hadn't been approved and I didn't have a blessing.

11     Q.    Okay.  But you -- but you came out of

12   the CMC meeting, you were pretty clear to me that

13   A was the plan and it ultimately was approved?

14     A.    A was my recommendation.

15     Q.    Right.

16     A.    And it was -- ultimately that's what

17   we implemented.

18     Q.    Okay.  And Ginger Jones is not on

19    the -- was not a part of that meeting?

20         A.   I don't know.  She might have been.

21    I don't know.  You know, I can't --

22         Q.   What about Joe Wofolk?

23         A.   No, he would not have been there.

24         Q.   Okay.  So correct me if I'm wrong.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

155

1    It was clear to you that when you talked to Cyze

2    Cyze had known something that you understood to be

3    confidential?

4        A.   I knew -- yes, Jim asked me whether

5    or not we were restructuring.  I don't know if Jim

6    told me he heard it from another source, as I said

7    earlier.

8            I assumed it had leaked because we

9    had been doing a lot of work on it.  It's possible

10   Jim could have been fishing.

11       Q.   Well, now you're assuming that --

12   well, strike that.  I thought you told me that you

13   learned that there was a leak that came from

14   Ginger Jones?

15       A.   I learned that later.

16       Q.   Okay.  So when you say he could have

17   been fishing you're not being completely accurate,

18   because you later learned that he wasn't fishing,

19   that, in fact, Ginger Jones had leaked the

20   information and he had learned it?

21        A.   I thought you were asking me about at

22   the time when I met with Jim.

23        Q.   What your mind -- state of mind was?

24        A.   Yes, yes.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

156

1    Q.   Okay.  But you don't know to whom

2   else Ginger Jones leaked the -- Ginger Jones

3   leaked the information?

4    A.   I don't.

5    Q.   Okay.  And you don't know whether Joe

6   Wofolk leaked the information to anybody else?

7    A.   I don't.

8    Q.   Okay.  And do you recall that the

9   question Cyze asked was whether or not the company

10   was going private and/or there was a

11   reorganization?

12    A.   He asked about a reorganization or a

13   restructuring.  I don't remember his phraseology.

14    Q.   He didn't say anything about going

15   private?

16    A.   No.

17    Q.   Okay.  And a -- and a reorganization,

18   would that have been a change of control?

19    A.    No.

20    Q.    Why wouldn't it have been?

21    A.    A reorganization is moving the

22  organizational box around.

23    Q.    Well, let me ask you a question.

24  Don't people use the phrase reorganization to

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

157

1 include a plan of merger on occasion?

2     A.   I don't know.  I only -- actually,

3 I've never been part of a merger prior to the R.R.

4 Donnelley acquisition --

5     Q.   Okay.

6     A.   -- of Banta.

7     Q.   Okay.  Would you agree with me that

8 Banta was reorganized as a consequence of the

9 merger that took place on January 10th?

10     A.   No, I think Banta ceased to exist.

11     Q.   Okay.  Anyway, we'll move on.  So

12 before you met with Cyze you knew that there had

13 been information leaked, so why was it that you

14 told him simply to not tell anybody if you knew it

15 was out already, the information?

16     A.   When did -- which meeting with Cyze

17 are we talking about?

18     Q.   I'm talking about the termination on

19    July 20th.  You knew then that Cyze had already

20    heard about the restructure, which actually took

21    place on July 20th.

22              Why was it that you were telling him

23    not to circulate that information if you knew the

24    information was out?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1       A.   Because it could be publicly and

2   materially relevant, and as an insider when you

3   have insider information in a publicly-traded

4   company you hold that confidential.

5       Q.   So you were telling him as an

6   insider?

7       A.   I told him as a -- as an employee of

8   Banta that was going to remain as an employee of

9   Banta until August 31st and as a direct report of

10   mine that the information was to remain -- to

11   remain confidential.

12       Q.   Even though you knew it was not

13   confidential?

14       MR. BOWEN:  I'm going to object at

15       this point.  We're talking about two

16       different times.

17   MR. CARPONELLI   Q.   Okay.  All right.

18   Well, let's rephrase it.  Did you tell -- were you

19   telling Cyze to keep what you told him

20   confidential or to keep what others had told him

21   confidential?

22       THE WITNESS   A.   I told him on July

23   20th to keep the information about the

24   restructuring, the details I had just given him,

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

159

1    including his termination, confidential.

2            I'll amend that and say I did expect

3    him to go home and talk about it with his wife.

4        Q.   Now you're saying the details of the

5    restructuring.  Previously your testimony was just

6    the termination.

7            Are you --

8        A.   No, I didn't say that.

9            MR. BOWEN:  Objection.

10       MR. CARPONELLI    Q.    I think you did,

11   but the record will speak for itself.  Is that

12   what your testimony is?

13       THE WITNESS    A.    I would correct it and

14   say the following.  When I talked to him on July

15   20th I told him -- and I thought I explained this

16   earlier -- that Mark Deterding was being demoted,

17   that Kim Williams was being let go, that we were

18   consolidating five business units into two

19    business units, and that all of that information

20    would be details about the restructuring.

21          I did not tell him his position was

22    the only position being eliminated.

23          Q.   But you told him his position was

24    being eliminated?


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

160

1  A. Yes.

2  Q. And you told him -- your recollection

3 is now that you told him not to talk about any of

4 those elements that you've just gone through?

5  A. That's correct.

6  Q. Okay.  And do you know what

7 specifically he told anybody else other than his

8 termination to Singer?

9  A. I don't recall how many details John

10 Singer had of the overall restructuring.  The

11 competitors had details about the restructuring.

12  Q. Now, let me ask you a question.  When

13 in mid-June or in late June Cyze asked you about

14 the restructuring --

15  A. Yes.

16  Q. -- did you -- did you misrepresent to

17 him that there was or there was not or did you

18 just refuse to answer?

19      A.   No.  Stephanie Streeter is pretty --

20   was and probably still is pretty clear that it

21   is -- if it's not approved and you're discussing

22   something it's not -- it hasn't been approved, so

23   there is no plan, there is no course of action

24   until she and/or the Board of Directors approved

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

161

1    it.

2          And we -- my experience at Banta and

3    my experience at Donnelley prior to that was we

4    reviewed structural change annually.

5          We talked about buying companies,

6    selling companies, closing divisions,

7    consolidating divisions, and sometimes those

8    discussions led to implementation and action and

9    other times they were tabled.

