IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES M. CYZE, | ) |
| Plaintiff | ) |
| | ) No. 07 C 2357 |
| v. | ) |
| | ) The Honorable William J. Hibbler |
| BANTA CORPORATION | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

James Cyze worked for Banta Corporation for seven years before the company terminated his employment. After his termination, Cyze sought payment under a golden parachute agreement between the parties, but Banta refused to pay. Cyze sued, and both parties move for summary judgment.

### I. Factual Background

In August 1999, Banta hired Cyze to serve as the president of the Direct Marketing Group, one of its five printing groups. (Def. 56.1(a) Statement (Def. St.) ¶ 12). After Cyze managed the Direct Marketing Group for nearly two years, Banta offered him a substantial benefit, in the form of a Key Executive Employment and Severance Agreement (KEESA). (Def. St. ¶ 13). Cyze understood that the KEESA was a typical "golden parachute" agreement designed to encourage him to stay with Banta in the face of rumors of possible takeovers or similar threats to his position. (Def. St. ¶ 15). Among other things the KEESA provided that Banta would pay Cyze severance benefits if it terminated him up to 180 days prior to a change in control of the company so long as the

1

termination "arose in connection with or in anticipation of" that change in control. (Def. St. ¶ 16; Cyze Dep., Ex. 2 (Agreement) § 8 & Agreement Ex. A ¶¶ e,g,h,i).

In 2003 or 2004, Cyze and Dan Thornton, the president of the Literature Management Group, another of Banta's printing groups, urged the company to merge the Literature Management Group into the Direct Marketing Group. (Def. St. ¶ 21; Cyze Dep. at 110-112). Banta did not act upon Cyze and Thornton's suggestions at that time. Later in 2004, Banta hired Goldman Sachs to provide anti-raid advice. (Pl. 56.1(b)(3)(B) St. Add'l Facts (Pl. Add'l Facts) ¶ 9). Among other things, Goldman Sachs advised Banta about fending off unsolicited activity and about the potential sale or merger of the company. (Pl. Add'l Facts ¶ 10). In 2005, Banta had conversations with the CEO of Cadmus Corporation, a printing company that Goldman Sachs had identified as a potential acquisition target. (Pl. Add'l Facts ¶¶ 12-13). Banta did not, however, acquire Cadmus.

At some point in 2006, executives in Banta worried that it would not meet its second quarter earnings goals. (Cyze Dep. at 131-32; Jones Dep. 22-23). Around the same time, Cyze again suggested to Allen that Banta could cut its overhead costs if it consolidated several of its print groups. (Def. St. ¶ 23). This time, Banta agreed with Cyze and had decided (with or without Cyze's input) to restructure its print divisions. Sara Armbruster, Banta's vice-president of business development began working on a plan to restructure the company in advance of the release of the second quarter earnings report. (Def. St. ¶ 24). Ginger Jones, Banta's corporate controller, calculated the impact to Banta's bottom line if it terminated two of its printing group presidents, Cyze and Kim Williams, including the savings reaped from avoiding KEESA payments. (Jones Dep. at 63-64). By May 2006, Armbruster had a proposal in place that would consolidate Banta's five print groups into two print groups. (Def. St. ¶ 25). In addition, Banta's CEO, Stephanie

Streeter, consulted with John Canning of Madison Dearborn Partners, about the advantages and disadvantages of repurchasing the shares of Banta's outstanding stock. (Pl. Add'l St. ¶ 14).

As the worries of the disappointing quarter spread, Banta gave its management team a "Question and Answer Script" to address employees' concerns with internal consistency. (Jones Dep. at 46-49). Among the possible questions for which the script provided an answer, was the question "Are we at risk of a takeover?" (Jones Dep. at 46). The script directed the manager to respond: "As a public company, our shareholders make the decision every day as to whether or not they want to remain owners of our company's stock. Likewise, at any time anyone interested in our stock can take a position in it. As for someone taking a large enough stake to wrestle control of our company, remember that the best takeover defense is a high stock price, and our staying focused on what we control, namely our four strategic cornerstones, is what will keep the price high." (Jones Dep. at 46-47).