10       Q.   Okay.

11       A.   And as of the time I spoke to Jim

12   Cyze I didn't know what was going to happen.

13       Q.   So you had no reservations about

14   telling him, "You don't know what you're talking

15   about"?

16       A.   No, I had reservations, because I

17   felt -- I felt that he had asked me a direct

18   question and my answer was no, there is -- we are

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    not currently going to restructure or something to

20    that effect.

21        Q.    As you sit here today, and I see that

22    the handwritten notations that I think are

23    Stephanie Streeter's were in the documents that

24    you reviewed, do you know whether or not Stephanie

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

162

1    Streeter talked to Madison Dearborn Partners about

2    going private?

3         A.   Are you talking about the document

4    you gave me?

5         Q.   June 29th.

6         A.   I don't believe I've ever seen this

7    prior to you handing it to me.

8         Q.   It was in the documents that you

9    reviewed before your deposition.

10        A.   I don't recall ever seeing it.

11        Q.   Okay.

12        A.   If it's in those documents, we may

13    not have reviewed it.  Maybe Mike had it.

14             MR. BOWEN:  It may have been.  I

15        don't recall it being in there.

16             MR. CARPONELLI:  Okay.  It's in there

17        as a dep exhibit for somebody's deposition.

18             MR. BOWEN:  If it was a deposition

19      exhibit, then it was in there.

20          MR. CARPONELLI:  Yes.

21          MR. BOWEN:  Okay.  But it was --

22          MR. CARPONELLI:  Not specifically

23      reviewed, but that's not necessary.

24          MR. CARPONELLI    Q.    Do you remember

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

163

1    that KEESA analysis document that was dated in

2    '06?

3         THE WITNESS    A.    Yes, the one that

4    you --

5         Q.    Could that have been prepared by

6    Price, Waterhouse, Cooper?

7         A.    It could have been.

8         Q.    Were they your accountants?

9         A.    I don't know if they were our

10   corporate accountants or if they were a consultant

11   to the company.

12         I don't remember.  For some reason I

13   think that Deloitte & Touche may have been our

14   accounting firm.

15        Q.    But did Price, Waterhouse, Cooper do

16   work for Banta?

17        A.    I know that they did do work for

18   Banta, but I didn't remember actually working with

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    them.  No, they did.

20         Yes, they provided some executive

21    financial counseling services, and so I met them

22    prior to, you know, my termination in January of

23    '07.

24         Q.   Okay.  Attached to my complaint is

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

164

1    the Buck Report, and I know it's part of the

2    documents that were reviewed by you before your

3    deposition.

4            Do you know who ordered the Buck

5    Report?

6        A.   No, and I had not seen it prior to

7    Mr. Bowen.  Well, I believe it was actually

8    attached to your complaint.

9        Q.   Yes.

10       A.   And that was the first time I ever

11   saw it.

12       Q.   Yes.

13       A.   And then the second time I saw it was

14   when Mr. Bowen showed it to me.

15       Q.   Okay.  So you were not a part of

16   ordering it, reviewing it, studying it,

17   understanding it, or knowing what the purpose of

18   it was?

19      A.      No, I had never seen it until --

20      Q.      A compound question.

21      A.      No to all of the above --

22      Q.      All right.

23      A.      -- until I saw the complaint.

24      Q.      Okay.  Had Banta ever had a

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

165

1  relationship with Madison Dearborn Partners, as

2  far as you know?

3      A.   Not that I am aware of.

4      MR. CARPONELLI:  This document,

5  before I mark it I need to know what it is,

6  because it may be that this is a privileged

7  document that shouldn't be marked.

8         Mike, will you look at that?

9  Here's a copy for you.  (Indicating)

10  I don't know what this document is, so

11  that's my big question.

12       And you let me know what it is,

13  because it appears as though there's a

14  1/16/2008 confidential draft.

15      MR. BOWEN:  Yes, that's the -- that's

16  a puzzle.  This was not generated in the

17  course of this litigation.

18      MR. CARPONELLI:  Okay.

19          THE WITNESS:  It's possible that Ron

20     was the one who took these comments.

21          MR. BOWEN:  But it could have been --

22     it could have been anyone.

23          THE WITNESS:  I agree.  I don't know.

24          MR. BOWEN:  And I'm just asking.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

166

1          THE WITNESS:  Yes.

2          MR. BOWEN:  I mean, you weren't

3     specifically advising -- providing comments

4     to counsel?

5          THE WITNESS:  Not that I recall.

6          MR. BOWEN:  This is -- we have no

7     basis for believing that this is a

8     privileged document.

9          MR. CARPONELLI:  Okay.  So let's mark

10     it then.

11          MR. BOWEN:  Okay.

12          MR. CARPONELLI:  Can you mark this?

13          (Whereupon said document was

14          marked Deposition Exhibit No.

15          20 as of 1/8/09.)

16     MR. CARPONELLI    Q.   Mr. Allen, is this

17     someone's rendition of your position and comments

18     made at the CMC meeting in May?

19      THE WITNESS    A.    No.

20          Q.    No.  What do you understand this to

21      be?

22          A.    If you look at the second page, the

23      draft for immediate release, it is about a

24      September 2006 --

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    Q.   I'm sorry.  Hold on.

2                   (Pause.)

3    A.   So if you look at Page 2, this is a

4    draft of -- so if you take a look at the second

5    page, this is a draft of a corporate announcement

6    that was dated September of 2006, and based on a

7    quick review of it it looks to be the draft -- a

8    draft of what we released associated with the

9    September earnings release, and at the same time

10   we were talking about the second phase of the

11   print sector restructuring and the annual cost

12   savings associated with that.

13           We talked about signing a new

14   five-year contract with Hewlett-Packard, a special

15   one-time dividend.

16           The first page appears to be my

17   comments provided to someone -- and I don't

18   remember whom -- by telephone about the release.

19      Q.   Okay.  Got it.  And beneath it

20   attached to it is a release that talks about the

21   $16 dividend that was given out by the

22   corporation, you know, which was --

23      A.   If you go to Page 3, it talks --

24      Q.   Yes.




CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1      A.   -- about the cost improvements and

2    the print sector restructuring and how we were

3    moving on with that and getting deeper and that

4    here we're talking about saving 27 million dollars

5    in 2007 and 35 million dollars in 2008.

6           And I think earlier you'll remember I

7    told you that our July announcement was really

8    just kind of the first step of a much broader

9    restructuring.