On July 20, 2006, Michael Allen, the president of Banta's print sector, informed Cyze of Banta's restructuring plans. (Def. St. ¶¶ 32-34). Allen told Cyze that his dismissal was due to Banta's decision to restructure its print sector and not due to Cyze's performance. (Def. St. ¶ 36). Allen provided Cyze with a severance and non-compete agreement that would keep Cyze on the payroll through August 31 and then provide continued base salary for fifteen months. (Def. St. ¶ 37). Cyze did not sign the agreement, and Banta withdrew it several days later because it believed Cyze had leaked information about its restructuring to a former employee. (Def. St. ¶¶ 40-42). Banta then offered Cyze a second severance agreement with less beneficial terms. (Def. St. ¶¶ 44-45). Cyze did not sign the second agreement.

3

On August 2, 2006, thirteen days after Banta announced its restructuring and two days after the end of Banta's second quarter, Cenveo, Inc., another printing company, launched an attempt to acquire Banta. (Def. St. ¶¶ 50-51). Executives at Banta were caught off guard by Cenveo's bid. (Def. St. ¶¶ 78-80). Despite Cenveo's hostile intentions, Banta refused to discuss a merger or acquisition with Cenveo. (Def. St. ¶¶ 53-59). In fact, Banta's board of directors authorized a special cash divided of $16 per share in order to stave off Cenveo's hostile takeover attempt. (Def. St. ¶ 76). Banta also hired UBS Global Investments to provide anti-takeover advice. (Pl. Add'l Facts ¶ 30).

A month later, R.R. Donnelley, yet another printing company, approached Banta to inquire about a non-hostile acquisition of Banta. (Def. St. ¶¶ 60-61). By the end of October 2006, Banta and R.R. Donnelley entered into a merger agreement, which was completed in January 2007. (Def. St. ¶¶ 65-66).

## II. Standard of Review

Summary judgment is proper only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When a court reviews cross-motions for summary judgment, it applies this standard to both motions; in other words, it must view all facts and draw all reasonable inferences in a light most favorable to the party against whom the motion is made. *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. # 506*, 545 F.3d 555, 559 (7th Cir.2008). The court cannot make credibility determinations or weigh conflicting evidence at this

4

stage. *See Anderson,* 477 U.S. at 249, 255, 106 S.Ct. at 2511, 2513. At the same time, the favor toward the nonmoving party does not require a court to draw "inferences that are supported by only speculation or conjecture." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir.2008).

Typically, matters of contract interpretation, including those contracts that are part of an employee benefit plan within the meaning of ERISA, are particularly suited to resolution on summary judgment. *Bechtold v. Physicians Health Plan of N. Ind., Inc.,* 19 F.3d 322, 325 (7th Cir.1994). Frequently, as here, the parties do not genuinely dispute the underlying facts, but instead dispute the interpretation of a clause or term in the contract. If the clause or term is not ambiguous, then there are no genuine issues of material fact because the interpretation of an unambiguous contract is a question of law for the court. *Id.* Merely because the parties dispute the meaning of a term does not make it ambiguous. Instead, a term is ambiguous only if it is subject to reasonable alternative interpretations. *Id.*

### III. Analysis

The KEESA between Cyze and Banta obligated Banta to pay Cyze substantial severance benefits if certain conditions were met. At issue here is whether Banta dismissed Cyze "in connection with or in anticipation of" a change in control of the corporation. Neither party presents any substantial argument discussing the ambiguity (or lack thereof) of the clause at issue. Instead, both parties focus their arguments upon reasons why the facts demonstrate that Banta did or did not terminate Cyze "in connection with" or "in anticipation of" a change in control. Such a focus skips a step; the Court must first determine whether these phrases are susceptible to reasonable alternative interpretations before it applies the facts to an interpretation of the KEESA.