10     Q.   Do you know what the purpose of the

11   $16 per share dividend was?

12     A.   I wasn't in meetings about that.

13   Afterwards the way it was described to me was we

14   had -- we had a very strong balance sheet, our

15   cash position exceeded our debt position, and that

16   after the Cenveo overture to us in August this was

17   a way of delivering shareholder value to the

18   market and demonstrating our strength.

19      Q.   And also making you less attractive

20   to a hostile takeover, having, you know, depleted

21   cash in that regard, would you agree?

22      A.   I don't -- I don't know enough about

23   it to know.

24      Q.   Okay.  Before I mark this I'm going

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    to ask you, is this your handwriting?

2        A.   It is.

3            MR. CARPONELLI:  Mark this, please.

4                (Whereupon said document was

5                marked Deposition Exhibit No.

6                21 as of 1/8/09.)

7        MR. CARPONELLI    Q.   Is this document

8    7/14 of '06?

9        THE WITNESS    A.   Yes.

10        Q.   And you were directing this to Mark

11    who?

12        A.   Mark Deterding.

13        Q.   Okay.

14        A.   This is a set of notes I had made to

15    myself as I was flying to Minneapolis to meet with

16    Mark Deterding.

17            Mark was the catalogue group

18    president reporting to me.  He's the gentleman I

19    earlier mentioned that he was demoted.

20          And this is more or less, if you

21    will, the outline of what I wanted to say to Mark.

22          Q.   Did you give this document to him?

23          A.   No.

24          Q.   It says To Mark D?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

170

1      A.   Yes.  This was not given to Mark.

2    This was -- I don't -- the sheet of paper says

3    that, but this is basically -- you could think of

4    it as my talking points, my script as to what I

5    was going to communicate to Mark.

6      Q.   Okay.

7      A.   I have a habit of when I have to

8    communicate, you know, bad news, is I kind of want

9    to think through how I want to say it.

10      MR. CARPONELLI:  Okay.

11      MR. BOWEN:  Steve, do you have extra

12    copies of that?

13      MR. CARPONELLI:  Did I not give you a

14    copy?

15      MR. BOWEN:  No.

16      MR. CARPONELLI:  I'm sorry.  There's

17    your copy, and this is mine.  (Indicating)

18      And what is that number?

19          MR. BOWEN:  Twenty-one.

20          MR. CARPONELLI:  Would you mark this,

21     please?

22               (Whereupon said document was

23               marked Deposition Exhibit No.

24               22 as of 1/8/09.)

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

171

1      MR. CARPONELLI   Q.   Do you recognize

2  this document?

3      THE WITNESS    A.   I do.

4      Q.   Who was it prepared by?

5      A.   I believe it was prepared by me.

6      Q.   Okay.

7      A.   I haven't read -- I'd have to go back

8  and look at the very back, but it looks like the

9  first half of it was prepared by me.

10          We talked earlier about the NBI Q&A.

11  You gave that to me earlier.

12     Q.   Yes.

13     A.   And I told you at the time I don't

14  know who actually typed up that document, but the

15  first couple of pages, 8966 through 8974, would

16  have been created by me.

17     Q.   Okay.  Will you look at D8975 through

18  8977?

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      A.   Eighty-nine seventy-five through

20   seventy-seven.  Yes, this is the same document we

21   talked about earlier.

22      Q.   Okay.  Now, this document, in light

23   of the other documents in this group exhibit, does

24   this lead you to believe that this was the final

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

172

1    questionnaire that was circulated?

2        A.    No, to me this looks like -- all of

3    this looks like a draft.  If you see the amount of

4    comments, there are some changes, there are some

5    edits throughout it.

6            You'll also notice that this talks

7    about the July 25th conference call.  The

8    conference call occurred on July 21st, not on July

9    25th.

10           And you'll see that there are other

11   areas where there are things that are kind of left

12   blank that needed to be filled out.  You know,

13   there are some question marks.

14           So this was -- I testified earlier

15   that between July 4th and July 20th I worked with

16   corporate communications and Frank Rudolph, V.P.

17   of HR, in developing a communication plan and an

18   implementation plan and that once we got beyond

19    July 12th I shared that communication strategy

20    with Bob Kreider and Dan Thornton, so that we

21    could be prepared to send material out to people,

22    hold the conference call, etc.

23            This is -- this looks like it's a

24    working document.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

173

1      Q.   All right.  Would you look at the

2  last page, 8982?

3      A.   Yes.

4      Q.   Like about the fifth line, Peter

5  called?

6      A.   Yes.

7      Q.   What is that referring to?

8      A.   This looks like it is -- I don't

9  recall writing this.  It looks like this is our

10  notes that I made at the restaurant when talking

11  to Kim Williams on the night of July 20th when she

12  called me and told me that Todd Baridelli had

13  called Andy Johnson in the Kansas City plant, that

14  Ritt Schiano had been called, that Ritt call Andy,

15  that Peter Hanson had called.

16       It's got, you know, the details.

17  They knew about Kim and Jim being eliminated.

18  They knew Mark Deterding was being demoted and

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    moving into operations.

20              Todd got blood info, blood-of-sales.

21      Q.    What does blood-of-sales mean?

22      A.    What that means to me, Todd was a

23    sales manager for Peter Hanson at Cadmus, and that

24    Todd was threatening to use this information in

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

174

1    the marketplace the following day.

2        Q.    Let me ask you a question.  What time

3    did you meet with Cyze?

4        A.    Between 4:00 and 5:30.

5        Q.    Okay.  This note says Peter called

6    three-ish to 5:00 P.M. Central time.

7        A.    Yes.

8        Q.    So would that have been -- if he

9    called at 3:00 he couldn't have got the

10   information from Cyze, because Cyze didn't get the

11   information 'til 4:00.

12        A.    Well, I don't know what approximately

13   3:00-ish means.  Five P.M. Central time -- I don't

14   know what three-ish means in this case.

15        Q.    Well, it looks like it says three-ish

16   to 5:00 P.M.  So if Peter called in at 3:00 the

17   information couldn't have come from Cyze, is that

18   correct?

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19          And these are your notes.

20      A.   That's not how I read it.  It says up

21  above that Todd Baridelli called in to Andy

22  Johnson at 5:30 Kansas City time.

23          That would be 7:00-ish, I guess, on

24  the east coast.  I don't know what the "ish" means

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

175

1   in these notes.