The primary objective of contract construction is to give effect to the parties' intent. To do so, a court looks to the plain meaning of the words used in the contract. *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 993 (7th Cir. 2007); *Trade Center v. Dominick's Finer Foods*, 304 Ill. App. 3d 931, 711 N.E.2d 333, 335 (1999). Although a court should give words their ordinary and accepted meaning, a court must also view the words in the context of the contract as a whole. *Camico Mut. Ins. Co.*, 474 F.3d at 993. In the end, a court should avoid absurd results, and favor a commonsense reading over a strained, literal one. *Foxfield Realty Co. v. Kubala*, 287 Ill App. 3d 519, 678 N.E.2d 1060, 1063 (1997); *see also BKCAP, LLC v. Captec Franchise Trust 2000-1*, 572 F.3d 353, 360 (7th Cir. 2009) (collecting cases).

Webster's defines "anticipation" in several ways, none of which favor Cyze's interpretation. First, Webster's defines anticipation as "intuitive preconception or apriori knowledge." The next definition is "a prior action that takes into account, deals with, or prevents the action of another." Finally, it offers "occurrence before the normal or expected time; the act of looking forward." Webster's Third New International Dictionary Unabridged 94 (1986). The connotation implicit in each of these definitions requires a knowledge of a certain future event and not mere speculation about a possible event. To act in anticipation of something requires an awareness of a future event and a preparation for it.

Cyze first suggests that Banta terminated him as part of a "larger plan" begun in 2004 to effect a change in control of the company. In short, Cyze argues that when Banta hired Goldman Sachs to provide it with anti-raid advice it took the first step in anticipation of a change in control. According to Cyze, Banta continued with its "anticipation of" the change in control when

6

restructured in advance of *anticipated* poor second quarter earnings in order to avoid the expected hostile takeover bid that would ensue.

Cyze's suggestion implies that the phrase "in anticipation of" can reasonably be construed to include any and all action taken in advance of a hypothetical possibility of a change in control, no matter how slight or attenuated from that possibility the action may have been. Such an interpretation, however, strains the meaning of the word "anticipation" far past its everyday limits and is not a reasonable interpretation of the KEESA.

The mere fact that Banta hired Goldman Sachs to provide it anti-raid advice (in 2004) does not mean that Banta foresaw a change in control that was anything more than speculative. Banta hired Goldman Sachs more than two years prior to the point where it terminated Cyze and subsequently became the object of Cenveo's hostile takeover bid. A publicly traded company may be subject to a hostile at any time, and the fact that Banta's corporate officers prepared themselves for such a possibility does not demonstrate that the company anticipated a change in control. Moreover, the advice that Goldman Sachs provided was geared towards *preventing* another company from acquiring Banta against its will. In other words, Goldman Sachs advised Banta on what it should do to *avoid* a change in control.

Cyze next speculates that Banta engaged in a convoluted, Machiavellian plan to balance its stock price upon the precise point where Banta could stave off any hostile takeover but where it could solicit bids for a friendly takeover. Cyze again points to the two-years old anti-raid advice provided by Goldman Sachs as the first phase of this plan. According to Cyze, the fulcrum of this precarious balancing act was Banta's decision to restructure in advance of potential poor second quarter earnings. Cyze hypothesizes that the restructuring was a sham, and instead was part of this

7

unspoken plan to invite R.R. Donnelley, or some other printing company, to acquire Banta after Banta had swindled Cyze (and no one else) out of his KEESA benefit. In other words, Cyze suggests that Banta knew that it would be acquired and knew that the company acquiring it would provide a more lucrative offer if Banta trimmed the fat ahead of time by eliminating potential KEESA payments. Thus, Cyze concludes, his termination arose "in connection with" a change in control. Cyze's argument is not convincing.