2       Q.   Yes, but I'm talking about the Peter

3   Hanson call.

4       A.   Right.

5       Q.   That Peter Hanson called between 3:00

6   and 5:00 Central time.

7       A.   I don't know that three-ish dash 5:00

8   P.M. is that indication.  I don't know what

9   three-ish means in this note.

10      Q.   Okay.  Would you agree with me that a

11  reasonable interpretation would have been that

12  Peter Hanson called at 3:00 o'clock talking about

13  this information, details, K and J eliminated?

14          And, of course, K and J refers to?

15      A.   No.  You want me to agree with your

16  interpretation of my document, which I've told you

17  I can't agree that that's how I would interpret

18  it.

19    Q.    Okay.  But nonetheless, it says Peter

20    called three-ish to 5:00 P.M.?

21    A.    I don't know what that three-ish

22    reference means.

23    Q.    Okay.

24    A.    I don't recall what it means.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

176

1      Q.    And blood-of-sales means what?

2      A.    As I recall, Todd Baridelli, who

3   worked for Peter Hanson, and both of which were

4   former executives at Banta, were saying, "I got

5   this information, we're using this information

6   with our customers, we're going to, you know, take

7   it into the marketplace, information is the

8   blood-of-sales," quote unquote.

9          In other words, they were going to

10   use it with our customers against us.

11     Q.    What does the last bullet point mean,

12   late last?  Late last what?

13     A.    It looks -- at 9:30 Central Standard

14   time, I believe that is when I spoke -- finally

15   spoke to Jim.

16          I called Jim and left him a

17   voicemail, I believe, at 9:05.  MVX is my

18   handwriting for voicemail.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19          And then it looks like I left him

20   another voicemail at 9:16 P.M., and then --

21          Q.   Where is -- where is that?  Where is

22   that?

23          A.   On the right-hand side.

24          Q.   Okay.  Nine oh five voicemail?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

177

1    A.   And then 9:16 P.M. I mentioned

2  earlier I called him back and I left him another

3  voicemail.

4    Q.   Okay.

5    A.   I had spoken to his daughter, and I

6  believe it was between those two calls.  I called

7  his cell phone, left him a voicemail, I called his

8  home, spoke to his daughter, and I called him

9  again and left him another voicemail, at which

10   point in time I said, "I need you to call me."

11       He called me then.

12    Q.   Okay.  Now, let's go through this.

13  You're making this note the next day?

14    A.   I don't know when I made this note.

15    Q.   Because it said late last 9:30 CS

16  time.

17    A.   That's a reasonable reading, so that

18  say maybe I was making this the next day.

19      Q.   Okay.  And it says called from Peter.

20   What does that mean?

21      A.   Called from Peter.  I don't recall.

22      Q.   Okay.

23      A.   I was --

24      Q.   Do you see where you say "don't say

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

178

1  anything"?

2       A.   Yes.

3       Q.   Is that you're telling Cyze don't say

4  anything at 9:30 at night?

5       A.   I don't -- I don't -- I don't know.

6  If this -- I think your -- I think your point is

7  a -- is a good one, that it says -- late last 9:30

8  Central Standard time would imply to me that I was

9  writing this the next day.

10           I may have been on the phone with Ron

11   Kneezel or Stephanie Streeter while creating it,

12   and that, you know, I told him, Jim, as I -- as I

13   remember the conversation with Jim, when I finally

14   got Jim on the phone I told him about the calls

15   from Peter and Todd Baridelli into our

16   organization and that I told him not to say

17   anything, I don't want him going out with this

18   information, and that we are still going forward

19    with the Tuesday announcement.

20        Q.    Okay.

21        A.    Now, we made the decision that we

22    were going out with the announcement that Friday.

23        Q.    Okay.  So you told him on Wednesday,

24    the 20th?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

179

1      A.   No, that was a Thursday.

2      Q.   Thursday.  So these notes could have

3   been made on Friday?

4      A.   They could have been made Thursday

5   night or they could have been made Friday, Friday

6   morning.

7      Q.   Before the --

8      A.   Friday morning.

9      Q.   Okay.

10      A.    I don't recall what time on Friday we

11   went public with it.

12      Q.    Does your -- does your last notation

13   on the left say Tuesday announcement?

14      A.   Yes.

15      Q.   Okay.

16      A.   Tuesday was probably the day after

17   the Board meeting when we came -- we were coming

18   out with it.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19      Q.    Okay.  And it says don't say

20   anything.  Could that have been your advising Cyze

21   not to say anything?

22      A.    Yes.  These notes could have been the

23   result of a conversation I had with, you know, Ron

24   Kneezel first thing in the morning on Friday.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

180

1      Q.   Okay.

2      A.   So I could have said, "Okay, Ron, you

3   know, now what are we going to do?"  I got in the

4   office and was going through, and these could have

5   been my extemporaneous notes based on a

6   conversation I was having with Ron.

7      Q.   Okay.  Although we know here that you

8   made a voicemail message at 9:05 and another one

9   at 9:16?

10     A.   And the reason I remember those

11   numbers are precise is because I remember looking

12   at my cell phone.

13     Q.   Okay.

14     A.   At the -- at the dialed call number.

15     Q.   What is that exhibit number?

16     A.   Twenty-two.

17        MR. CARPONELLI:  Twenty-two.  Thank

18        you.  Last exhibit.  Will you mark this one

19    as 23?

20              (Whereupon said document

21                was marked as requested.)

22      MR. CARPONELLI    Q.    Is this a draft of

23    the announcement regarding the print sector

24    reorganization?

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

181

1        THE WITNESS    A.    This appears to be a

2    draft of the organizational announcement, and it

3    was a letter that was going to go out from

4    Stephanie Streeter and from me.

5        Q.    Okay.  Did it ever go out?

6        A.    I don't recall specifically.  I

7    believe this went out, but I don't recall.

8        Q.    The note up on top, is that your

9    handwriting?

10       A.    Yes, that's my handwriting.

11       Q.    And are you trying to decide who is

12    going to be the recipient?

13       A.    Yes.  Somebody would have sent this

14    to me most likely via e-mail, and this was an

15    attachment announced internally.

16            And that little chicken scratch in

17    the first paragraph and the circle at the bottom

18    around the -- adding the S, that's my handwriting.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19          It looks like I was preparing for a

20   conference call with somebody and say, okay, who

21   exactly is going to receive this, who are the

22   recipients, so that I could make sure that I was

23   reading it with the proper lens.