Cyze's hypothesis regarding what he terms a "larger plan" rests upon nothing other than empty speculation. Nothing in the undisputed facts demonstrates that Banta had any conversation with R.R. Donnelley or Cenveo prior to its decision to restructure, and Cyze's speculation that Banta's restructuring was a sham to "pretty itself up" for sale is nothing more than unsupported conspiracy theory, which the Court will not countenance. Further, Cyze's speculation that Banta would "pretty itself up" for a change in control is precisely the kind of speculation about an abstract possibility that falls outside of the definition of an "anticipation." Nor does such speculation even remotely suggest that his termination had a "connection" with a change in control.

Cyze's logic strains the bounds of common sense. He is correct that Banta anticipated that it might have poor second quarter numbers. Cyze is also correct that a company that underperforms *might* be ripe for a hostile takeover bid. But it does not logically follow from these two propositions that every action a company takes in response to poor earnings therefore anticipates or arises in connection with a change-in-control. A company that underperforms must correct its course, and increasing a company's profitability by reducing its payroll obligations is one way to correct the course. Indeed, Cyze himself had suggested both in 2004 and in 2006 shortly before his termination that the company should reduce its payroll and administrative costs by combining its print divisions.

8

When faced with poor earnings numbers, Banta did what any reasonable company would do: it looked for ways to cut costs and boost earnings. The mere temporal proximity of a subsequent change in control to Banta's efforts to respond to poor second quarter earnings does not provide a causal nexus between the two actions.

In a last ditch effort to save his claim, Cyze claims that Banta wrongfully withdrew the July 26 severance agreement, and that, had it not, his termination would have arisen in connection with or in anticipation of a change in control. Cyze's argument is without merit. First, Cyze himself admits that he discussed the severance agreement with a former Banta executive who worked for a rival company, and therefore it is not disputed that Banta had reason to withdraw the agreement. Even were this not the case, Cyze's argument still lacks merit. That is because Cyze never signed the agreement, and therefore the parties never had a meeting of the minds. Cyze reasons that he can enforce the agreement against Banta regardless because Banta signed the agreement, making it an irrevocable option contract that Banta could not withdraw during the option period. Cyze cites generic law supporting his argument, but neglects to consider that an option contract requires the promisee (Cyze) to give consideration for the option, which he did not do. *DiLorenzo v. Valve & Primer Co.*, 347 Ill. App. 3d 394, 807 N.E.2d 673, 679 (2004).

Moreover, the entire argument is little more than a red herring. Cyze's argument rests on the fact that the severance agreement would have kept him on Banta's payroll through August 31, substantially after Cenveo launched its takeover attempt and after discussions with R.R. Donnelley had commenced (or so Cyze speculates). Cyze reasons, therefore, that his termination "would have clearly been in anticipation of a change in control." Why? Cyze's premise that Banta's discussions with R.R. Donnelley must have begun prior to August 31 is utterly without factual support. More

importantly, the fact that Cyze remained on the payroll through August 31 is not related to Banta's decision to terminated him. Banta *decided* to terminate him by eliminating his position on July 20. Nothing about his continued employment at Banta for an additional month would amend the decision-making process or connect his termination with an ensuing change in control.

The Court holds that the parties intended the phrase "in connection with or in anticipation of" a change in control to protect executives who might be dismissed by the acquired company in advance of the acquisition in order to secure a benefit for the acquiring company (namely, reduction in the cost of acquisition). The phrase therefore requires that Banta executives know of an impending, rather than speculative, change in control and take action in advance of that change.

The undisputed facts demonstrate that Banta terminated Cyze on July 20, several days prior to an unexpected hostile takeover attempt and several months prior to the negotiations that led to the sale of Banta to R.R. Donnelley. Nothing in the record suggests that Banta communicated with R.R. Donnelley as it developed its restructuring plan. Nothing in the record suggests that Banta executives anticipated that R.R. Donnelley would soon acquire it. Cyze nonetheless argues that Banta did anticipate some change in control. Cyze pins much of his argument on the fact that Banta executives anticipated some hostile takeover attempt, though not necessarily one by Cenveo. As noted earlier, it is not sufficient to demonstrate some speculative anticipation about a hypothetical change in control.