24          Q.   You were not asked to make an

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

182

1    overture to Mark Engelson at any time?

2        A.   No.

3        Q.   Did Engelson -- do you know whether

4    Engelson approached Banta or someone from Banta

5    approached Engelson?

6        A.   I don't remember.  The only way I

7    would have known that is through reading the

8    merger agreement.

9            It's probably detailed there.

10       Q.   Okay.  Stephanie didn't share that

11    with you?

12       A.   Not that I recall.

13           MR. CARPONELLI:  Okay.  I have no

14       further questions.

15           MR. BOWEN:  I have a few questions

16       for you.

17               CROSS-EXAMINATION

18               BY MR. BOWEN

19      Q.   Where did Peter Hanson work in July

20   of 2006, if you know?

21      A.   Peter Hanson worked for Cadmus

22   Communications.  I believe he was either a

23   president or an EVP by title running their

24   publishing services sector, which was the vast

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

183

1    majority of their printing business.

2        Q.   Where is Cadmus Communications, or in

3    July of 2006 where was the Cadmus Communications

4    facility where his office was located?

5        A.   Well, I don't know where his office

6    was located.  Their corporate headquarters was in

7    Richmond, Virginia, as I recall.

8        Q.   Okay.  You mentioned that you had --

9    that your title at Banta was president of the

10    print sector, is that correct?

11       A.   Yes.

12       Q.   Did you also have the title of

13    executive vice-president at the corporate level?

14       A.   I don't believe I carried the

15    executive vice-president title at Banta.

16       Q.   Okay.  You testified in some detail

17    about your prior experience before Banta.  In the

18    course of your career that you described, how many

19    restructurings have you been involved in?

20        A.    In the nineteen to twenty years that

21    I have been in management I have either led or

22    participated in a restructuring of the business

23    unit I was involved in probably about every three

24    years, so that would be about seven or eight

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

184

1  times.

2        They've been small ones.  I've

3  testified about in 2004 we formed the literature

4  management group.

5        I would call that a restructuring.

6  We were taking people and assets away from the

7  book group.

8        They've been as large as a three

9  hundred million dollar capital appropriation when

10   I was at Donnelley that consolidated ten printing

11   plants into eight and took five printing business

12   units and consolidated them down into two

13   management structures, so they kind of ranged.

14        Q.    And can you give us a -- in terms of

15   the number of people involved sort of the range

16   that would be covered by the scale of these

17   various restructurings that you were involved in?

18        A.    The largest would have been at R.R.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19   Donnelley.  And I'm not sure.  Are you asking how

20   many people were involved in the organizations or

21   who were impacted?

22        Q.   I'd say let's start with who were

23   impacted, who lost their jobs or had other

24   deleterious impacts.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

185

1      A.   I think the largest one would have

2   been back in about 1996, when we closed two plants

3   and consolidated five business units.

4           That was at probably 1,000 to 1,500

5   employees.

6      Q.   And which, if any, of these

7   restructurings prior to the one in 2006 at Banta

8   was followed by a merger or acquisition of the

9   company that you -- that had been restructured?

10      A.   None.

11      Q.   Let's focus on your for a moment --

12   before we get to that, you were asked in some

13   detail about whether you made disparaging comments

14   about direct marketing.

15           To what extent, if at all, were

16   capital investment requests on the table or

17   pending at Banta during the year 2006?

18      A.   I went -- take a step back in the

19    process.  We would budget capital appropriations,

20    and then if they exceeded a certain amount or if

21    they had been not anticipated in the original

22    budget we would go to our Board of Directors and

23    seek approval for all projects.

24            I went to our Board of Directors

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

186

1    multiple times in 2006 for large projects as well

2    as unbudgeted projects.

3        Q.    And to what extent, if at all, did

4    the capital projects in support of which you went

5    to the Board in 2006 include capital projects for

6    direct marketing?

7        A.    We went to the Board at least once --

8    I actually think it was twice -- requesting

9    capital.

10            I believe the first one was budgeted

11    and the second one was not.  The direct marketing

12    group was a business that we were investing in.

13       Q.    And were you -- when you went to the

14    Board were you supporting these capital

15    investments in direct marketing, opposing them, or

16    simply referring them without taking a position?

17       A.    I was recommending them.  I would --

18    I would work with the business unit presidents and

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19   their staffs to put together the projects.  I

20   would then approve them.

21        Then Stephanie would have to approve

22   them, and then I would take them to the Board and

23   I would present them on behalf of the business

24   units, and then the Board would have to approve

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

187

1    them if they were unbudgeted or in excess of a

2    certain capital dollar amount.

3        Q.   And do you recall what the

4    approximate dollar level of the capital

5    investments in direct marketing that you were

6    supporting before the Board during the year 2006

7    was?

8        A.   It would have been several millions

9    of dollars.  I would say less than ten million

10    dollars.

11            Between five and ten million dollars

12    is what I recall.

13        Q.   Okay.  Let me focus -- go ahead.

14        A.   That's prior to the July Board

15    meeting as part of the restructuring.  And as we

16    moved forward there were other capital

17    appropriations that we anticipated.

18            When I'm talking about five to ten

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    million dollars worth of capital, that would have

20    been the first six months of the year.

21        Q.   Okay.  Let me just try to nail down

22    your perceptions about where things were as the

23    restructuring proposal was working its way through

24    Banta in the first half of 2006.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

188

1          To what extent, if at all, were you

2     aware of any feeler or overture from any other

3     company about acquisition of Banta?

4          A.   I wasn't aware of anything until

5     August 10th or 11th, when I learned of the public

6     letter that Cenveo distributed, about any

7     overtures toward Donnelley -- toward Banta.

8          Q.   Prior to learning about that letter

9     from Cenveo did you have any feeling about the

10    plausibility of the idea that Cenveo might go

11    after Banta?

12         A.   Prior to learning of that letter I

13    never considered the possibility of someone trying

14    to acquire Banta.

15         Q.   Well, let's focus specifically on

16    Cenveo.  Are there any specific reasons why you

17    viewed Cenveo as not a plausible suitor?

18         A.   Well, as I've testified earlier, one

19    of the key cornerstones or the key colors of our

20    corporate strategy was to be involved in

21    evaluating acquisitions to see if we could add

22    acquisitions that met our strategic hurdles and

23    were consistent with our strategic direction, so

24    we were constantly looking at and evaluating other

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1  targets from our own perspective.