Moreover, even if Banta executives did anticipate an impending hostile takeover attempt, they acted to prevent it. Cyze himself admits that Banta restructured its printing groups to prop up its stock price as an effort to *avoid* a change in control. Indeed, when Cenveo made its proposal to acquire Banta, Banta's board of directors's *fought* the effort by refusing to negotiate with Cenveo

and by authorizing a special $16 dividend for shareholders. The mere fact that Banta executives anticipated poor second quarter earnings and hoped to forestall any raid upon its stock by cutting its costs does not connect its decision to restructure with a subsequent change in control.

Consequently, the Court GRANTS Banta's motion for summary judgment and DENIES in part Cyze's motion for partial summary judgment.

A final matter requires resolution. The KEESA requires Banta to pay Cyze's attorney's fees and costs in any legal or arbitral dispute over whether Banta owes Cyze benefits under the KEESA, so long as Cyze did not act in bad faith. As with the merits of the case, neither party makes an effort to set forth the legal standard or to disambiguate the contractual term "bad faith." Generally, the term "bad faith" implies that a plaintiff did something more than pursue a meritless claim. *See, e.g., Krautsack v. Anderson*, 223 Ill.2d 541, 560-66, 861 N.E.2d 633, 647-51 (Ill. 2006) (discussing requirement of bad faith in the context of consumer fraud litigation); *Lee v. Clinton*, 209 F.3d 1025 (discussing bad faith in the context of *in forma pauperis* appeal); *Adkins v. Briggs & Stratton Corp.*, 159 F.3d 306 (7th Cir. 1998) (discussing bad faith in the context of ADA litigation). A plaintiff who sues for the sake of suing, bringing vexatious or harassing litigation, or who pursues litigation to coerce a settlement, or who pursues a claim that no reasonable person could suppose to have any merit acts in bad faith. *Krautsack*, 223 Ill.2d 541 at 563-64 (plaintiff with "uncommon," but not "unheard of" legal theory did not act in bad faith); *Lee*, 209 F.3d at 1026 (person acts in bad faith when acting with a subjective belief that the pursued litigation is frivolous); *Adkins*, 159 F.3d at 307 (equating bad faith with pursuit of frivolous or unreasonable claim).

Banta argues that Cyze acted in bad faith for two reasons. First, Banta argues that Cyze did not believe in the merits of his own claim because he told persons not related to the litigation that

he did not know why Banta fired him. But both of the conversations to which Banta points occurred in the context of Cyze's search for employment. It is hardly surprising that Cyze may have put a different spin on his termination when looking for a job. Moreover, Cyze's declarations are not necessarily inconsistent with his legal theory. Cyze's declarations may have been a politically expedient way of stating that he did not know why Banta chose to restructure in pursuit of a change in control. Second, Banta suggests that Cyze "lied" to the Court. Banta's claim is, at best, a gross exaggeration, and merits no discussion whatsoever.

The Court finds that although Cyze pursued a legal position that ultimately lacked merit, he did not do so in bad faith. Cyze pursued an arguable legal claim. First, the proximity of the change in control to the termination is sufficient in and of itself to raise the suspicion in a reasonable person that Banta terminated him in anticipation of a change in control. Second, Cyze presented a colorable argument regarding involving the interpretation of the language of the KEESA. The Court GRANTS in part Cyze's Motion for Summary Judgment and holds that Banta must pay reasonable attorneys fees and costs pursuant to Paragraph 16 of the KEESA.

IT IS SO ORDERED.

9/8/09
Dated

Hon. William J. Hibbler
United States District Court