2        Cenveo was never considered a target

3  by us for a couple of reasons and by -- I'll

4  specifically say by me.

5        Much of Cenveo's business -- there

6  was very little overlap between Cenveo's business

7  and Banta's business.

8        Much of Cenveo's business was in the

9  production of paper envelopes for direct mail, and

10  we didn't do any of that, and we didn't even mail

11  those kinds of envelopes.

12        The other part of their business was

13  small regional commercial printing businesses, and

14  to the extent that we had those in Banta they were

15  all what I call subscale plants and they were on

16  the list for either being fixed or shut down or

17  sold, so the idea of merging and acquiring a

18  company that had more of those problems would have

19    been an issue.

20           And then, lastly, Cenveo wasn't a

21    particularly strong company financially.

22           Q.   Okay.  And how about R.R. Donnelley?

23    Did you have any views in the first half of 2006,

24    through July, about whether R.R. Donnelley might

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

190

1    make a run at Banta?

2        A.    Obviously you know my background.  I

3    knew R.R. Donnelley extremely well.  I didn't

4    consider R.R. Donnelley to be interested in Banta.

5            But one of the things that was

6    occurring at that time, as I recall it -- and I --

7    and I'd have to -- I'd have to do some research to

8    confirm this, but there was -- there was -- there

9    were news reports in the media about R.R.

10   Donnelley considering taking themselves private,

11   and so I would never have thought about them

12   trying to buy us.

13           Mark Engelson, who I didn't know at

14   the time, but I would listen to his conference

15   calls as a competitor and as a former employee, he

16   would often talk about how printing is the cash

17   cow and we're going to take the money out of the

18   printing business and we're going to redeploy it

19    into this business process outsourcing.

20            And the acquisitions they were making

21    at that time were in India and in Europe and they

22    weren't really in printing, so I never would have

23    considered R.R. Donnelley to be interested in

24    Banta.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

191

1      Q.   What was your reaction in August when

2   you got word about Cenveo's letter offering to

3   purchase Banta?

4      A.   I was floored.  I was on the phone --

5   this is after the restructuring had occurred and

6   Jim and Kim weren't, you know, working.  And I was

7   on the phone with Bob Kreider and Dan Thornton.

8           It was an early morning call, 7:00 or

9   7:30 in the morning as we were talking, and Dan

10   Thornton's BlackBerry buzzed, and he had just

11   received a Google alert, if you know what I mean,

12   and he said, "Oh, my gosh," or something to that

13   effect, and he read to Bob Kreider and I the

14   public letter from Bob Burton to Stephanie

15   Streeter about being interested in acquiring the

16   company.

17           That in and of itself is a pretty

18   dramatic event, but in addition to that I remember

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19    being shocked because Stephanie was on vacation,

20    and I thought how are we going to respond to this

21    when Stephanie's, you know, hiking in the

22    mountains and we can't even get her on the cell

23    phone.

24        Q.    Now, the reorganization plan, the

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

192

1   restructuring plan that you were involved in

2   developing at Banta, if I understand the testimony

3   you gave in response to Mr. Carponelli's questions

4   correctly, that went through a number of stages in

5   the evolutionary process?

6       A.   Yes.

7       Q.   At any stage or to what extent, if at

8   all, at any stage in that process was your own

9   position at Banta in question as part of a

10   possible restructuring?

11       A.   At the earliest stages.  When I first

12   took the concept -- and this is before anything

13   was put down on paper.

14           When I first took the concept to the

15   meeting with Stephanie Streeter and Sara that

16   occurred in Stephanie's office in January/February

17   of 2006 I talked about restructuring the business

18   unit, and we talked about different ways of doing

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19   it.

20        My recommendation at that time was to

21   consolidate much like what we ultimately ended up

22   with, but I also included in there a

23   recommendation that my job as sector president be

24   eliminated.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

193

1        It was my feeling that if I had five

2    people reporting directly to me and we were going

3    to go down to two Stephanie could add on -- could

4    handle one additional direct report.

5        In other words, she would have the

6    two presidents that reported in the print sector

7    reporting to her, which was a net one additional

8    person.

9        She didn't like that recommendation

10   but wouldn't take it off the table.  So when --

11   and she tasked me to meet with Frank Rudolph to

12   develop a -- to put more meat on the proposal, and

13   I did that.

14        I met with Frank, and sometime in --

15   you know, over March, April, May we put together

16   the detail and presented kind of a recommendation

17   to Stephanie about how the organization would be

18   structured, and at that time I put on the table

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19     that my position should be eliminated and that

20     Frank disagreed with me.

21             Stephanie ultimately made the

22     decision not to eliminate my position and told me

23     to continue to work with Frank on the policy and

24     the transition details that would be required if

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

194

1   we were going to go forward with the

2   implementation.

3        Q.   Now, recognizing that you tried to be

4   as objective as possible, even with your own

5   interests at stake, if you had had any notion that

6   an acquisition of Banta or a change in control of

7   Banta might be in the offing in the near future,

8   to what extent, if at all, would that have given

9   you any reservations about recommending that your

10   own position be eliminated before that happened?

11        A.   If I understand your question, if

12   I -- if I knew that the possibility of Banta going

13   through a change of control was in the offing I

14   would like to think I would have proposed it

15   anyway, but I'm not sure, because I was subject to

16   the change of control agreement, and so by

17   recommending eliminating my own job prior to any

18   change of control I would have eliminated my

19    rights to the change of control agreement.

20            MR. BOWEN:  That's all the questions

21    I have.  Thank you very much.

22            REDIRECT EXAMINATION

23            BY MR. CARPONELLI

24    Q.    Correct me if I'm wrong, Mr. Allen.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

195

1   You knew there was a rollback provision in the

2   change of control as it relates to the effective

3   date, didn't you?

4       A.   I don't understand.  What's a

5   rollback provision?

6       Q.   A rollback provision where we talked

7   about the effective date, where even if you're

8   terminated after the acquisition or before the

9   acquisition as a consequence of it it gets rolled

10   back to the effective date.

11       A.   I'm aware of that now.  I think I

12   said earlier that I had read the document when I

13   signed it in January of 2004.  The next time I

14   read the KEESA agreement was in August of 2006.

15       So during the time that we're

16   discussing, which is from, I assume, January of

17   '04 through July of '06, it was not common

18   knowledge to me of the rollback provision.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt (389 of 416) [4/30/2009 5:17:32 PM]

19      Q.    It was not common knowledge?

20      A.    I wouldn't have remembered it.

21      Q.    But you understand that there was a

22   rollback provision?

23      A.    I do now, yes.

24      Q.    And had you been terminated even

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

196

1  before a takeover, if it was otherwise arising in

2  connection with or as a consequence and

3  anticipation of, you would have been -- received

4  your KEESA benefits?

5     A.  I now know that if I had -- if

6  Stephanie had accepted my recommendation and had

7  eliminated my job as part of the restructuring and

8  she had known about a merger possibility and it

9  happened within, I think it's 180 days --

10    Q.  Right.

11    A.  -- that the clause you and I

12  referenced a few minutes ago may have applied.  It

13  would have probably applied.

14       But at the time that I was doing all

15  the work on the strat plan that was not --

16    Q.  You didn't know about that?

17    A.  I had access to the information and

18  I've read the -- I had read the KEESA when I

19    joined the company in January of '04, but it was

20    kept at home in files, and I didn't ever read it

21    again until after the Cenveo overture.

22        Q.    Okay.

23        A.    I promise you I read it after that.

24        Q.    All right.  We talked about Exhibit

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

197

1   No. 15, the presentation to the Banta Board by

2   Goldman Sachs dated July 27, '04.

3        A.   Yes.  I have it right here.

4        Q.   And I know you answered Mr. Bowen's

5   questions, but would you agree with me if you look

6   at Perspective on Banta at Page 11 that the --

7   strike that.

8             Let's look at a different page.

9   Would you agree with me that Exhibit No. 15 has at

10   Page 25 potential Banta merger partners listed,

11   R.R. Donnelley and Cenveo?

12        A.   I see both companies' names on that

13   page that you're referring to.

14        Q.   Okay.  So at least Goldman Sachs and

15   at least the members of the Board of Directors of

16   Banta who received this report, whoever they may

17   have been -- I understand it was not you -- were

18   advised by Goldman Sachs that a potential merger

19    partner included Donnelley and Cenveo?

20        A.    And the other names on this page.

21        Q.    Exactly.

22        A.    They were told that.

23        Q.    Okay.  And correct me if I'm wrong.

24    When did you do -- attempt the acquisition of


CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

198

1    Cadmus?

2        A.    That would have been in, I believe,

3    2005, I believe.

4        Q.    Okay.  Will you look at Page 18?

5        A.    Okay.

6        Q.    Would you agree with me that the

7    Goldman Sachs document has listed in it a Section

8    3 called Acquisition of Cadmus?

9        A.    Yes.

10       Q.    So someone at Goldman Sachs who was

11   an anti-takeover consultant to Banta and/or

12   someone at Goldman Sachs -- at Banta was aware

13   that there was a potential for an acquisition of

14   Cadmus which you attempted and it didn't come to

15   fruition, and someone knew that there were

16   potential merger partners, including Cenveo and

17   R.R. Donnelley, as early as 2004?

18       A.    My understanding is that we actually

19    approached Cadmus prior to my getting involved in,

20    I think it was 2005, so we had had earlier

21    conversations with Cadmus, and then we had them

22    again when I was involved.

23          As far as would I agree that Goldman

24    Sachs presented to our Board of Directors,

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1    assuming this document was presented -- and I

2    wasn't there, but the way this looks, this

3    document was presented by Goldman Sachs to our

4    Board of Directors, and they were making the pitch

5    that there were potential sale opportunities out

6    there.

7         Q.   And, in fact, we know that Cenveo did

8    attempt a hostile takeover, which was

9    unsuccessful, and that there was a white knight

10    acquisition by R.R. Donnelley which closed on

11    January 10th of '07, is that correct?

12        A.   Yes.

13        Q.   And there was an attempt to acquire

14    Cadmus which was unsuccessful?

15        A.   Yes, along with a few other potential

16    acquisitions.

17            MR. CARPONELLI:  Okay.  No further

18            questions.

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19          RECROSS-EXAMINATION

20          BY MR. BOWEN

21      Q.   Let's go back to Page 25, the one

22   that's headed Potential Banta Merger Partners.  Do

23   you see what I'm referring to, Mr. Allen?

24      A.   I'm seeing the slide, yes.

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

200

1      Q.   Okay.  And a merger partner --

2   actually, tell me if I'm right.  Can a merger

3   partner be someone only -- would a merger partner

4   be limited to companies buying Banta, or could it

5   also include companies that Banta was buying?

6      A.   Well, a merger doesn't connote which

7   direction that purchase or transaction is

8   occurring, so I'd have to read the rest of the

9   document or hear the voice-over to understand if

10   this was either way, but just this slide that

11   you're showing me right now could imply that we

12   could -- we could acquire them and merge them into

13   our organization.

14      Q.   Okay.  As, in fact, you did try to

15   acquire Cadmus?

16      A.   Yes.

17      Q.   And the only company listed on this

18   chart of potential Banta merger partners that is

19    smaller than Cadmus is Cenveo, am I correct, in

20    terms of its -- of the diluted equity market

21    capitalization?

22        A.   At that time, according to this

23    chart, that's correct.

24        Q.   Okay.  And Cenveo at that time -- why

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

201

1   don't you -- why don't you just tell us, what does

2   the chart show about the diluted equity market

3   capitalization of Banta as compared to Cenveo at

4   the time this chart was prepared?

5        A.   Banta's market cap, according to the

6   time this chart was prepared, which was July 9th

7   of 2004, was one billion one hundred two million

8   dollars.

9             Cenveo's market cap at that same time

10   was a hundred and thirty-seven million dollars, so

11   we were maybe eight times larger from a market cap

12   perspective.

13        Q.   Okay.  And does -- the quantification

14   there that Banta was eight times or so larger than

15   Cenveo, is that, in your own judgment, consistent

16   or inconsistent with your perception that you've

17   testified to that Cenveo was not a likely

18   candidate to come after Banta?

19      A.    It's very consistent.

20      Q.    Explain why, please.

21      A.    Cenveo was not a particularly -- they

22  were larger in revenue than this chart might

23  represent.

24          It's just that they were a poorly-run

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

202

1    organization that did not have very strong

2    earnings, and if I remember correctly, they also

3    didn't have a very strong balance sheet, and

4    consequently the stock market's market

5    capitalization of it was such that it was 137

6    million dollars.

7            They were much more financially

8    strapped than we were, and they were not

9    performing well.

10            And you could say that about many of

11   the companies, you know, kind of to the right of

12   us, and I would also say some of these companies

13   weren't in our space.

14            We wouldn't -- I wouldn't have

15   advised any kind of a merger with a Bount, for

16   example.  They are a financial printing company.

17            We don't -- we didn't do financial

18   printing.  So that's why I believe this document,

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

19     as I said earlier, I think it's a sales pitch.

20         MR. BOWEN:  Okay.  That's all I have

21     for you.

22             REDIRECT EXAMINATION (Resumed)

23             BY MR. CARPONELLI

24     Q.    Okay.  Correct me if I'm wrong.  Will

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

203

1    you look at Page 22?

2         A.   I assume of the Goldman Sachs

3    document?

4         Q.   Yes.

5         A.   Sale of Company?

6         Q.   Yes.  We're not talking about

7    anything other than Goldman Sachs saying here that

8    we're selling Banta to these potentials.

9              And it says on every page at the

10   bottom header Sale of Company, Sale of Company.

11   So when we're talking about a merger partner we're

12   talking about the sale of Banta.

13             We're not talking about the purchase

14   of anybody, are we?

15        A.   It says Sale of Company on all these

16   pages.

17        Q.   Okay.  All right.  And correct me if

18   I'm wrong.  You have certainly seen in your

19    experience of 30 years in business where a smaller

20    market cap company has acquired a larger market

21    cap company in your past experience, is that

22    correct?

23        A.   Yes.

24        Q.   Okay.  And in particular when you

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

204

1   talk about -- for instance, on this Page 25 we see

2   that R.R. Donnelley has a seven billion dollar

3   market cap, Cenveo has only a hundred and

4   thirty-seven million, and then we look at

5   Quebecor/World, they have 2.8 billion, and they're

6   today in bankruptcy, isn't that correct?

7       A.   That's correct.

8       Q.   And Cenveo is not?

9       A.   That's correct.

10      MR. CARPONELLI:  Okay.  No further

11      questions.

12      MR. BOWEN:  Nothing further.  We will

13      read and sign.

14              (Witness excused.)

15

16

17

18

19

20

21

22

23

24

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

205

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2
    JAMES M. CYZE,                    )
3                    Plaintiff,   )
                                  )
4          -vs-              ) No. 07-L-003638
                                  )
5    R.R. DONNELLEY & SONS COMPANY,   )
    et al,                    )
6                    Defendants.   )
    _____)
7
                    I, MICHAEL BRENNAN ALLEN, being
8    first duly sworn, on oath say that I am the deponent in
    the aforesaid deposition taken on January 8, 2009, and
9    that I have read the foregoing transcript of my
    deposition, consisting of Pages 3 through 204
10    inclusive, taken at the aforesaid time and place, and
    that the foregoing is a true and correct transcript of
11    my testimony so given.

12

13

14
                    _____
15

16

17
    SUBSCRIBED AND SWORN TO
18    before me this _____ day
    of _____, A.D. 2009.

19

20

21

22    _____
      Notary Public

23

24

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

1  STATE OF ILLINOIS  )
              ) SS:
2  COUNTY OF C O O K  )

3

4            I, JUDY A. LANDAUER, CSR, a

5  Certified Shorthand Reporter and Notary Public within

6  and for the County of Cook and State of Illinois, do

7  hereby certify that heretofore, to-wit, on the 8th day

8  of January, A.D. 2009, personally appeared before me at

9  Suite 2800, 321 North Clark Street, in the City of

10  Chicago, County of Cook, and State of Illinois, MICHAEL

11  BRENNAN ALLEN, a witness called by the plaintiff in a

12  certain cause now pending and undetermined in the

13  United States District Court for the Northern District

14  of Illinois, wherein JAMES M. CYZE is the plaintiff and

15  R.R. DONNELLEY & SONS COMPANY, STEPHANIE A. STREETER,

16  and MICHAEL B. ALLEN are the defendants.

17            I further certify that the said

18  witness, MICHAEL BRENNAN ALLEN, was by me first duly

19    sworn to testify the truth, the whole truth, and

20    nothing but the truth in the cause aforesaid; that the

21    testimony then given by him was by me reduced to

22    writing by means of machine shorthand in the presence

23    of said witness and afterwards transcribed upon a

24    computer, and the foregoing is a true and correct

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

file:///C|/DOCUME~1/BRIANM~1.OZO/LOCALS~1/Temp/allen.txt

207

1    transcript of the testimony so given by him as

2    aforesaid.

3            I further certify that after said

4    testimony had been so transcribed it was made available

5    to the witness for examination.

6            I further certify that the taking of

7    this deposition was pursuant to notice and that

8    there were present at the taking of the deposition

9    counsel as hereinbefore set forth.

10           I further certify that I am not

11    counsel for nor in any way related to any of the

12    parties to this suit, nor am I in any way interested in

13    the outcome thereof.

14           In testimony whereof I have hereunto

15    set my hand and affixed my notarial seal this 20th day

16    of January, A.D. 2009.

17

18

19

_____

20             JUDY A. LANDAUER, CSR
          CSR License No. 084-000153
21          Notary Public, Cook County, IL

22

23

24

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007

CENTRAL REPORTERS ASSOCIATED
29 East Madison Street * Suite 1826
Chicago, Illinois 60602
(312) 630-2007

January 20, 2009


Mr. Michael A. Bowen
Foley & Lardner, LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-5306

RE: Caption: Cyze vs. R.R. Donnelley
    Deposition of: Michael Brennan Allen
    Date of Deposition: 1/8/09
    Transcript Length: 207 pages

Dear Mr. Bowen:

It is our understanding that you will arrange for the
review of the above-entitled transcript by the witness.
Accordingly, we are enclosing errata sheets and the
original signature page with your copy of the
deposition transcript.

Please note that the Rules of the United States
District Courts provide that depositions may be used as
fully as if signed if they remain unsigned for more
than 30 days after having been made available to the
deponents. We, therefore, would appreciate your
handling this matter within the 30-day limit.

Please return the executed signature page and errata
sheets, if any, to the above address. We will then
distribute them to all counsel.

Very truly yours,

CENTRAL REPORTERS ASSOCIATED

cc: Mr. Stephen P. Carponelli

CENTRAL REPORTERS ASSOCIATED, LTD.  (312) 630-2007